# EXHIBIT 1-A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

CERTAIN UNDERWRITERS AT LLOYD'S LONDON –
SYNDICATE 1861, SUBSCRIBING TO POLICY NO.
ANV122398A; CRUM & FORSTER SPECIALTY
INSURANCE COMPANY; and STARSTONE
SPECIALTY INSURANCE COMPANY,

                       Plaintiffs,

 

-against-

TIMOTHY DAILEADER and
AARON KIBBEY,

                       Defendants.

-------------------------------------------------------------------X

Index. No.
Date Filed: February 1, 2022

Plaintiffs designate New York County as the place of trial

Venue is appropriate under CPLR § 503 because at least one of the Defendants resides in New York County

**TO THE ABOVE NAMED DEFENDANTS:**

      **YOU ARE HEREBY SUMMONED** and required to serve upon the plaintiffs' attorneys, an answer to the annexed complaint, which is herewith served upon you with all relevant pleadings in the action, within twenty (20) days after the service thereof, exclusive of the day of service, or within thirty (30) days after service is complete if service is made by any method other than personal delivery to you within the State of New York.

      In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:      February 1, 2022
              New York, New York

Respectfully submitted,

/s/ Rafael Rivera

Rafael Rivera, Esq.
Stephanie A. Nashban, Esq.
Gary L. Gassman, Esq.
COZEN O'CONNOR
*Attorneys for Plaintiffs*
Certain Underwriters at Lloyd's – Syndicate 1861,
Subscribing to Policy No. ANV122398A and
StarStone Specialty Insurance Company
3 WTC
175 Greenwich Street
55th Floor
New York, New York 10007
Telephone: (212) 509-9400
Emails:      rafaelrivera@cozen.com
             snashban@cozen.com
             ggassman@cozen.com


/s/ Scott A. Schechter

Scott A. Schechter, Esq.
Joshua DiLena, Esq.
KAUFMAN BORGEEST & RYAN LLP
*Attorneys for Plaintiff*
Crum & Forster Specialty Insurance Company
200 Summit Lake Drive
Valhalla, New York 10595
Telephone: (914) 449-1055
Emails:      sschechter@kbrlaw.com
             jdilena@kbrlaw.com



TO:    TIMOTHY DAILEADER
       257 Central Park W, Apt. 7A
       New York, NY 10024

       AARON KIBBEY
       Huron Consulting Group,
       1166 Avenue of the Americas, 3rd Floor
       New York, NY 10036

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 4 of 381

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X

CERTAIN UNDERWRITERS AT LLOYD'S LONDON –
SYNDICATE 1861, SUBSCRIBING TO POLICY NO.
ANV122398A; CRUM & FORSTER SPECIALTY
INSURANCE COMPANY; and STARSTONE
SPECIALTY INSURANCE COMPANY,

Index. No.

                                Plaintiffs,

            -against-

Date Filed: February 1, 2022

TIMOTHY DAILEADER and
AARON KIBBEY,

                                Defendants.
------------------------------------------------------------------------X

## COMPLAINT FOR DECLARATORY JUDGMENT

Certain Underwriters at Lloyd's London – Syndicate 1861, Subscribing to Policy No. ANV122398A ("Syndicate 1861"), Crum & Forster Specialty Insurance Company ("Crum & Forster"), and StarStone Specialty Insurance Company ("StarStone") by and through their counsel, and for their Complaint for Declaratory Judgment against the defendants Timothy Daileader ("Daileader") and Aaron Kibbey ("Kibbey"), alleges as follows:

### NATURE OF THE ACTION

1.      Syndicate 1861, Crum & Forster, and StarStone each seek a declaration that they do not owe a duty to defend or an obligation to indemnify defendants Daileader and Kibbey under certain excess policies issued by Syndicate 1861, Crum & Forster, and StarStone (collectively, "Excess Insurers") to Oaktree LLC as the Named Insured, in connection with claims alleged against Daileader and Kibbey by John K. Fort, the Chapter 7 Trustee of the bankruptcy estate of Oaktree LLC and other related entities ("Trustee").

Case 1:22-cv-02038  Document 1-1  Filed 03/11/22  Page 5 of 381

## PARTIES

2.      Syndicate 1861 is an insurance syndicate organized and existing under the laws of England, with its principal place of business in London, England.

3.      Crum & Forster is an insurance company organized under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey.

4.      StarStone is an insurance company organized and existing under the laws of the State of Delaware with its principal place of business in Jersey City, New Jersey.

5.      Daileader is an individual who is a resident of the State of New York.

6.      Kibbey is an individual who is a resident of the State of New Jersey.

## JURISDICTION AND VENUE

7.      The court has original subject matter jurisdiction over this matter pursuant to CPLR §§ 503 and 3001 as the Excess Insurers seek a declaration of their respective rights, status and other legal relations under a contract or other writing, whether or not there has been any breach.

8.      The court has personal jurisdiction over the Defendants because Daileader is a resident of New York and Kibbey is employed by Huron Consulting Group and works out of its New York office.

9.      Venue is properly laid in this court pursuant to CPLR § 503 because at least one of the Defendants resides in New York County.

## THE POLICIES

A.      **The Syndicate 1861 Excess Policy**

10.     Syndicate 1861 issued Excess Professional Liability Insurance Policy, number ANV122398A, to Oaktree LLC as the Named Insured for the period August 22, 2018 to January 9, 2020 ("Syndicate 1861 Excess Policy") with limits of liability of $1,000,000 in excess of $1,000,000. A copy of the Syndicate 1861 Excess Policy is attached as Exhibit A.

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 6 of 381

11.     The Syndicate 1861 Excess Policy contains the following Insuring Agreement:

I.      **INSURING AGREEMENT**

In consideration of the premium and in reliance upon all statements made in the Application for this Policy and the **Followed Policy**, including information furnished in connection therewith, whether directly or through public filings, the **Insurer** agrees to provide insurance coverage to the **Insureds** in accordance with the terms, definitions, warranties, conditions, exclusions and limitations of the **Followed Policy** and to the extent coverage is further limited or restricted thereby, of any other **Underlying Policy**, except as otherwise provided herein.

12.     The term **"Followed Policy"** is defined in the Syndicate 1861 Excess Policy to mean "the policy designated as such in Schedule A of this Policy."

13.     Schedule A of the Syndicate 1861 Excess Policy designates the **Followed Policy** to be Landmark American Insurance Company Private Company Management Liability Policy, number LHP6777660 ("Landmark Primary Policy").

**B.      The Crum & Forster Excess Policy**

14.     Crum & Forster issued Excess Liability Policy, number EPP-100004, to Oaktree LLC as the Policyholder for the period of August 22, 2018 to January 9, 2020 ("Crum & Forster Excess Policy") with limits of liability of $1,000,000 excess of $2,000,000. A copy of the Crum & Forster Excess Policy is attached as Exhibit B.

15.     The Crum & Forster Excess Policy contains the following Insuring Agreement, in pertinent part:

I.      INSURING AGREEMENT

This Policy shall provide coverage in accordance with the same terms, conditions and limitations of the **Followed Policy**, as modified and subject to the terms, conditions and limitations of this Policy.

*       *       *

16.     The Crum & Forster Excess Policy defines "**Followed Policy**" to mean the Landmark Primary Policy.

LEGAL\56134461\1 20781.0001.000/521631.000

Case 1:22-cv-02038  Document 1-1  Filed 03/11/22  Page 7 of 381

## C.     The StarStone Excess Policy

17.     StarStone issued Management and Professional Liability Follow Form Excess Insurance Policy, number H70164180ASP, to Oaktree LLC as the **Named Insured** for the period December 11, 2018 to January 9, 2020 ("StarStone Excess Policy") with limits of liability of $5,000,000 in excess of $5,000,000. A copy of the StarStone Excess Policy is attached as Exhibit C.

18.     The StarStone Excess Policy contains the following Insuring Agreement:

> I.     INSURING AGREEMENT
>
> The Insurer shall provide excess coverage for **Claims** first made during the **Policy Period** or, if applicable, the extended reporting period. This Policy, except as stated herein, is subject to all of the terms, conditions, representations, limitations and restrictions contained in the **Followed Policy** as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive **Underlying Policy**.

19.     The StarStone Excess Policy defines "**Followed Policy**" to mean "the policy specified in Item 5 of the Declarations."

20.     The Policy specified in Item 5 of the Declarations to the StarStone Excess Policy is the Landmark Primary Policy.

## E.     The Landmark Primary Policy

21.     The Landmark Primary Policy is also issued to Oaktree PC as the Named Insured for the period July 9, 2018 to January 9, 2020, with a Directors and Officers Limit of Liability of $1,000,000. A copy of the Landmark Primary Policy is attached as Exhibit D.

22.     The Directors and Officers Liability Coverage Section of the Landmark Primary Policy ("D&O Section") is subject to a Retention of $150,000 for **Claims** arising under Insuring Agreements B or C, and $0 for **Claims** arising under Insuring Agreement A.

23.     The Landmark Primary Policy contains the following Insuring Agreements:

A.    With the **Insured Person**, that if a **Claim** for **Wrongful Act** is first made against **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all such **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss**.

B.    With the **Insured Organization**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

C.    With the **Insured Organization**, that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

24.    The D&O Section sets forth the following relevant definitions:

A.    **Claim**, either in the singular or the plural, means:

    1.    A written demand for monetary or non-monetary relief…

C.    **Insured** means any **Insured Organization** and/or any **Insured Person**.

D.    **Insured Person** means:

    1.    Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**…

F.    **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

    1.    Any amount for which the **Insureds** are not financially liable or which there is not legal recourse to the **Insureds**;

    2.    Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

25. The Landmark Primary Policy contains a Bankruptcy/Insolvency Exclusion, which provides as follows:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any **Wrongful Act** that is alleged to have caused, directly or indirectly, in whole or in part:

a.     The bankruptcy or insolvency of the **Insured Organization**;

b.     The **Insured Organization's** filing of a petition, or a petition being filed against the **Insured Organization** pursuant to the federal Bankruptcy Code or any similar state law;

c.     The **Insured Organization** assigning its assets for the benefit of its creditors; or

d.     By any other means seeking protection under the common or statutory law as a result of insolvency or financial impairment.

2.     Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the **Insured Organization** having sustained a financial loss due to a **Wrongful Act** by or on behalf of any **Insured Person** that actually or allegedly occurred before the date that the **Insured Organization** or other party sought protection of the **Insured Organizations** assets by any means including but not limited to those referenced in sections 1. a. through 1. d. of this endorsement.

3.     Brought or maintained by or on behalf of any creditor or debt-holder of the **Insured Organization**, or any **Claim** arising out of any actual or alleged **Wrongful Act**, where such **Wrongful Act** actually or allegedly results in the **Insured Organization's** failure, refusal or inability to pay debts or amounts due and owing, including but not limited to **Claims** alleging misrepresentation in connection with any extension of credit or in connection with the purchase or sale of a debt instrument, or **Claims** alleging any **Wrongful Acts** where such **Wrongful Acts** actually or allegedly result in the deterioration in the value of any debt instrument or security as a result of, wholly or in part the bankruptcy or insolvency of the **Insured Organization**.

The specific limitations on coverage contained in this endorsement should not under any circumstances be interpreted to suggest the existence of coverage under terms and conditions elsewhere in this policy or in contexts other than those referenced in this endorsement.

## **BACKGROUND FACTS**

### A.    **The Trustee Demand Letter**

26.     On April 2, 2021, Willis Towers Watson, broker for Oaktree, reported to Oaktree's insurers, including Syndicate 1861, Crum & Forster, and StarStone, copies of a letter dated April 1, 2021 ("Trustee Demand Letter") sent by counsel for the Trustee for the

Bankruptcy Estate of Oaktree LLC and related entities, Labsource, LLC ("Labsource") and Oaktree Medical Centre, PC ("Oaktree PC"), (collectively, "Estates") to counsel for Daileader and counsel for Huron Consulting Services, LLC ("HCS"). A copy of the April 2, 2021 email and the Trustee Demand Letter are attached collectively as Exhibit E.

27.    The Trustee Demand Letter states that based on the Trustee's investigation thus far, the Trustee has determined that HCS and Daileader are jointly and severally liable to the Estates for their failure to comply with South Carolina law by breaching their fiduciary duties while engaged as officers and directors of Oaktree PC and its related entities.

28.    The Trustee Demand Letter states that before filing for bankruptcy protection, Oaktree was a pain management practice privately owned by Dr. Daniel McCollum ("McCollum") and which operated numerous facilities in South Carolina, North Carolina, and Tennessee, including an independent resource lab, Labsource.

29.    The Trustee alleges that in July 2018, due to Oaktree PC's violation of a covenant in an investment agreement between certain lenders ("Lenders") and Oaktree LLC dated May 6, 2014, the Lenders enacted their power under a stock pledge and, as a result: gave all corporate authority and control of the Debtors to Daileader; appointed Daileader as an Independent Director/Manager of Oaktree PC and Labsource; and terminated all rights of the Debtors' sole shareholder and member, McCollum. The Trustee also alleges that Oaktree PC elected Daileader as its sole director and transferred all authority to the Board effective July 12, 2018, and on that same date, Labsource also elected to be managed by Daileader and transferred all corporate authority from McCollum to Daileader. Oaktree PC retained Daileader as its sole manager effective June 20, 2019.

30.     In and around late July 2018, the Trustee contends that Daileader required McCollum and the Debtors to retain Huron and the law firm of McGuire Woods to assist with corporate restructuring and refinancing the Loan and that between July 18, 2018 and September 19, 2019, when the Debtors filed for Chapter 7 bankruptcy protection, both Daileader and Huron engaged in various instances of wrongdoing, which, under their watch caused the assets of Oaktree to fall from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019, with total liabilities increasing from approximately $27 million to approximately $39 million during the same period.

31.     Specifically, the wrongdoing alleged by the Trustee includes: (a) causing Oaktree to have to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and not being able to make the next two payments due to the expenditures incurred by Daileader and Huron; (b) placing the collection of Daileader and Huron's fees ahead of the Debtors' interests by threatening to go "pencils" down with respect to preparing a financial projection and business plan if their professional fees were not paid; (c) Daileader's inability to analyze how clear and present internal and external threats would affect Oaktree and by extension their creditors, especially after the United States Department of Justice raided certain of Oaktree's clinics, because their main desire was to get paid; and (d) Daileader and Huron's failure to file for Chapter 11 or do a workout.

32.     Additionally, the letter alleges that on or about November 9, 2018, Daileader "placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of [Oaktree PC]." Essentially, the Trustee alleges that Kibbey was inexperienced, should have resolved the company's cash flow issues early on, and should have concluded early in his tenure at Oaktree

that there was no other reasonable workout for the company outside of filing for Chapter 11 bankruptcy protection.

33.     In his letter, the Trustee threatens to file an Adversary Complaint against Daileader and HCS in which he plans to allege causes of action including breach of fiduciary duty, negligence, negligent misrepresentation, gross negligence, unfair trade practices, fraud, breach of contract, breach of contract accompanied by fraudulent act, unjust enrichment, conversion, civil conspiracy, and claims under 11 U.S.C. §§ 547 and 548. The Trustee contends that the damages are "massive" and believes that had Oaktree been restructured properly, the entirety of the initial $32 million worth of debt could have been eliminated. The Trustee also states that he may seek punitive or treble damages.

**B.     The Draft Complaint**

34.     On June 16, 2021, Willis Towers Watson emailed to Oaktree LLC's insurers, including Syndicate 1861, Crum & Forster, and StarStone, a copy of a draft adversary proceeding complaint captioned *John K. Fort, Trustee v. Aaron Kibbey, et al.* ("Draft Complaint"). A copy of the June 16, 2021 email and the Draft Complaint are attached hereto collectively as Exhibit F.

35.     The Draft Complaint names Kibbey, Daileader and HCS as defendants.

36.     The allegations in the Draft Complaint set forth analogous allegations to those set forth in the Trustee Demand Letter, and the Draft Complaint sets forth the following causes of action: breach of fiduciary duty against all defendants; aiding and abetting breach of fiduciary duty against HCS; negligence/gross negligence against all defendants; violation of the South Carolina Unfair Trade Practices Act against all defendants; unjust enrichment as to Daileader and Huron; Bankruptcy Code Section 548(a)(1)(A) (actual fraud); Bankruptcy Code Section

548(a)(1)(B) (constructive fraud); Bankruptcy Code Section 547 (preferences); and Bankruptcy Code Section 550 (recovery of avoided transfers).

37.     The Draft Complaint seeks the following relief: actual, general, compensatory, incidental, and consequential damages; exemplary and/or punitive damages; treble damages for defendants' violation of the South Carolina Unfair Trade Practices Act; judgment for plaintiff and ordering recovery of the value of the property transferred to defendants pursuant to Bankruptcy Code Section 550; pre- and post-judgment interest; and costs of suit.

**C.     The Original Adversary Proceeding Complaints**

38.     On or about September 17, 2021, the Trustee filed three analogous adversary proceeding complaints captioned *John K. Fort, Trustee v. Aaron Kibbey, et al.*, filed in the United States Bankruptcy Court for the District of South Carolina in the Chapter 7 Bankruptcy Proceedings for Oaktree LLC, Oaktree PC, and Labsource, LLC (collectively, "Complaints"). Copies of the Complaints are collectively attached hereto as Exhibit G.

39.     The Complaints name the following defendants: Kibbey, an employee of HCS, sued both in his individual capacity, as well as in his capacity as the Chief Restructuring Officer of Oaktree PC; Daileader, in his individual capacity, as well as in his capacity as an Independent Director of Oaktree PC; HCS; Mark Freedlander ("Freedlander"), an attorney with the law firm of McGuireWoods, LLC ("McGuireWoods"); David Pivnick, an attorney with McGuireWoods; and McGuireWoods.

40.     The Complaints set forth analogous allegations to those set forth in the Trustee Letter and the Draft Complaint, while adding Freedlander, McGuireWoods, and Pivnick as defendants and allegations against those defendants.

41.     Specifically, the Complaints allege that the adversary proceedings arise out of Defendants' engagements as third-party officers, restructuring consultants, and professionals for each of the Debtors, and that during these defendants' tenure, they succeeded "only in paying themselves and substantially increasing the [Debtors'] unsecured debt, for which they are liable." In sum, the complaints contend that the defendants were hired to "fix a healthcare conglomerate that was failing to pay its debt on a credit facility secured by, among other things, the lender's ability to place turnaround professionals into critical management positions." However, "over the course of approximately one year…the Defendants made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a corporate restructuring." Nonetheless, while "the Debtors' assets were quickly depleted and the liabilities grew," the Defendants were still able to collect professional fees totaling nearly $5 million.

42.     Indeed, the Complaints state that "on Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019" and that "[t]otal liabilities increased from approximately $27 million to approximately $39 million during the same period." The complaints contend that "[o]nce there were no more funds to pay those fees, and with no concern for the unsecured creditors to whom the Defendants owed a fiduciary duty, they filed the herein Chapter 7 Petitions."

D.     **The Amended Adversary Proceeding Complaints**

43.     On or about December 7, 2021, Trustee filed three analogous amended adversary proceeding complaints in the United States Bankruptcy Court for the District of South Carolina in the Chapter 7 Bankruptcy Proceedings for Oaktree LLC, Oaktree PC, and Labsource, LLC (collectively, "Amended Complaints"). Copies of the Amended Complaints are attached collectively hereto as Exhibit H.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 16 of 381

44.     The allegations against Kibbey and Daileader in the Amended Complaints are nearly identical, save for the Amended Complaints dropping the allegation of violation of the South Carolina Unfair Trade Practices Act against all defendants, and adding a breach of contract claim against all defendants.

**E.     The Declination Letters**

45.     On August 2, 2021, Syndicate 1861 issued letters denying coverage for Daileader and Kibbey under the Syndicate 1861 Excess Policy for the Trustee Demand Letter and Draft Complaint by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy to which the Syndicate 1861 Excess Policy follows form. Copies of these letters are attached collectively as Exhibit I.

46.     On August 3, 2021, Crum & Forster issued letters denying coverage for Daileader and Kibbey under the Crum & Forster Excess Policy for the Trustee Demand Letter and the Draft Complaint by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy to which the Crum & Forster Excess Policy follows form. Copies of these letters are attached collectively as Exhibit J.

47.     On August 24, 2021, StarStone issued letters denying coverage for Daileader and Kibbey under the StarStone Excess Policy for the Trustee Demand Letter and Draft Complaint by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy to which the StarStone Excess Policy follows form. Copies of these letters are attached collectively as Exhibit K.

48.     On October 27, 2021 and November 12, 2021, respectively, Syndicate 1861 issued letters denying coverage for Daileader and Kibbey under the Syndicate 1861 Excess Policy for the Complaints by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark

Primary Policy to which the Syndicate 1861 Excess Policy follows form. Copies of these letters are attached collectively as Exhibit L.

49.     On November 5, 2021 and November 12, 2021, respectively, StarStone issued letters denying coverage for Daileader and Kibbey under the StarStone Excess Policy for the Complaints by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy to which the StarStone Excess Policy follows form. Copies of these letters are attached collectively as Exhibit M.

50.     On November 3, 2021, Crum & Forster issued a letter denying coverage for Daileader under the Crum & Forster Excess Policy for the Complaints by virtue of the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy to which the Crum & Forster Excess Policy follows form. A copy of this letter is attached as Exhibit N.

## COUNT I – DECLARATORY JUDGMENT
### (No Duty to Defend or Indemnify – Bankruptcy/Insolvency Exclusion)

51.     Syndicate 1861, Crum & Forster, and StarStone reallege each of the allegations of Paragraphs 1 through 50 as though fully set forth herein.

52.     The Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy, to which the Syndicate 1861 Excess Policy, the Crum & Forster Excess Policy, and the StarStone Excess Policy follow form and incorporate, expressly provides in relevant part, that coverage is precluded for any **Claim** made against any **Insured**: (1) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any **Wrongful Act** that is alleged to have caused, directly or indirectly, in whole or in part, the bankruptcy or insolvency of the **Insured Organization** or the **Insured Organization's** filing of a petition pursuant to the federal Bankruptcy Code; (2) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the **Insured Organization**

having sustained a financial loss due to a **Wrongful Act** by or on behalf of any **Insured Person** that actually or allegedly occurred before the date the **Insured Organization** or other party sought protection of the **Insured Organization's** assets by any means; or (3) brought or maintained by or on behalf of any creditor or debt-holder of the **Insured Organization**, or any **Claim** arising out of any actual or alleged **Wrongful Act** where such **Wrongful Act** actually or allegedly results in the **Insured Organization's** failure, refusal or inability to pay debts or amounts due and owing.

53.     As set forth in detail in the Trustee Demand Letter, the Draft Complaint, and the Complaints, the Trustee plainly alleges **Wrongful Acts** against Daileader and Kibbey, both **Insured Persons**, that the Trustee contends resulted in financial losses to Oaktree LLC, Oaktree PC, and Labsource, Oaktree's inabilities to pay debts, and ultimately caused the aforementioned entities to have to file for Chapter 7 bankruptcy protection.

54.     Coverage for the matters alleged in the Trustee Demand Letter, the Draft Complaint, and the Complaints is therefore precluded under the Syndicate 1861 Excess Policy, the Crum & Forster Excess Policy, and the StarStone Excess Policy in their entirety by virtue of the Bankruptcy/Insolvency Exclusion.

### COUNT II – DECLARATORY JUDGMENT
### (No Duty to Defend or Indemnify – Underwriting Negotiations & Agreement)

55.     Syndicate 1861, Crum & Forster, and StarStone reallege each of the allegations of Paragraphs 1 through 54 as though fully set forth herein.

56.     Given the financial status of Oaktree LLC at the time the Syndicate 1861 Excess Policy, the Crum & Forster Excess Policy, and the StarStone Excess Policy were being underwritten, Syndicate 1861, Crum & Forster, and StarStone each agreed to write Oaktree

LLC's distressed risk only if a bankruptcy exclusion, like the Bankruptcy/Insolvency Exclusion in the Landmark Primary Policy, was made part of their respective policies.

57.     Oaktree LLC, a sophisticated business entity, and its broker acting as Oaktree LLC's agent, both agreed to the inclusion of the Bankruptcy/Insolvency Exclusion, as a part of and a condition of the issuance of the Syndicate 1861 Excess Policy, the Crum & Forster Excess Policy, and the StarStone Excess Policy.

58.     Accordingly, if the Bankruptcy/Insolvency Exclusion were found to be void as an *ipso facto* clause or otherwise, this Court should still find that Syndicate 1861, Crum & Forster, and StarStone have no coverage obligations with respect to the Trustee Demand Letter, the Draft Complaint, the Complaints, and the Amended Complaints, otherwise Syndicate 1861, Crum & Forster, and StarStone would be unduly denied the benefit of arms-length underwriting and policy term negotiations with Oaktree LLC and the expressly agreed upon terms and provisions, and a material condition of the issuance, of the Syndicate 1861 Excess Policy, the Crum & Forster Excess Policy, and the StarStone Excess Policy.

WHEREFORE, Syndicate 1861, Crum & Forster, and StarStone respectfully request that this Court enter declaratory judgment in its favor and against Defendants:

A.     Declaring that Syndicate 1861, Crum & Forster, and StarStone have no duty to defend or indemnify Daileader or Kibbey in connection with the matters alleged in the Trustee Demand Letter, the Draft Complaint, the Complaints, and the Amended Complaints; and

B.     Awarding such other and further relief as the Court finds just and proper.

Case 1:22-cv-02038  Document 1-1  Filed 03/11/22  Page 20 of 381

DATED:     February 1, 2022
           New York, New York

Respectfully submitted,

*/s/ Rafael Rivera*

Rafael Rivera, Esq.
Stephanie A. Nashban, Esq.
Gary L. Gassman, Esq.
COZEN O'CONNOR
*Attorneys for Plaintiffs*
Certain Underwriters at Lloyd's – Syndicate 1861,
Subscribing to Policy No. ANV122398A and
StarStone Specialty Insurance Company
3 WTC
175 Greenwich Street
55th Floor
New York, New York 10007
Telephone: (212) 509-9400
Emails:       rafaelrivera@cozen.com
              snashban@cozen.com
              ggassman@cozen.com


/s/ Scott A. Schechter

Scott A. Schechter, Esq.
Joshua DiLena, Esq.
KAUFMAN BORGEEST & RYAN LLP
*Attorneys for Plaintiff*
Crum & Forster Specialty Insurance Company
200 Summit Lake Drive
Valhalla, New York 10595
Telephone: (914) 449-1055
Emails:       sschechter@kbrlaw.com
              jdilena@kbrlaw.com

LEGAL\56134461\1 20781.0001.000/521631.000



# *POLICY DECLARATIONS*

## EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY

THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENTS OR SETTLEMENT AMOUNTS, MAY BE REDUCED BY AMOUNTS INCURRED FOR COSTS OF DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR COSTS OF DEFENSE MAY BE APPLIED AGAINST THE APPLICABLE RETENTION AMOUNT.

PLEASE READ THIS POLICY CAREFULLY.



### Item A

**Policy Number: ANV122398A**

**Renewal of Policy Number: N/A**

> **ANV GLOBAL SERVICES INC.**
> **ON BEHALF OF:**
> **AMTRUST AT LLOYD'S SYNDICATE 1861 - 100%**
> **UMR: B601818A22T5001**
>
> **POLICY No:**   ANV122398A

### Item B

**Named Insured:**
**Oaktree Medical Centre, PC**
**Pain Management Associates**

**Broker Name:**
**RT Specialty - Chicago**

**Mailing Address:**
115 Brushy Creek Road
Easley, SC 29642

**Mailing Address**:
500 West Monroe Street, 30th Floor
Chicago, IL 60661

### Item C

**Policy Period:**
From **August 22, 2018** to **July 09, 2019** at 12:01 A.M. Standard Time at your mailing address shown above.

### Item D

| LIMITS OF LIABILITY* | Aggregate Limit |
|---|---|
| Maximum Per **Claim** | $1,000,000 |
| Aggregate All **Claim** | $1,000,000 |

| UNDERLYING LIMITS | |
|---|---|
| Total **Underlying Limits** | $1,000,000 |

### Item E

**Notices to:**
**Notice of Claim or Potential Claim:**

Attn: Claims Department

ANV Global Services, Inc.,
200 Hudson Street, Suite 800
Jersey City, NJ  07311
Email: MGAClaims@anv.us.com

**All other notices**
PL Underwriting Group

ANV Global Services, Inc.
200 Hudson Street, Suite 800
Jersey City, NJ 07311
PLUnderwriting@anv.us.com

### Item F

**Premium: $15,830**



**IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY, WE AGREE TO PROVIDE THE INSURED WITH THE INSURANCE AS STATED IN THIS POLICY.**

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY INCLUDING INFORMATION FURNISHED IN CONNECTION THEREWITH, AND THE COVERAGE FORM AND ANY ENDORSEMENTS ATTACHED HERETO, CONSTITUTE THE ABOVE NUMBERED INSURANCE POLICY.**

| September 20, 2018 | |
| --- | --- |
| **(Date)** | **(Authorized Representative)** |



# SCHEDULE OF UNDERLYING INSURANCE

## SCHEDULE A

**UNDERLYING INSURANCE**

A. Followed Policy:

| | |
|---|---|
| Coverage: | Directors and Officer Liability Coverage |
| Carrier: | Landmark American Insurance Company |
| Policy Term: | July 09, 2018 to July 09, 2019 |
| Policy Number: | LHP677660 |
| Limits: | $1,000,000 |



# SCHEDULE OF FORMS:

| Form Number: | Description: |
|---|---|
| ANV EX 0001 | ANV Excess Professional Liability Insurance Policy |
| ANV EX 0105 | Service of Suit Endorsement |
| ANV PL 0028 | Cap On Losses From Certified Acts of Terrorism |
| ANV PL 0102 | U.S. Treasury Department OFAC Advisory Notice |
| ANV EX 0049 | Follow Form Over Specific Coverage Sections |
| ANV EX 0070 | Non Follow Form Endorsement |
| ANV PL 0098 | Specific Litigation Event Or Situation Exclusion |
| ANV EX 0078 | Pending or Prior Litigation Exclusion |
| ANV EX 0148 | RT Specialty Amend Excess Professional Policy Endorsement |
|  |  |
|  |  |
|  |  |





## EMPLOYMENT PRACTICES LIABILITY (EPL HOTLINE)

ANV is pleased to offer its Employment Practices Liability policyholders with a Hotline providing access to the employment law firm of Genova Burns LLC, a preeminent employment law and litigation firm with over twenty-five years experience representing employers in all regions of the United States.  The firm's practice spans all industries, including but not limited to technology, healthcare, financial services, construction, manufacturing, transportation and hospitality. Genova Burns provides business owners, managers, and human resource professionals with strategy, advice and counseling on all employment-related issues.

Through the use of the Genova Burns dedicated team, we now offer policyholders up to two (2) hours of calls to the Hotline at no additional charge. The Hotline is designed to provide quick, practical guidance on day-to-day workplace issues. To utilize the hotline, simply call 844-206-4626 or e-mail anvhotline@genovaburns.com.

From reviewing the proper steps for a sexual harassment investigation to discussing the appropriate factors to consider before you make day-to-day employment decisions, Genova Burns LLC's attorneys are available to assist policyholders in managing their workplace risk and minimizing employment related claims. As part of this program, policyholders are also eligible to receive a discount on Genova Burns LLC's regular fees for matters beyond the scope of the Hotline.  Matters beyond the scope of the Hotline would include those dealing with specific employees or employment decisions, or determinations on legal compliance.

Please note that the Hotline cannot be used to report a claim or for a determination of policy coverage regardless of any disclosure made to Genova Burns LLC.

We encourage policyholders to take advantage of this Hotline. For further information about the Hotline, please visit http://anv.us.com/eplhotline/



Genova Burns is an independent law firm that is not an agent nor an affiliate of ANV and Genova Burns is solely responsible for the advice and guidance provided directly, or through the EPL Hotline. ANV and Genova Burns cannot guarantee that there will be fewer or less serious claims as a result of using the program. As noted here, Genova Burns directly, or through the EPL Hotline may help an insured with risk assessment and improvement but it is not intended to supplant any duty to provide a workplace that is safe and complies with the law. ANV does not engage in giving legal advice and therefore encourages policyholders to seek the advice from their own legal counsel when implementing any and all employment practices. Please note that communication with Genova Burns either directly, or through the EPL Hotline is not notice to ANV of a claim or an act or situation that may give rise to a claim. Nothing herein alters or amends in any way the insurance policy contract between the underwriting company and the policyholder.



| Section | Contents |
|---------|----------|

| *I.* | *Insuring Agreement* |
| *II.* | *Definitions* |
| *III.* | *Attachment; Limit of Liability* |
| *IV.* | *Underlying Insurance* |
| *V.* | *Claims; Notices* |





*UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS IS A CLAIMS MADE AND REPORTED POLICY WITH COSTS OF DEFENSE INCLUDED IN THE LIMIT OF LIABILITY. COVERAGE APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE DURING THE POLICY PERIOD AND REPORTED DURING THE POLICY PERIOD OR ANY DISCOVERY PERIOD, IF APPLICABLE. WORDS PRINTED IN BOLD FACE, OTHER THAN CAPTIONS, ARE DEFINED IN THE POLICY. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY.*

## EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the **Insurer** shown in the Declarations, including those furnished in the **Application,** and subject to all terms, conditions and limitations of this Policy, the **Insureds** and **Insurer** agree:

## I. INSURING AGREEMENT

In consideration of the payment of the premium and in reliance upon all statements made in the Application for this Policy and the **Followed Policy**, including the information furnished in connection therewith, whether directly or through public filings, the **Insurer** agrees to provide insurance coverage to the **Insureds** in accordance with the terms, definitions, warranties, conditions, exclusions and limitations of the **Followed Policy** and, to the extent coverage is further limited or restricted thereby, of any other **Underlying Policy**, except as otherwise provided herein.

## II. DEFINITIONS

A. The term "**Insurer**" means the insurance company identified in the Declarations.

B. The term "**Followed Policy**" means the policy designated as such in Schedule A of this Policy.

C. The term "**Insureds**" means those individuals and entities insured by the **Followed Policy**.

D. The terms "**Claim**," "**Loss**" and "**Discovery Period**" have the meanings attributed to them, or to comparable terms, in the **Followed Policy**.

E. The term "**Primary Policy**" means the first listed **Underlying Policy** in Schedule A of the Declarations.



F. The term "**Policy Period**" means the policy period set forth in the Declarations, subject to prior termination in accordance with the **Followed Policy**.

G. The term "**Underlying Limit(s)**" means an amount equal to the aggregate of all limits of liability as set forth in Schedule A for all **Underlying Policies**, plus the uninsured retention, if any, applicable under the **Followed Policy**.

H. The term "**Underlying Policy(ies)**" means the **Followed Policy** and all other policies listed in Schedule A of this Policy.

## III.  ATTACHMENT; LIMIT OF LIABILITY

A. Liability under this Policy shall attach to the **Insurer** only after the insurers of the **Underlying Policies** and/or the **Insureds** shall have paid in legal currency the full amount of the **Underlying Limit**.  The aggregate limit of liability set forth in the LIMITS OF LIABILITY section of the Declarations shall be the **Insurer's** maximum liability under this Policy with respect to all covered **Claims** against all **Insureds**.

B. Only in the event of the reduction or exhaustion of the **Underlying Limit** by reason of the insurers of the **Underlying Policies** and/or the **Insureds** paying in legal currency **Loss** covered under the respective **Underlying Policy**, this Policy shall:  (i) in the event of reduction, pay excess of the reduced **Underlying Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this Policy shall only pay excess of the retention, if any, applicable under the **Primary Policy**, which retention shall be applied to any subsequent **Loss** in the same manner as specified in the **Primary Policy**.

C. Notwithstanding any of the terms of this Policy which might be construed otherwise, this Policy shall drop down only in the event of reduction or exhaustion of the **Underlying Limit** as described above, and shall not drop down for any other reason including, but not limited to, uncollectability (in whole or in part) of any **Underlying Policy**. The risk of uncollectability of the **Underlying Policies** (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the **Insureds** and is not in any way or under any circumstances insured or assumed by the **Insurer**.

D. If any Underlying Policy contains a specific grant of coverage that is subject to a sublimit of liability, then coverage under this Policy shall not apply to any **Claim** which is otherwise subject to such grant of coverage.  However, any **Loss** paid under the **Underlying Policies**



on account of such **Claim** shall reduce or exhaust the **Underlying Limit**, as provided in Section III.B. above, for purposes of this Policy.

## IV.  UNDERLYING INSURANCE

A. If the **Underlying Policies** are canceled or terminate during the **Policy Period**, including the **Discovery Period** if exercised, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policies** not been canceled or terminated.

B. To the extent the terms, definitions, conditions, exclusions or limitations of any of the **Underlying Policies** are changed to limit or restrict coverage, this Policy shall become subject to such changes upon the effective date of the change in the **Underlying Policy**.  To the extent the terms, definitions, conditions, exclusions or limitations of any of the **Underlying Policies** are changed after the **Underlying Policy** is bound to expand or broaden coverage, this Policy shall become subject to such changes only if and to the extent the **Insurer** agrees to such changes by written endorsement to this Policy and the **Insureds** pay any additional premium reasonably required by the **Insurer** for such changes.

## V. CLAIMS; NOTICES

A. The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of:
(i) any **Claim** at the same time and in the same manner required by the terms and conditions of the **Followed Policy**, regardless of the amount of the **Claim** or the **Underlying Limit** applicable to the **Claim**, and
(ii) any circumstances which could give rise to a **Claim** at the same time and with the same specificity as notice of such circumstances is given under all **Underlying Policies**.  To be effective under this Policy, such notice of circumstances shall contain the information required by and shall otherwise comply with the terms and conditions of the **Followed Policy** and shall also be given under all **Underlying Policies**.

B. The **Insurer** may, at its sole discretion, participate in the investigation, defense or settlement of any **Claim** or circumstance reported to the **Insurer** under this Policy even if the **Underlying Limit** has not been exhausted.

C. All notices under this Policy shall be in writing and given by prepaid express courier, certified mail or fax properly addressed to the appropriate party.  Notice to the **Insureds** may be given to the Parent



Company at the address as shown in the Named Insured section of the Declarations.  Notice to the **Insurer** of any **Claim** or potential **Claim** shall be given to the **Insurer** at the address set forth in the Notices to Insurer section of the Declarations.  All other notices to the **Insurer** under this Policy shall be given to the **Insurer** at the address set forth in Notices to Insurer section of the Declarations.  Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is properly sent, whichever is earlier.  Any notice to an insurer of an **Underlying Policy** shall not constitute notice to the **Insurer** unless also given to the **Insurer** as provided in this Section V.C.



## *Insured Education Document*

### Representative of the Insurer

ANV Global Services, Inc., (200 Hudson Street , Suite 800, Jersey City, NJ 07311) shall act on behalf of the Insurer for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of Claims shall be given pursuant to Section VII of the Policy.

### Insurer

This Policy is underwritten by Certain Underwriters at Lloyd's led by Syndicate ANV 1861 (ANV) whose registered office is at 47 Mark Lane, London, EC3R 7QQ, United Kingdom.

### Law

All matters arising hereunder including questions related to the validity interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York notwithstanding New York's conflicts of law rules.

### Queries

Any query or question about this Policy or any claim under it should be addressed in the first instance to your broker.

### Complaints

ANV aims to provide a professional service to its customers. Should you have any questions or concerns about your Policy or the handling of a Claim you should, in the first instance, contact your broker.  If your broker does not provide you with a satisfactory response, please contact ANV Global Services, Inc., at 200 Hudson Street, Suite 800, Jersey City, NJ 07311, email: PLUnderwriting@anv.us.com or for any Claims matters, Attn: Claims Department at the same address.  The Claims Department email is: MGAClaims@anv.us.com.  In the event that you remain dissatisfied and wish to make a complaint, please contact ANV´s compliance department at anvcomplaintsMGU@anv.eu.com.  It is also possible for you to refer the matter to the Policyholder and Market Assistance team at Lloyd's.  Their address is:

Policyholder & Market Assistance
Market Services
Lloyd's
One Lime Street
London EC3M 7HA
Tel No: 00 44 207 327 5693
Fax No: 00 44 207 327 5225
E-mail: complaints@lloyds.com

Details of Lloyd's complaints procedures are set out in a leaflet "Your Complaint - How We Can Help" available at www.lloyds.com/complaints and are also available from the above address. If you remain dissatisfied after Lloyd's has considered your complaint, you may have the right to refer your complaint to the United Kingdom Financial Ombudsman Service.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 33 of 381

Endorsement No:  1

Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### SERVICE OF SUIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that the service of process in any **Claim** or suit on the policy against ANV Global Services, Inc. may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the policy is issued.  The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the policy is issued is hereby authorized and directed to accept service of process on our behalf in any such **Claim** or suit.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Endorsement No:  2

Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**
**EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY**
**NOT FOR PROFIT ORGANIZATION MANAGEMENT LIABILITY INSURANCE POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**
**PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**
**SIDE-A DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that this policy is amended as follows:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"**Certified Act Of Terrorism**" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Endorsement No:  3

Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.
This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as ''Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site — http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 2

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Endorsement No:  4

Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## FOLLOW FORM OVER SPECIFIC COVERAGE SECTIONS

This endorsement modifies insurance provided under the following:

**EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that this Policy shall provide coverage excess over the following coverage sections of the **Followed Policy** only:

| **Followed Policy** Coverage Sections: | Director and Officers Liability |
|---|---|

Coverage under this Policy shall not apply to any **Claim** which is otherwise subject to any other grant of coverage or coverage section of the **Underlying Policies**. However, in the event that the not followed coverage shares a single aggregate Limit of Liability with the covered section, any **Loss** paid under the **Underlying Policies** on account of such **Claim** shall reduce or exhaust the **Underlying Limit**, as provided in the UNDERLYING INSURANCE section of this Policy.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 37 of 381

Endorsement No:   5

Policy Number:   ANV122398A

Named Insured:   Oaktree Medical Centre, PC

Endorsement Effective Date:   August 22, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NON FOLLOW FORM ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY**

| **Excluded Endorsements of the Followed Policy** |
|:---:|
| Employment Practices Liability and Fiduciary Liability |

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that, notwithstanding the terms and conditions of the **Followed Policy** this Policy shall not follow coverage as is afforded under any endorsement(s) designated in the above shown schedule of the **Followed Policy.**

The **Insurer** shall not be obligated to pay any **Loss** arising from a Wrongful Act or related Wrongful Acts as may be insured by reason of any endorsement(s) designated in the above shown schedule of the **Followed Policy.**

However, in the event that the not followed coverage shares a single aggregate Limit of Liability with the covered section, any **Loss** paid under the **Followed Policy** on account of such **Claim** shall reduce or exhaust the **Underlying Limit**, as provided in the UNDERLYING INSURANCE section of this Policy.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Case 1:22-cv-02038  Document 1-1  Filed 03/11/22  Page 38 of 381

Endorsement No:  6                           Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### SPECIFIC LITIGATION EVENT OR SITUATION EXCLUSION

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**
**EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**
**PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**

| SCHEDULE OF EXCLUDED LITIGATION, EVENT(S), OR SITUATION(S) |
| --- |
| **Office of Inspector General litigation**<br>**Select Health of South Carolina litigation**<br>**Georgetown Physician Services litigation**<br>**Premier Imaging Medical System litigation**<br>**Scott Lacher litigation**<br>**Lesco Rogers litigation**<br>**Joseph Case litigation**<br>**Stephanie Webb, MD litigation**<br>**Karen Mathewson litigation** |

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** directly or indirectly related to, based upon, attributable to or arising out of, in whole or in part, including the prosecution, settlement, disposition, resolution or defense of, the litigation, event or situation designated in the SCHEDULE shown above including but not limited to, any **Claim** for financial loss to the **Company**, its security holders or its creditors.

It is further agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a **Related Wrongful Act**, regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 39 of 381

Endorsement No:  7                              Policy Number:   ANV122398A

Named Insured:   Oaktree Medical Centre, PC

Endorsement Effective Date:   August 22, 2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PENDING OR PRIOR LITIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

## EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY

| Pending or Prior Litigation Date: | August 22, 2018 |
|---|---|

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that the **Insurer** shall not be liable for **Loss** resulting from any **Claim** based upon, arising out of, or attributable to any civil or criminal demand, suit or proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the date specified above or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.

Endorsement No:  8

Policy Number:  ANV122398A

Named Insured:  Oaktree Medical Centre, PC

Endorsement Effective Date:  August 22, 2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## RT SPECIALTY AMEND EXCESS PROFESSIONAL POLICY ENDORSEMENT

This endorsement modifies insurance provided under the following:

## EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that this Policy shall be amended as follows:

1. Section III. ATTACHMENT; LIMIT OF LIABILITY, paragraphs A. and B. are deleted and replaced with the following:

   A. Liability under this Policy shall attach to the **Insurer** only after the insurers of the **Underlying Policies**, the **Insureds** and/or a third party on behalf of the **Insureds** shall have paid in legal currency the full amount of the **Underlying Limit**.  The aggregate limit of liability set forth in the LIMITS OF LIABILITY section of the Declarations shall be the **Insurer's** maximum liability under this Policy with respect to all covered **Claims** against all **Insureds**.

   B. Only in the event of the reduction or exhaustion of the **Underlying Limit** by reason of the insurers of the **Underlying Policies**, the **Insureds** and/or a third party on behalf of the **Insureds** paying in legal currency **Loss** covered under the respective **Underlying Policy**, this Policy shall:  (i) in the event of reduction, pay excess of the reduced **Underlying Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this Policy shall only pay excess of the retention, if any, applicable under the **Primary Policy**, which retention shall be applied to any subsequent **Loss** in the same manner as specified in the **Primary Policy**.

2. Section IV. UNDERLYING INSURANCE, paragraph B. is deleted and replaced with the following:

   B. To the extent the terms, definitions, conditions, exclusions or limitations of any of the **Underlying Policies** are changed after the **Underlying Policy** is bound, this Policy shall become subject to such changes only if and to the extent the **Insurer** agrees to such changes by written endorsement to this Policy and the **Insureds** pay any additional premium reasonably required by the **Insurer** for such changes. In no event shall any such change or modification affect this Policy's excess position or attachment point.

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 41 of 381

Endorsement No. 2          Policy Number: 3ANV122398A

**3.** Section V. CLAIMS; NOTICES, paragraph C. is deleted and replaced with the following:

C. All notices under this Policy shall be in writing and given by prepaid express courier, certified mail or fax properly addressed to the appropriate party. Notice to the **Insureds** may be given to the Parent Company at the address as shown in the Named Insured section of the Declarations. Notice to the **Insurer** of any **Claim** or potential **Claim** shall be given to the **Insurer** at the address, or email address if notice is given via email, set forth in the Notices to Insurer section of the Declarations. All other notices to the **Insurer** under this Policy shall be given to the **Insurer** at the address set forth in Notices to Insurer section of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is properly sent, whichever is earlier. Any notice to an insurer of an **Underlying Policy** shall not constitute notice to the **Insurer** unless also given to the **Insurer** as provided in this Section V.C.

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.



July 10, 2019

John Delaplane
RT Specialty - Chicago
500 West Monroe Street, 30th Floor
Chicago, IL 60661

**SUBJECT:**

**Insured: Oaktree Medical Centre, PC Pain Management Associates**
**Policy #: ANV122398A**
**Policy Change#:1**

Dear John:

Enclosed is Policy Change Endorsement 1 and specific document(s) for Oaktree Medical Centre, PC Pain Management Associates.

After reviewing these document(s), please notify us immediately of any needed changes.  Please distribute the document(s) to the appropriate parties.

Sincerely,

*Jim Pittinger*
Underwriting Director



**INSURANCE CARRIER**: ANV Global Services, Inc. on behalf of Certain Underwriters at Lloyd's

## POLICY CHANGE ENDORSEMENT#1
Policy Number: ANV122398A
Effective Date: July 9, 2019
Issue Date: July 10, 2019

**Named Insured & Mailing Address:**

Oaktree Medical Centre, PC Pain Management Associates
115 Brushy Creek Road
Easley, SC 29642

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement is added to and made a part of this policy.

All other terms, conditions and exclusions under the policy are applicable to this Endorsement and remain unchanged.

**AUTHORIZED REPRESENTATIVE**



Endorsement No:  9                                    Policy Number:   ANV122398A

Named Insured:   Oaktree Medical Centre, PC Pain Management

Endorsement Effective Date: July 9, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### GENERAL CHANGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYEE BENEFIT PLAN FIDUCIARY INSURANCE POLICY**
**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**
**EXCESS PROFESSIONAL LIABILITY INSURANCE POLICY**
**NOT FOR PROFIT ORGANIZATION MANAGEMENT LIABILITY INSURANCE POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**
**PUBLIC COMPANY MANAGEMENT LIABILITY INSURANCE POLICY**
**SIDE-A DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY**

Unless specifically designated herein, this Endorsement shall not serve to increase our limits of insurance, as described in the LIMITS OF LIABILITY section of the policy.

In consideration of the premium charged, it is agreed by the **Insured** and **Insurer** that the following changes are incorporated into the policy:

---

**Policy Extension:**

In consideration of the payment of ▮▮▮▮▮▮ **additional premium**, it is hereby agreed that the policy is amended to show the expiration date to be **January 9, 2020.**

This endorsement is added to and made a part of this policy.

---

All other terms, conditions and exclusions under the policy are applicable to this endorsement and remain unchanged.



101 Hudson Street 32nd Flr
Jersey City, NJ 07302
www.cfins.com



Crum & Forster Specialty Insurance Company
North River Insurance Company
Unites States Fire Insurance Company
101 Hudson Street 32nd Floor
Jersey City, NJ 07302
Phone: (212)444-4006

Friday, September 21, 2018

**John Delaplane**
**RT Specialty, LLC**
**500 West Monroe, 30th Floor**
**Chicago, IL 60661**

RE:    **Oaktree Medical Centre, LLC**
       **EPP-100004**
       **8/22/2018-7/9/2019**

Hi John:

We appreciate your choice of Crum & Forster, as a market for your professional liability needs. Enclosed please find the above captioned policy for your records.

I trust this meets your approval. If you should have any questions or concerns please feel free to contact me.

Sincerely,

Fadyah Nour
Underwriting Technical Associate

**C&F** **CRUM & FORSTER®**
EST. 1822   A FAIRFAX COMPANY

**Insurer:**   Crum & Forster Specialty Insurance Company          **Policy Number:** EPP-100004

## EXCESS LIABILITY POLICY
## DECLARATIONS

NOTICE: DEPENDING ON THE TERMS, CONDITIONS AND LIMITATIONS OF THE **FOLLOWED POLICY**, THIS POLICY MAY (1) ONLY PROVIDE COVERAGE FOR LOSS FROM CLAIMS FIRST MADE OR FIRST MADE AND REPORTED DURING ITS **POLICY PERIOD**; (2) HAVE ITS **LIMIT OF LIABILITY** REDUCED BY THE PAYMENT OF DEFENSE COSTS AND/OR CLAIM EXPENSES; AND (3) NOT IMPOSE A DUTY TO DEFEND ON THE **INSURER**. PLEASE READ THE **FOLLOWED POLICY** AND THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE PROVIDED THEREUNDER AND HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

| | | |
|---|---|---|
| Item 1. | **Policyholder:**<br>**Policyholder Address:** | Oaktree Medical Centre, LLC<br>115 Brushy Creek Rd.<br>Easley, SC 29642 |
| Item 2. | **Policy Period:** | From: 8/22/2018 (Effective)     To: 7/9/2019 (Expiration)<br>(12:01 a.m. local time at the **Policyholder Address** shown above) |
| Item 3. | **Limit of Liability:** | $1,000,000 |
| Item 4. | **Total Underlying Limits:** | $2,000,000 |
| Item 5. | **Premium:** | ▮ |
| Item 6. | **Claims Address:** | E-Mail: mapsnol@cfins.com<br>Mail:   Crum & Forster<br>Claims Department<br>305 Madison Avenue<br>Morristown, NJ 07962 |
| Item 7. | **Insurer Address:** | Crum & Forster<br>Professional Risk<br>101 Hudson Street, 32nd Floor<br>Jersey City, NJ 07302 |

Item 8.   The following endorsements, if any, are made a part of this Policy at issuance:

1.   Signature Page CS 07 001 10 17
2.   U.S. Treasury Department's OFAC Advisory Notice to Policyholders, IL P 001 01 04
3.   Disclosure Pursuant to Terrorism Risk Insurance Act, XEO 43 003 01 18
4.   Service of Process Clause, SOP CF 07 16
5.   Cap on Losses from Certified Acts of Terrorism, XEO 19 001 05 18
6.   Pending and Prior Litigation Exclusion, XEO 21 001 01 16
7.   Non Follow Form of Sub-limits – Underlying Erosion Recognized, XEO 24 010 01 16
8.   Non Follow Form– Underlying Erosion Recognized, XEO 24 007 08 16
9.   Specific Matter Exclusion, XEO 21 009 01 16

Item 9.   **Schedule of Underlying Coverage:**

| | Underlying Insurer | Underlying Policy | Underlying Limit | Underlying Policy Period |
|---|---|---|---|---|
| * | Landmark American Insurance Company | HP677660 | $1,000,000 | 7/9/2018 to 7/9/2019 |
| | ANV Global Services, Inc. | ANV122398A | $1,000,000 Excess of $1000,000 | 8/22/2018 to 7/9/2019 |

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 48 of 381

Terms appearing in "**Bold**" typeface are used in this Policy with the meanings and values ascribed to them above; however, subject to the Changes section, the "**Followed Policy**" means the policy in the Schedule with an "*" at the beginning of its row.

# EXCESS LIABILITY POLICY

In consideration of the payment of the **Premium**, the **Insurer** and insureds agree as follows:

I.   INSURING AGREEMENT

This Policy shall provide coverage in accordance with the same terms, conditions and limitations of the **Followed Policy**, as modified and subject to the terms, conditions and limitations of this Policy.

The **Insurer's** coverage obligations under this Policy attach to the **Insurer** only after the **Total Underlying Limits** have been exhausted through payments by, on behalf of or in the place of the **Underlying Insurers** of amounts covered under the **Underlying Policies**.  This Policy shall continue in force as primary insurance only upon the exhaustion of the **Total Underlying Limits** by reason of such payments and satisfaction of any applicable retention. This Policy shall recognize erosion of an **Underlying Limit** of an **Underlying Policy** through payments by others of covered amounts under that **Underlying Policy**.  The risk of uncollectibility of any part of the **Total Underlying Limits**, for any reason, is expressly retained by the **Policyholder** and any insureds, and is not insured under this Policy or assumed by the **Insurer**.

II.  LIMIT OF LIABILITY

The **Limit of Liability** is the aggregate limit of the **Insurer's** liability for all coverage under this Policy.

III. NOTICES

Where the **Followed Policy** requires or permits notice to its insurer, the **Policyholder** or the insureds have the same obligations and rights to notify the **Insurer** under this Policy, except that with respect to this Policy, any notice to the **Insurer** must be directed as follows: (1) for claims-related matters, by mail or e-mail to the **Claims Address**; and (2) for all other notices, by mail to the **Insurer Address**.

IV.  RIGHTS

The **Insurer** shall have the same rights, privileges and protections afforded to the **Underlying Insurer** of the **Followed Policy** in accordance with the terms, conditions and limitations of the **Followed Policy**.  The **Insurer** shall also have the right, in its sole discretion, but not the obligation, to effectively associate with the insureds in the defense and settlement of any claim that appears to be reasonably likely to involve the **Insurer**.  The **Policyholder**, its subsidiaries and any insureds shall provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request and shall not do anything that prejudices the **Insurer's** position or potential rights of recovery.

V.   RELIANCE

The **Insurer** has issued this Policy in reliance upon the completeness and accuracy of the applications, warranties, statements, and binders for both this Policy and for the **Underlying Policies**, along with any attachments thereto and any other materials submitted for this Policy and for the **Underlying Policies**, which shall be deemed attached hereto and made a part hereof.

VI.  CHANGES

If, subsequent to the issuance of the **Followed Policy**, the terms, conditions or limitations of an **Underlying Policy** are modified, the insureds must notify the **Insurer** in writing, as soon as practicable, of such modification.  If any changes to the **Followed Policy**: (1) expand coverage; (2) change the **Policyholder** name or **Policyholder Address**; or (3) modify premium, this Policy shall not follow those changes unless the **Insurer** reflects its agreement to do so in a written endorsement to this Policy.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 50 of 381

## Crum & Forster Specialty Insurance Company
## A Delaware Corporation
## Home Office: Wilmington, DE

(A Capital Stock Company)

SIGNATURE

Marc J. Adee
Chairman and CEO

SIGNATURE

James Kraus
Secretary

CS 07 001 10 17

**CRUM & FORSTER®**
A FAIRFAX COMPANY
EST. 1822

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

## ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

**THIS NOTICE IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

**Terrorism Premium (Certified Acts):** $0
**This premium is the total Certified Acts premium attributable to the following Policy(ies):**
Excess Liability Policy XEO 00 001 01 16 (All Other States)
Excess Liability Policy XEO 00 002 01 16 (Florida, Montana, Vermont)
**The Terrorism Risk Insurance Act applies to the following coverage(s) only, when provided under this Policy:**
Management Liability (including Directors & Officers Liability, Employment Practices Liability and Fiduciary Liability)
Professional Liability coverage is excluded under the Terrorism Risk Insurance Act.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorists acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this notice.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap on Insurer Participation in Payment of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# SERVICE OF PROCESS CLAUSE

The Insurance Commissioner, Director of Insurance, Superintendent of Insurance, or other officer specified by law, pursuant to the laws of the state where this policy is delivered, is hereby designated as the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit, or proceeding arising out of this policy.  The Company further designates:

| | |
|---|---|
| Name: | Marc Adee, President |
| Name of Company or Firm: | Crum & Forster Specialty Insurance Company |
| Mailing Address: | 305 Madison Avenue<br>Morristown, NJ 07960 |

as its person to whom such process shall be forwarded by the Insurance Commissioner, Director of Insurance, Superintendent of Insurance, or other officer specified by law.

All other terms and conditions of the policy remain unchanged.

SOP CF 07 16

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Policyholder:<br>Oaktree Medical Centre, LLC | | Endorsement Number:<br>1 |
|---|---|---|
| Policy Number:<br>EPP-100004 | Policy Period:<br>8/22/2018 to 7/9/2019 | Effective Date of Endorsement:<br>8/22/2018 |
| Insurer:<br>Crum & Forster Specialty Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met its deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"**Certified Act of Terrorism**" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

C. This endorsement does not apply to professional liability insurance as defined in the U.S. Treasury Department's August 25, 2006 Terrorism Risk Insurance Act Final Rule.

All other terms, conditions and limitations of the Policy remain unaltered.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 55 of 381

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Policyholder:<br>Oaktree Medical Centre, LLC | | Endorsement Number:<br>2 |
|---|---|---|
| Policy Number:<br>EPP-100004 | Policy Period:<br>8/22/2018 to 7/9/2019 | Effective Date of Endorsement:<br>8/22/2018 |
| Insurer:<br>Crum & Forster Specialty Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## PENDING AND PRIOR LITIGATION EXCLUSION ENDORSEMENT

### SCHEDULE

| Pending And Prior Litigation Date: | 8/22/2018 |
|---|---|

In consideration of the premium charged, it is agreed that the **Insurer** shall have no liability to make any payment in connection with any pending or prior litigation, demand, proceeding or investigation against any insured commenced on or before the Pending And Prior Litigation Date set forth in the above schedule of this endorsement, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein.

All other terms, conditions and limitations of the Policy remain unaltered.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Policyholder: Oaktree Medical Centre, LLC | | Endorsement Number: 3 |
|---|---|---|
| Policy Number: EPP-100004 | Policy Period: 8/22/2018 to 7/9/2019 | Effective Date of Endorsement: 8/22/2018 |
| Insurer: Crum & Forster Specialty Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## NON-FOLLOWING FORM ENDORSEMENT
## ANY UNDERLYING POLICY SUB-LIMITS NOT COVERED
## (UNDERLYING EXHAUSTION RECOGNIZED)

In consideration of the premium charged, it is agreed that if any **Underlying Limit** of any **Underlying Policy** is subject to a **Sub-Limit** of liability, then this Policy shall not provide coverage with respect to the coverage that is subject to such **Sub-Limit**; provided, however this Policy shall recognize payments made under any such **Sub-Limit** in any **Underlying Policy** and such payments shall apply toward the exhaustion of the **Total Underlying Limits**.

For purposes of this endorsement, the term **Sub-Limit** shall mean any limit of insurance for a specified covered cause of loss in an **Underlying Policy** which is less than the amount of the **Underlying Limit** of the **Underlying Policy**.

All other terms, conditions and limitations of the Policy remain unaltered.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Policyholder:<br>Oaktree Medical Centre, LLC | | Endorsement Number:<br>4 |
|---|---|---|
| Policy Number:<br>EPP-100004 | Policy Period:<br>8/22/2018 to 7/9/2019 | Effective Date of Endorsement:<br>8/22/2018 |
| Insurer:<br>Crum & Forster Specialty Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## NON-FOLLOWING FORM ENDORSEMENT
## (UNDERLYING EXHAUSTION RECOGNIZED)

### SCHEDULE

| Non-**Followed Policy** Provision(s) |
|---|
| Employment Practices Liability Coverage |
| Fiduciary Liability Coverage |

In consideration of the premium charged, it is agreed that while this Policy generally follows the terms and conditions of the **Followed Policy**, subject to the terms, conditions and exclusions of this Policy, in no event shall this Policy be construed to follow form to any provision(s) of the **Followed Policy** set forth in the above schedule of this endorsement or any similar provision in any other **Underlying Policy**; provided, however this Policy shall recognize payments made under such provision(s) of the **Followed Policy** or under any similar provision in any other **Underlying Policy** and such payments shall apply toward the exhaustion of the **Total Underlying Limits**.

All other terms, conditions and limitations of the Policy remain unaltered.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Policyholder: Oaktree Medical Centre, LLC | Endorsement Number: 5 |
|---|---|
| Policy Number: EPP-100004 | Policy Period: 8/22/2018 to 7/9/2019 | Effective Date of Endorsement: 8/22/2018 |
| Insurer: Crum & Forster Specialty Insurance Company | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## SPECIFIED MATTER EXCLUSION ENDORSEMENT

### SCHEDULE

| Specified Matter Description: | Office of Inspector General - Claim #363329 |
|---|---|
| | Select Health of South Carolina- Claim #391753 |
| | Georgetown Physician Services- Claim #397924 |
| | Premier Imaging Medical System- Claim #408571 Scott Lacher- Claim # 357496 Lesco Rogers- Claim #380561 Joseph Case- Claim #384213 Stephanie Webb, MD- Claim #387377 |
| | Karen Mathewson- Claim #394998 |

In consideration of the premium charged, it is agreed that the **Insurer** shall have no liability to make any payment in connection with the litigation, demand, proceeding or investigation described in the above schedule of this endorsement, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein.  It is further agreed that the **Insurer** shall not recognize any erosion of the **Total Underlying Limits** due to amounts paid by any **Underlying Insurers** under such **Underlying Insurer's** respective **Underlying Policy** arising out of, based upon or attributable to the litigation, demand, proceeding or investigation described in the above schedule of this endorsement.

All other terms, conditions and limitations of the Policy remain unaltered.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Policyholder:<br>Oaktree Medical Centre, LLC | | Endorsement Number:<br>7 |
|---|---|---|
| Policy Number:<br>EPP-100004 | Policy Period:<br>8-22-18 to 1-9-20 | Effective Date of Endorsement:<br>7-9-19 |
| Insurer:<br>Crum & Forster Specialty Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## AMENDMENT TO DECLARATIONS ENDORSEMENT
## (PREMIUM BEARING)

In consideration of an additional premium of ▮▮▮▮▮ it is agreed that Item 2 of the Declarations is amended as follows:

Item 2.  Policy Period:  From:  8-22-18 (Effective)  To:  1-9-20 (Expiration)


All other terms, conditions and limitations of the Policy remain unaltered.

XEO 12 002 01 16    Page 1 of 1



**DECLARATIONS**

**STARSTONE SPECIALTY INSURANCE COMPANY**
Harborside Five
185 Hudson Street, Suite 2600
Jersey City, New Jersey 07311
855-275-6041

## MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE

**NOTICE: THIS IS A CLAIMS-MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY COVERS CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE EXTENDED REPORTING PERIOD. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DEFENSE COSTS AND DAMAGES. PLEASE READ THIS POLICY CAREFULLY.**

**NOTICE: THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THE NAMED INSURED'S STATE OF DOMICILE AND IS ISSUED AND DELIVERED AS A SURPLUS LINE COVERAGE PURSUANT TO THE INSURANCE STATUTES.**

POLICY NO: H70164180ASP

ITEM 1.   NAMED INSURED:   Oaktree Medical Centre, PC dba Pain Management Associates

        ADDRESS:   115 Brushy Creek Road
                            Easley, SC 29642

ITEM 2.   POLICY PERIOD:   From: December 11, 2018  To: July 09, 2019
                            (12:01 A.M. local time at the address stated in Item 1.)

ITEM 3.   LIMIT OF LIABILITY:   a.   $5,000,000 each **Claim** (inclusive of defense costs)
                                  b.   $5,000,000 in the aggregate (inclusive of defense costs)

ITEM 4.   PENDING & PRIOR DATE:   a.   12/11/2018
        RETROACTIVE DATE:   b.   N/A

This Policy follows any Pending & Prior Litigation Exclusion or similar exclusion in the **Followed Policy**, except that the applicable date in such Exclusion shall be the date indicated in this Item 4.a.

This Policy follows any Retroactive Date Exclusion or similar exclusion in the **Followed Policy**, except that the applicable date in such Exclusion shall be the date indicated in this Item 4.b.

ITEM 5.   FOLLOWED POLICY:

| Insurer | Policy No. | Policy Term | Limits of Liability | Attachment |
|---|---|---|---|---|
| Landmark American Insurance Company | LHP677660 | 07/09/2018 to: 07/09/2019 | $1,000,000 each **Claim** $1,000,000 Aggregate | $50,000 each **Claim** deductible |

ITEM 6.   UNDERLYING POLICY(IES):

| Insurer | Policy No. | Policy Term | Limits of Liability | Attachment |
|---|---|---|---|---|
| Landmark American Insurance Company | LHP677660 | 07/09/2018 to: 07/09/2019 | $1,000,000 each **Claim** $1,000,000 Aggregate | $50,000 each **Claim** deductible |
| ANV Global Services Inc | ANV122398A | 08/22/2018 to: 07/09/2019 | $1,000,000 excess of | $1,000,000 |
| Crum & Forster Specialty Insurance Company | EPP-100004 | 08/22/2018 to: 07/09/2019 | $1,000,000 excess of | $2,000,000 |
| CFC Underwriting Limited | DOH00746111 | 08/22/2018 to: 07/09/2019 | $2,000,000 excess of | $2,000,000 |

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

SSS-MPL-EFF-DEC (01-17)

STARSTONE

ITEM 7.   POLICY PREMIUM:        ███████

ITEM 8.   EXTENDED REPORTING PERIOD PREMIUM:  As per **Followed Policy**.

ITEM 9.   FORMS & ENDORSEMENTS:

These Declarations, together with the attached Policy Form and Endorsements as stated in the SSS-MPL-EFF-END-CW-001 (01-17) Policy Form Schedule and the **Application** (including all information furnished by the **Insured's** in the underwriting of this Policy), shall constitute the contract between the **Insureds** and the **Insurer** ("Policy").

ITEM 10.  NOTICE TO THE INSURER:

| A.  Address for Notice of Claim or Potential Claim: | B.  Address for all other Notices: |
|---|---|
| Attn:  StarStone US Services Claims Office<br>Harborside Five<br>185 Hudson Street, Suite 2600<br>Jersey City, New Jersey 07311<br>Facsimile: (877) 412-7985<br>Tel: (201) 830-2568<br>Email: claims@starstone.com | Attn:  StarStone US Services<br>Specialty Underwriting Department<br>Harborside Five<br>185 Hudson Street, Suite 2600<br>Jersey City, New Jersey 07311<br>Facsimile: (201) 743-7701<br>Tel: (201) 743-7700 |

The **Insurer** hereby causes this Policy to be signed by a duly authorized representative of the **Insurer**.

_____
President

_____
Secretary

<u>12-28-2018</u>
DATE

Whenever printed in this Declarations, the boldface type terms shall have the same meanings as indicated in the Policy Form.

SSS-MPL-EFF-DEC (01-17)                                              Page 2 of 2



**Named Insured:** Oaktree Medical Centre, PC dba Pain Management Associates

**Policy No:** H70164180ASP

**Endorsement No:** 1

**Effective Date:** December 11, 2018

**Premium:** Included

## Management and Professional Liability Follow Form Excess Insurance
## Policy Form Schedule

It is agreed that:

1. Item 9. Forms and Endorsements of the Declarations of this Policy is amended by the addition of the following:

   Item 9. Forms and Endorsements:

| Form | Form Title |
| --- | --- |
| SSS-MPL-EFF-GTC (01-17) | Management and Professional Liability Follow Form Excess Insurance |
| SSS-MPL-STATE AMENDATORY-SC (04-16) | South Carolina State Amendatory |
| SSS-MPL-EFF-END-CW-07 (01-17) | Non-Follow Form Endorsement-No Underlying Limit Erosion |
| SSS-MPL-EFF-END-CW-10 (01-17) | Specific Litigation Exclusion |
| SSS-MPL-EFF-END-CW-56 (01-17) | Privacy, Collection and Disclosure Exclusion |
| SSS-MPL-EFF-END-CW-60 (01-17) | War and Terrorism Exclusion Endorsement |
| SSS-MPL-EFF-END-CW-61 (01-17) | Nuclear Energy Exclusion Endorsement |

_____
President

_Thomas J. Balkan_
_____
Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

SSS-MPL-EFF-END-CW-001 (01-17)                                                                 Page 1 of 1

Harborside 5
185 Hudson Street, Suite 2600
Jersey City, NJ 07311
855-275-6041
www.starstone.com

## STARSTONE SPECIALTY INSURANCE COMPANY

### MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM  EXCESS INSURANCE

In consideration of the premium paid and in reliance on all statements made and information furnished by the **Insureds** in the **Application** and the underwriting of this Policy, and subject to the terms, conditions and limitations of this Policy, the **Insureds** agree with the **Insurer** as follows:

## I. INSURING AGREEMENT

The **Insurer** shall provide excess coverage for **Claims** first made during the **Policy Period** or, if applicable, the extended reporting period. This Policy, except as stated herein, is subject to all of the terms, conditions, representations, limitations and restrictions contained in the **Followed Policy** as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive **Underlying Policy**.

## II. CONDITIONS

## A. UNDERLYING INSURANCE

1. Liability for any covered **Loss** resulting from covered **Claims** shall attach to the **Insurer** only after the insurers of the **Underlying Policy(ies)**, the **Insureds** or any **DIC Insurer** have paid in legal currency **Loss** covered under the respective **Underlying Policy(ies)** equal to the full amount of the **Underlying Limit**. The **Insurer** shall then be liable to pay only covered **Loss** in excess of such **Underlying Limit** up to the Limit(s) of Liability specified in Item 3 of the Declarations.

2. This Policy shall drop down to the extent the **Underlying Limit** is paid as described in paragraph A.1. above and shall not drop down for any other reason including but not limited to uncollectability, in whole or in part, of any **Underlying Policy** or any insurance provided by a **DIC Insurer**. The risk of such uncollectability, whether because of financial impairment or insolvency or for any other reason, is expressly retained by the **Insureds** and is not in any way or under any circumstances insured or assumed by the **Insurer**.

3. If any **Underlying Policy** contains a specific grant of coverage that is subject to a sublimit of liability or a supplementary payment, then this Policy shall not provide such coverage.  However, this Policy shall recognize any reduction and, if applicable, exhaustion of the **Underlying Limit** by payment under such coverage.

4. Any and all **Underlying Policy(ies)** shall be maintained in full force and effect. In the event of failure to maintain any **Underlying Policy(ies)**, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policy(ies)** been maintained.

## B. LIMITS OF LIABILITY AND RETENTION

1. If an each **Claim** Limit of Liability is specified in Item 3.a. of the Declarations, the maximum liability of the **Insurer** for all **Loss**, including without limitation defense costs, arising from each **Claim** covered under this Policy shall not exceed the each **Claim** Limit of Liability specified in Item 3.a. of the Declarations.

2. The maximum liability of the **Insurer** for the combined total of all **Loss**, including without limitation defense costs, arising from any and all **Claims** covered under this Policy shall not exceed the aggregate Limit of Liability specified in Item 3.b. of the Declarations.

3. If this Policy drops down because of the exhaustion of the **Underlying Limit**, the applicable deductible, retention and/or coinsurance of the **Followed Policy** shall apply to each **Claim** handled by the **Insurer** on a primary basis.

## C. REPORTING AND NOTICE REQUIREMENTS

1. All notices under this Policy shall be in writing and properly addressed to the appropriate party. Notice to the **Insureds** shall be given to the **Named Insured** at the address as shown in Item 1 of the Declarations.

2. Where the **Followed Policy** permits or requires notice to its insurer, including notice of a **Claim** or potential **Claim**, then as a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall, contemporaneously with and according to the terms of the **Followed Policy**, give the same written notice to the **Insurer** at the applicable address shown in Item 10 of the Declarations.

**STARSTONE**
Part of the Enstar Group

3. The **Insurer** may, at its sole discretion, fully and effectively associate with the **Insureds** in the investigation, defense and/or settlement of any **Claim** or potential **Claim** reported to the **Insurer** under this Policy even if the **Underlying Limit** has not been exhausted. The **Insureds** shall give the **Insurer** all information and cooperation as the **Insurer** may reasonably require.

### D. EXTENDED REPORTING PERIOD COVERAGE

If the **Insureds** elect and secure extended reporting period coverage in all unexhausted **Underlying Policies**, the **Insureds** shall also be entitled to elect an extended reporting period under this Policy; provided however, in no event shall the duration of the extended reporting period under this Policy be greater than the duration of the extended reporting period under any unexhausted **Underlying Policy**. Such extended reporting period shall follow form to, and apply in conformance with, the provisions of the **Followed Policy**.

The right to purchase the extended reporting period under this Policy is conditioned upon satisfaction of the same conditions as specified in the **Followed Policy**. The additional premium for the extended reporting period under this Policy shall be calculated at the same percentage of this Policy's annual premium as the percentage stated in the **Followed Policy** for calculating the extended reporting period premium thereunder. The right to purchase extended reporting period coverage under this Policy shall lapse unless written notice of such election, together with payment of the additional premium due, is given to the **Insurer** within the time specified in the **Followed Policy**. The entire premium for the extended reporting period shall be deemed fully earned and non-refundable upon payment.

The Limit(s) of Liability for the extended reporting period, if exercised, shall be part of and not in addition to the Limit(s) of Liability specified in Item 3 of the Declarations. The purchase of the extended reporting period shall not increase or reinstate the Limit(s) of Liability of this Policy.

### E. CHANGES

To the extent any term, condition, representation, limitation or restriction of any of the **Underlying Policy(ies)** is changed during the **Policy Period** and/or, if applicable, the extended reporting period, this Policy shall automatically become subject to any such change that limits or restricts coverage. This Policy shall become subject to any such change that expands or broadens coverage only if and to the extent the **Insurer** agrees to such change in writing. Assignment of interest under this Policy shall not bind the **Insurer** unless its consent is endorsed hereon.

## III. DEFINITIONS

Whenever printed in boldface type, and whether in singular or plural form in this Policy, the following terms shall have the meanings indicated below.  Any term used in this Policy that is defined in the **Followed Policy**, including but not limited to **Application**, **Claim** and **Loss**, shall have the same meaning as assigned to that term or the equivalent term in the **Followed Policy** unless otherwise stated herein.

1. **DIC Insurer** means any insurer of an insurance policy written specifically excess of this Policy that is contractually obligated to drop down and pay covered **Loss** that is not paid by any **Underlying Policy**. This Policy does not follow form to the provisions of the policy of such **DIC Insurer**.

2. **Followed Policy** means the policy specified in Item 5 of the Declarations.

3. **Insurer** means the insurance company shown at the top of the Declarations.

4. **Insureds** means all natural persons and entities insured by the **Followed Policy**.

5. **Named Insured** means the person or entity named in Item 1 of the Declarations.

6. **Policy Period** means the period of time specified in Item 2 of the Declarations, subject to prior termination in accordance with the **Followed Policy**.

7. **Underlying Limit** means an amount equal to the total limits of liability of all **Underlying Policies**, plus the retention, deductible, and/or coinsurance, if any, applicable under the **Underlying Policy(ies)**.

8. **Underlying Policy(ies)** means the **Followed Policy** and any other policies listed in Item 6 of the Declarations.

## IV. SERVICE OF SUIT CLAUSE

The **Insurer** appoints the highest state official in charge of insurance affairs (Commissioner of Insurance, Director of Insurance, Insurance Commissioner, Executive Secretary, Superintendent of Insurance, or such other official title as designated by the state) of the **Insured's** domiciliary state and his/her successor or successors in office as his/her and their duly authorized deputies, as the **Insurer's** true and lawful attorney in and for the aforesaid state, upon whom all lawful process may be served in any action, suit or proceeding instituted in the **Insured's** domiciliary state by or on behalf of any **Insured** or beneficiary against the **Insurer** arising out of this Policy, provided a copy of any process, suit, complaint or summons is sent by certified or registered mail to:

**STARSTONE**
Part of the Enstar Group

Thomas Balkan
Secretary
StarStone US Companies
150 2nd Avenue North
Third Floor
St Petersburg, FL 33701
Facsimile: (727) 576-3627
Tel: (727) 217-2908
Email: thomas.balkan@enstargroup.com

IN WITNESS WHEREOF, the **Insurer** has caused this Policy to be signed by its President and Secretary, and, if required by state law, this Policy will not be valid unless countersigned by a duly authorized representative of the **Insurer**.

_____
President

_____
Secretary



**Named Insured:** Oaktree Medical Centre, PC dba
Pain Management Associates

**Policy No:** H70164180ASP

**Endorsement No:** 2

**Effective Date:** December 11, 2018

**Premium:** Included

### SOUTH CAROLINA STATE AMENDATORY ENDORSEMENT

In compliance with state law, it is agreed that:

1.  The NON-RENEWAL provision of this Policy is deleted in its entirety and replaced with the following:

    If the **Insurer** decides not to renew this Policy, the **Insurer** will mail written notice of non-renewal to the **Named Insured** not less than:

    1.  60 days prior to the expiration date of this Policy, if the expiration date of this Policy is the November 1 or any date thereafter up until and including May 31; or

    2.  90 days prior to the expiration date of this Policy, if the expiration date of this Policy is June 1 or any date thereafter up until and including October 31.

_____
President

_Thomas J. Balkan_
_____
Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**STARSTONE**
Part of the Enstar Group

| | |
|---|---|
| **Named Insured:** Oaktree Medical Centre, PC dba Pain Management Associates | **Policy No:** H70164180ASP |
| **Endorsement No:** 3 | **Effective Date:** December 11, 2018 |
| **Premium:** Included | |

## MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE
## NON-FOLLOWING FORM ENDORSEMENT - NO UNDERLYING LIMIT EROSION

It is agreed that:

1. Notwithstanding any other terms or conditions of this Policy to the contrary, coverage under this Policy shall not be in accordance with or subject to the following provision(s) in the **Followed Policy** or any similar provision in any **Underlying Policy(ies)**:

   Non-Followed Provision(s):
   Employment Practice Liability
   Fiduciary

2. Notwithstanding any other terms or conditions of this Policy to the contrary, this Policy shall not recognize any reduction or exhaustion of the **Underlying Limit** on account of any payment made by the insurer(s) of the **Underlying Policy(ies)**, the **Insureds**, and/or any other party by reason of the Non-Followed Provision set forth in Section 1. above.

_Thomas J. Balkan_

_____          _____
President                                            Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

SSS-MPL-EFF-END-CW-07 (01-17)                                    Page 1 of 1

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 68 of 381



**STARSTONE**
Part of the Enstar Group

**Named Insured:** Oaktree Medical Centre, PC dba
Pain Management Associates

**Policy No:** H70164180ASP

**Endorsement No:** 4

**Effective Date:** December 11, 2018

**Premium:** Included

### MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE
### SPECIFIC LITIGATION EXCLUSION

It is agreed that:

1. The following exclusion is added to this Policy:

   This Policy shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Specific Litigation** or any litigation, proceeding, claim or investigation alleging, or derived from, the same or substantially similar facts or circumstances as alleged in such **Specific Litigation**.

2. Section III. Definitions of this Policy is amended by the addition of the following:

   III. **Specific Litigation** means the litigation, proceeding, claim or investigation described below:
   **Specific Litigation**: all known matters

_____
President

_____
Secretary

_Thomas J. Balkan_

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**STARSTONE**
Part of the Enstar Group

| | |
|---|---|
| **Named Insured:** Oaktree Medical Centre, PC dba | **Policy No:** H70164180ASP |
| Pain Management Associates | |
| **Endorsement No:** 5 | **Effective Date:** December 11, 2018 |
| **Premium:** Included | |

## MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE POLICY
### PRIVACY, COLLECTION AND DISCLOSURE EXCLUSION

It is agreed that:

I.    The following exclusion is added to this Policy:

This Policy shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

a.    access to or disclosure of, any organization's or person's confidential or personal information, including but not limited to patents, copyrights, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information;

b.    unauthorized collection of information by any **Insured** or the failure to provide adequate and legal notice that such information is being collected;

c.    violation of any federal, state, local or foreign regulation, statute, rule or law:

1.    that requires commercial entities that collect personal information to post privacy policies, adopt specific privacy or security controls, or provide notification to individuals in the event personal information has been compromised or potentially compromised; or

2.    limiting or prohibiting facsimile, electronic mail or any other means of communication, including but not limited to, the Telephone Consumer Protection Act 47 U.S.C. Section 227, CAN-SPAM Act of 2003, or any similar Federal Communications Commission regulation or similar provision of any federal, state, local or foreign regulation, statute, rule or law;

d.    access to, theft of, or use of an **Insured's** computer hardware, software, web site, electronic systems, network or programs by an unauthorized person or entity, or access by an authorized person in an unauthorized manner, or the transmission or receipt of unauthorized, corrupting, or harmful computer code, including but not limited to adware, cookies, viruses, spyware, Trojan horses, logic bombs or worms.


_____                        _____
President                                      Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

SSS-MPL-EFF-END-CW-56 (01-17)                                                        Page 1 of 1



**STARSTONE**

Part of the Enstar Group

**Named Insured:** Oaktree Medical Centre, PC dba
Pain Management Associates

**Policy No:** H70164180ASP

**Endorsement No:** 6

**Effective Date:** December 11, 2018

**Premium:** Included

## MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE WAR, TERRORISM AND MILITARY ACTION EXCLUSION ENDORSEMENT

It is agreed that:

1. The following exclusion is added to this Policy:

   This Policy does not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action to defend against or hinder an actual or expected attack by any government, sovereign or other authority using military personnel or other agents;

   c. **Terrorism**, including any action taken to defend against or hinder any actual or expected **Terrorism**; or

   d. Insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, riot, usurped power, rebellion, revolution, or action taken by governmental authority to defend against or hinder any of these;

2. As used in this endorsement, **Terrorism** means activities against persons, organizations or property that involve the following or preparation for the following:

   a. use of threat or violence, or commission or threat of a dangerous act; or

   b. commission or threat of an act that interferes with or disrupts infrastructure or any electronic, communication, information or mechanical system;

   when the effect is to intimidate or coerce the civilian population, any segment of the economy, or to influence the policy or conduct of the government by coercion, or to further political, ideological, religious, social or economic objectives or to express a philosophy or opposition to a philosophy.

_____
President

_Thomas J. Balkan_
_____
Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



| | |
|---|---|
| **Named Insured:** Oaktree Medical Centre, PC dba | **Policy No:** H70164180ASP |
| Pain Management Associates | |
| **Endorsement No:** 7 | **Effective Date:** December 11, 2018 |
| **Premium:** Included | |

## MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

It is agreed that:

1. The following exclusion is added to this Policy:

    This Policy shall not apply:

    A. To "bodily injury" or "property damage:"
       1. with respect to which an **Insured** under this policy is also an Insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or
       2. resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B. To "bodily injury" or "property damage" resulting from the hazardous properties of "nuclear material":
       1. if the "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an **Insured** or (b) has been discharged or dispersed therefrom;
       2. if the "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or
       3. if the "bodily injury" or "property damage" arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion 3 applies only to "property damage" to such "nuclear facility" and any property thereat.

2. Solely for the purposes of this endorsement:

    "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these;

    "Hazardous properties" include radioactive, toxic or explosive properties;

    "Nuclear facility" means:

    a. any "nuclear reactor;"
    b. any equipment or devise designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste;"
    c. any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

---

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



d.  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;" and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear material" means "source material", "special nuclear material" or "by-product material;"

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" means:

a.  physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it;

"Property damage" includes all forms of radioactive contamination of property;

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor;"

"Waste" means any waste material (1) containing "by-product material" and (2) resulting from the operation by any person or organization of any "nuclear facility" within the definition of "nuclear facility" under paragraph (a) or (b) thereof;

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

_____
President

_____
Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

SSS-MPL-EFF-END-CW-61 (01-17)                                                                                       Page 2 of 2



| | |
|---|---|
| **Named Insured:** Oaktree Medical Centre, PC dba | **Policy No:** H70164180ASP |
| Pain Management Associates | |
| **Endorsement No:** 8 | **Effective Date:** July 09, 2019 |
| **Premium:** ▮ | |

### MANAGEMENT AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS INSURANCE
### AMENDED POLICY PERIOD ENDORSEMENT

It is agreed that:

1.  Item 2. Policy Period of the Declarations of this Policy is deleted in its entirety and replaced with the following:

ITEM 2.   POLICY PERIOD:         From:  December 11, 2018 To: January 09, 2020
(12:01 A.M. local time at the address stated in Item 1.)

President

Thomas J. Balkan

Secretary

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form.
ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



Landmark American Insurance Company

**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA 30326-1160

# PRIVATE COMPANY
# MANAGEMENT LIABILITY POLICY

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS. THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

**Mail notices to:** **RSUI Group, Inc.**
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

**Fax notices to:** **(404) 231-3755**
**Attn: Claims Department**

**E-mail notices to:** **reportclaims@rsui.com**

**RSUI's Panel Counsel Finder: Panel Counsel Link**

*A member of Alleghany Insurance Holdings LLC*

RSG 241006 0118

# PRIVATE COMPANY COMMON POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| L | HP677660 | N/A |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME AND MAILING ADDRESS          PRODUCER'S NAME AND ADDRESS

OAKTREE MEDICAL CENTRE, LLC DBA PAIN
MANAGEMENT ASSOCIATES
115 BRUSHY CREEK ROAD
EASLEY, SC 29642

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM     7/9/2018     TO     7/9/2019     12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

|  | **Purchased** | **Shared Limit** | **Separate Limit** |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
| B.  Employment Practices Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
| 1)  Third Party Liability Coverage | ☒ Yes ☐ No | | |
| C.  Fiduciary Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |

**ITEM 4. LIMIT OF LIABILITY:**

$   1,000,000     Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$   ▇▇▇▇▇▇     Total Policy Premium for All Coverage Sections

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS – RSG 240041 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     September 20, 2018     _____
                                                   DATE                    AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30367

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | HP677660 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

OAKTREE MEDICAL CENTRE, LLC DBA PAIN
MANAGEMENT ASSOCIATES

## ITEM 2. LIMIT OF LIABILITY:

| | | |
|---|---|---|
| A.  Directors and Officers Limit of Liability | $ | 1,000,000 |
| B.  Additional Side-A Limit of Liability | $ | Not Applicable |
| C.  Investigative Costs Sublimit of Liability | $ | 250,000 |

## ITEM 3. RETENTION:

A.  Directors and Officers Liability Retentions

| | | |
|---|---|---|
| 1)  Insuring Agreement A | $ | 0 |
| 2)  Insuring Agreement B | $ | 50,000 |
| 3)  Insuring Agreement C | $ | 50,000 |

## ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:

Directors and Officers Prior and/or Pending Litigation Date:     06/09/2015

This company has been approved by the director
or his designee of the South Carolina Department
of Insurance to write business in this State as an
eligible surplus lines insurer, but it is not afforded
guaranty fund protection.

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: _____ | September 20, 2018 | _~signature~_ |
|---|---|---|
| | DATE | AUTHORIZED REPRESENTATIVE |

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 5    Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 77 of 381    RECEIVED NYSCEF: 02/01/2022

INDEX NO. 650484/2022

# PRIVATE COMPANY EMPLOYMENT PRACTICES LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | HP677660 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

OAKTREE MEDICAL CENTRE, LLC DBA PAIN
MANAGEMENT ASSOCIATES

**ITEM 2. LIMIT OF LIABILITY:**

| | | |
|---|---|---|
| A. | Employment Practices Limit of Liability | $ 1,000,000 |
| | (Including Third Party Liability, if purchased) | |
| B. | Workplace Violence Expenses Sublimit | $ 250,000 |

**ITEM 3. RETENTION:**

| | | |
|---|---|---|
| A. | Employment Practices Liability Retentions | |
| 1) | Employment Practices Liability | $ 100,000 |
| 2) | Third Party Liability Coverage | $ 100,000 |

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Employment Practices Prior and/or Pending Litigation Date:     06/09/2014

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: _____ | September 20, 2018 | _~signature~_ |
|---|---|---|
| | DATE | AUTHORIZED REPRESENTATIVE |

# PRIVATE COMPANY FIDUCIARY LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | HP677660 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

OAKTREE MEDICAL CENTRE, LLC DBA PAIN
MANAGEMENT ASSOCIATES

**ITEM 2. LIMIT OF LIABILITY:**

Fiduciary Limit of Liability          $  1,000,000

**ITEM 3. RETENTION:**

Fiduciary Liability Retention          $  0

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Fiduciary Liability Prior and/or Pending Litigation Date:          06/09/2015

**ITEM 5. FIDUCIARY LIABILITY ADDITIONAL COVERAGES:**

| ADDITIONAL COVERAGES | SUBLIMIT | RETENTION | PRIOR/PENDING LITIGATION DATE |
|---|---|---|---|
| ☒HIPAA Violations | $25,000 | $0 | 06/09/2015 |
| ☒Voluntary Compliance Fees or Sanctions | $100,000 | $0 | 06/09/2015 |
| ☒PPACA Civil Money Penalties | $25,000 | $0 | 06/09/2015 |
| ☒Plan Value Fiduciary Liability | $25,000 | $0 | 06/09/2015 |
| ☒Settlor Breaches of Duty | $1,000,000 | $0 | 06/09/2015 |
| ☒Other Penalties | $25,000 | $0 | 06/09/2015 |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     September 20, 2018     _____
                                                         DATE                     AUTHORIZED REPRESENTATIVE

A member of Alleghany Insurance Holdings LLC

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# SUPPLEMENTAL DECLARATIONS

POLICY NUMBER:   LHP677660

## SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Disclosure Pursuance to Terrorism Risk Insurance Act | RSG 204123 0116 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Private Company | RSG 241001 0118 |
| Absolute Exclusion-Sexual Abuse with Allocation | RSG 206096 0118 |
| Affiliate Coverage | RSG 204207 0118 |
| Amended Conditions - 35% Acquisition Threshold | RSG 204178 0118 |
| Amended Definition of Insured Person-Additional Positions | RSG 204089 0118 |
| Amended Notice of Claim or Circumstance | RSG 204090 0118 |
| Amended Prior Notice Exclusion | RSG 244025 0118 |
| Amended Settlement Provision | RSG 204160 0118 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| Class Action Retention | RSG 204181 0118 |
| Coverage Extension-Federal Immigration and Nationality Act | RSG 204159 0118 |
| Coverage Extension-Healthcare Organization | RSG 244035 0118 |
| Coverage Extension-HIPAA | RSG 244031 0118 |
| Exclusion-Amended Bodily Injury and Property Damage | RSG 206118 0118 |
| Exclusion-Bankruptcy-Insolvency | RSG 206104 0118 |
| Exclusion-Specific Litigation | RSG 206115 0118 |
| Extradition Coverage | RSG 204174 0118 |
| Fully Non-Rescindable Coverage | RSG 204157 0118 |
| Separate Retention - Physicians ($150,000) | |
| State Amendatory Discrepancy | RSG 204202 0118 |
| Sublimit-Employed Lawyers Professional Liability | RSG 204182 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Private Company | RSG 241007 0118 |
| Absolute Contractual Exclusion | RSG 244018 0118 |
| Amended Exclusion (IPO Road Show) | RSG 244026 0118 |
| Amended Exclusion-Pollution Liability | RSG 244027 0118 |

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 80 of 381

| | |
|---|---|
| Exclusion-Malpractice | RSG 206107 0118 |
| Exclusion-Professional Errors and Omissions with Management Carve Back | RSG 246013 0118 |
| Jobs Act Endorsement | RSG 244022 0118 |
| Modified Insured vs. Insured Exclusion (Carve Back Former D&O's) | RSG 206119 0118 |
| Sublimit-Anti-Trust Claim | RSG 204124 0118 |

**FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY**

| | |
|---|---|
| Employment Practices Liability Coverage Section-Private Company | RSG 241008 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |

**FORMS APPLICABLE TO FIDUCIARY LIABILITY**

| | |
|---|---|
| Fiduciary Liability Coverage Section-Private Company | RSG 241009 0118 |

**STATE AMENDATORY FORMS**

| | |
|---|---|
| South Carolina Changes-Cancellation and Nonrenewal | RSG 203045 0118 |

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM INDEX NO. 650484/2022
NYSCEF DOC. NO. 5 Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 81 of 381 RECEIVED NYSCEF: 02/01/2022

LANDMARK AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

| | |
|---|---|
| **Terrorism Premium** | **$0** |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.*

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



# *www.RSUIextra.com*

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
    - Preventing Sexual Harassment
    - Preventing Discrimination
    - Preventing Wrongful Termination
    - Promoting Ethical Behavior

### How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

### Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 02/01/2022

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 83 of 381

LANDMARK AMERICAN INSURANCE COMPANY

# *IMPORTANT NOTICE*

### SOUTH CAROLINA SURPLUS LINES DISCLOSURE NOTICE

**This company has been approved by the director or his designee of the South Carolina Department of Insurance to write business in this State as an eligible surplus lines insurer, but it is not afforded guaranty fund protection.**

# COMMON POLICY TERMS AND CONDITIONS
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**. Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy. If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

## SECTION II. - COVERAGE EXTENSIONS

### A. Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy. Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B. Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**. The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C. Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

## SECTION III. - DEFINITIONS

**A. Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

**B. Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**C. Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

**D. Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

1. Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

2. Any obligation to apply for or furnish any appellate or similar bond.

**E. Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**F. Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

**G. Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**H. Insured Organization** means:

1. The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

2. Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

**I. Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**J. Insurer** means the Company providing this insurance as shown on the Declarations Page.

**K. Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**L. Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

**M. Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

1. Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting stock and/or outstanding securities, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers, or the means by which the **Insured Organization** is legally enabled to exercise fifty percent (50%) ownership or control is formally extinguished.

**N. Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   a. Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   b. Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

      (1) The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (2) The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (3) The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

      (4) Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld. Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy. The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

**1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**. **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

**2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**. Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

**3.** As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

**4.** All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

**5.** In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

**6.** Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person**, provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

**7.** The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

**8.** Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

**1.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

**2.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

    **a.** The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

    **b.** The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

**D. Cooperation**

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

**E. Allocation**

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

**F. Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization,** unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction"),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H. Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I. No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J. Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K. Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L. Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy. The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M. Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N. Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O. Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P. Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q. Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R. Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy. Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                              President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE EXCLUSION – SEXUAL ABUSE WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and to the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with that portion of any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to, or in any way involving, in whole or in part, any forcible physical or sexual assault, battery or molestation, including rape; provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 206096 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AFFILIATE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A. SECTION III. – DEFINITIONS, **H. Insured Organization** in the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

    **H. Insured Organization** means the organization named in Item 1. of the Declarations Page and any **Subsidiary** or **Affiliate** existing prior to or at the inception date of this policy and listed on the **Application** attached.  In addition, subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall mean any **Subsidiary** or **Affiliate** created or acquired after the inception date of this policy.

B. SECTION III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section shall be amended to include the following:

    **O. Affiliate** means any organization other than a **Subsidiary** which the **Insured Organization** or any **Subsidiary** controls or otherwise has the ability to direct the financial or managerial decisions of such organization, whether through operation of law, contract or agreement, stock ownership or membership, charter, articles of incorporation or by-law provisions.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 204207 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 5
Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 93 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED CONDITIONS – 35% ACQUISITION THRESHOLD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, G. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**G.  Merger, Consolidation or Acquisition**

1.  If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed thirty five percent (35%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2.  If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed thirty five percent (35%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition.  After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

    a.  Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

    b.  The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

    c.  The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

    d.  The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3.  If during the **Policy Period**:

    a.  The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    b.  Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

    (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

    then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction.  This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660          **Effective:** 7/9/2018

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED DEFINITION OF INSURED PERSON
# (ADDITIONAL POSITIONS)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION III. – DEFINITIONS, **I. Insured Person** of the Common Policy Terms and Conditions Coverage Section, is amended to include <u>Advisory Board Members</u>.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 204089 0118

*This Endorsement Changes The Policy. Please Read It Carefully.*

# AMENDED NOTICE OF CLAIM OR CIRCUMSTANCE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. - CONDITIONS, C.1. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

1. If, during the **Policy Period** or Extended Reporting Period Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the expiration date or any earlier cancellation date of this policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660   **Effective:** 7/9/2018

RSG 204090 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 5
INDEX NO. 650484/2022
Case 1:22-cv-02038  Document 1-1  Filed 03/11/22  Page 96 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED PRIOR NOTICE EXCLUSION

This endorsement modifies insurance provided under the following:

### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION IV. – EXCLUSIONS, 1. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

1.  Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any D&O/EPL policy of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660          **Effective:** 7/9/2018

RSG 244025 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED SETTLEMENT PROVISION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, A. Duty to Defend of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**A. Duty to Defend**

It shall be the right and the duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing.  No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld.  Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy.  The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into a settlement of any **Claim** that the **Insurer** deems appropriate.  If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1.  The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2.  Eighty percent (80%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660   **Effective:** 7/9/2018

RSG 204160 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  LHP677660    **Effective:**  7/9/2018

RSG 204198 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM INDEX NO. 650484/2022

NYSCEF DOC. NO. 5　　　　　　Case 1:22-cv-02038　Document 1-1　Filed 03/11/22　Page 99 of 381　LANDMARK AMERICAN INSURANCE COMPANY 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CLASS ACTION RETENTION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Declarations Page:

**ITEM 7. RETENTION:**

$ 250,000　　　Each claim for an actual or putative class action

All other terms and conditions of this policy remain unchanged.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 5

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 100 of 381

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION – FEDERAL IMMIGRATION & NATIONALITY ACT

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, the amount of $50,000 shall be the maximum aggregate Limit of Liability of the **Insurer** for **Loss** under this policy in connection with any **Claim** made against any **Insured** based upon, arising out of, or attributable to any actual or alleged violation of the Federal Immigration & Nationality Act, 8 U.S.C. Section 1101, et seq., as amended, including insurable fines or penalties under Section 1324a of that act ("FINA Claim").  This sublimit shall be one sublimit only, regardless of the number of Coverage Sections purchased by any or all **Insureds**, and shall be part of and not in addition to the amount set forth in Item 4. of the Common Policy Declarations Page.

A Retention in the amount of $100,000 shall apply to any **Loss** arising from a FINA **Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION – HEALTHCARE ORGANIZATION

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A. SECTION III. - DEFINITIONS **D. Insured Person** in the Directors and Officers Liability Coverage Section and **F. Insured Person** in the Employment Practices Liability Coverage Section is amended to include the following:

**Insured Person** shall include any past, present or future member of any duly constituted committee ("Committee Member"), any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician ("Outside Expert"), any individual in charge of any operational department ("Department Head") or any staff physician or faculty member of the **Insured Organization**, regardless of whether they are considered as an **Employee** of the **Insured Organization** or an independent contractor.

B. SECTION III. - DEFINITIONS **F. Loss** in the Directors and Officers Liability Coverage Section and **G. Loss** in the Employment Practices Liability Coverage Section is amended to include the following:

1. **IRS Fines**

   **Loss** shall include **Defense Expenses** incurred in connection with a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

   Section 4911 (tax on excess expenditures to influence legislation);

   Section 4940 (a) (tax on net investment income of tax-exempt foundations);

   Section 4941 (taxes on self-dealing);

   Section 4942 (taxes on failure to distribute income);

   Section 4943 (taxes on excess business holding);

   Section 4944 (taxes on investments which jeopardize charitable purpose);

   Section 4945 (taxes on taxable expenditures);

   Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);

   Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and

   Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2. **Excess Benefit Penalty Coverage**

   **Loss** shall include the ten percent (10%) "Excess Benefit" penalty which might be assessed by the Internal Revenue Service against any individual **Insured Person** for management involvement in the award of an "Excess Benefit".

   No coverage shall be provided by this policy for any individual **Insured Person** subject to the twenty five percent (25%) "Excess Benefit" penalty assessed by the Internal Revenue Service against any such **Insured Person** as a "disqualified person"; provided, however, that **Defense Expense** incurred in connection with the twenty five percent (25%) "Excess Benefit" penalty shall be provided to such **Insured Person**.

   Under no circumstances shall the **Insurer** be liable for the payment of **Loss** attributable to any two hundred percent (200%) penalty assessed by the Internal Revenue Service for failure to correct the award of an "Excess Benefit."

**Policy No.:** LHP677660     **Effective:** 7/9/2018

For purposes of this endorsement, the terms "Excess Benefit" and "disqualified person" shall be defined in the "Taxpayer Bill of Rights 2", (H.R. 2337, P.L. 104–168).

3. **EMTALA Coverage**

   **Loss** shall include the fines, penalties and **Defense Expenses** resulting from any **Claim** arising out of or in connection with an actual or alleged violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd et seq., and any similar state or local statute.

4. **Government Funding Defense Expense Coverage**

   **Loss** shall not include the return of funds which were received from any federal, state or local governmental agency; provided, however, that with respect to any **Claim** arising out of the return or request to return, such funds, and subject to a Retention amount of $1,000,000 the **Insurer** shall pay **Defense Expenses** up to a total of $1,000,000 incurred by the **Insured** on a fifty percent (50%) coinsurance basis, with fifty percent (50%) of such **Defense Expenses** to be borne by the **Insured** and to remain uninsured; and the remaining fifty percent (50%) of such **Defense Expenses** to be covered by the **Insurer** subject to all other terms, conditions and exclusions of this policy.

   Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION - HIPAA

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION III. – DEFINITIONS, **F. Loss** of the Directors and Officers Liability Coverage Section and **G. Loss** of the Employment Practices Liability Coverage Section shall be amended by adding the following:

Notwithstanding anything in this DEFINITION to the contrary, **Loss** shall include any civil money penalties imposed upon an **Insured** for violation of Title II of the Health Insurance Portability and Accountability Act ("HIPAA"), amendments to such law or regulations promulgated under such law concerning privacy of health information; provided the **Insurers** maximum aggregate Limit of Liability for all such civil money penalties on account of all **Claims** first made during the **Policy Period** shall be $25,000.  This sublimit shall be one sublimit only, regardless of the number of Coverage Sections purchased by any or all **Insureds**, and shall be part of and not in addition to the amount set forth in Item 4. of the Common Policy Declarations Page.

A Retention in the amount of $50,000 shall apply to any **Loss** arising from a **Claim** alleging violation of HIPAA.  Such retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from a HIPAA **Claim** which is in excess of the above stated retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660        **Effective:** 7/9/2018

RSG 244031 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 5
INDEX NO. 650484/2022
Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 104 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – AMENDED BODILY INJURY AND PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

B.  The first paragraph of SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced with the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660      **Effective:** 7/9/2018

RSG 206118 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 5
Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 105 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BANKRUPTCY / INSOLVENCY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured**:

1.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any **Wrongful Act** that is alleged to have caused, directly or indirectly, in whole or in part:

    a.  The bankruptcy or insolvency of the **Insured Organization**;

    b.  The **Insured Organization's** filing of a petition, or a petition being filed against the **Insured Organization** pursuant to the federal Bankruptcy Code or any similar state law;

    c.  The **Insured Organization** assigning its assets for the benefit of its creditors; or

    d.  By any other means seeking protection under the common or statutory law as a result of insolvency or financial impairment.

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the **Insured Organization** having sustained a financial loss due to a **Wrongful Act** by or on behalf of any **Insured Person** that actually or allegedly occurred before the date that the **Insured Organization** or other party sought protection of the **Insured Organizations** assets by any means including but not limited to those referenced in sections 1. a. through 1. d. of this endorsement.

3.  Brought or maintained by or on behalf of any creditor or debt-holder of the **Insured Organization**, or any **Claim** arising out of any actual or alleged **Wrongful Act**, where such **Wrongful Act** actually or allegedly results in the **Insured Organization's** failure, refusal or inability to pay debts or amounts due and owing, including but not limited to **Claims** alleging misrepresentation in connection with any extension of credit or in connection with the purchase or sale of a debt instrument, or **Claims** alleging any **Wrongful Acts** where such **Wrongful Acts** actually or allegedly result in the deterioration in the value of any debt instrument or security as a result of, wholly or in part the bankruptcy or insolvency of the **Insured Organization**.

The specific limitations on coverage contained in this endorsement should not under any circumstances be interpreted to suggest the existence of coverage under terms and conditions elsewhere in this policy or in contexts other than those referenced in this endorsement.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 206104 0118

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – SPECIFIC LITIGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly, in whole or in part, the following litigation:

Office of Inspector General - Claim #363329

Select Health of South Carolina- Claim #391753

Georgetown Physician Services- Claim #397924

Premier Imaging Medical System- Claim #408571

Scott Lacher- Claim # 357496

Lesco Rogers- Claim #380561

Joseph Case- Claim #384213

Stephanie Webb, MD- Claim #387377

Karen Mathewson- Claim #394998

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 206115 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXTRADITION COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

B.  SECTION III. – DEFINITIONS, **B. Claim**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Claim** also means any official request for **Extradition** of any **Insured Person**, return of an indictment (in the case of a criminal proceeding), or receipt or filing of a notice of charges.

C.  SECTION III. – DEFINITIONS, **D. Defense Expenses**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Defense Expenses** also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

a.  Opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

b.  Appealing any order or other grant of **Extradition** of that **Insured Person**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 204174 0118

*This Endorsement Changes The Policy. Please Read It Carefully.*

# FULLY NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I., INSURING AGREEMENT A., B. and C. of the Directors and Officers Liability Coverage Section shall be non-rescindable by the **Insurer**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 204157 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED RETENTION AMOUNTS

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY – PRIVATE COMPANY**

ITEM 4. RETENTION of the Declarations Page is amended to read as follows:

**ITEM 4. RETENTION:**

| | |
|---|---|
| $ 0 | Insuring Agreement A. |
| $ 150,000 | Insuring Agreement B. |
| $ 150,000 | Insuring Agreement C. |
| $ 150,000 | Each claim brought by or against a **Medical Professional** employed or contracted by the **Insured** |

Section III. – DEFINITIONS is amended by adding the following:

**Medical Professional** means a clinical professional, including a physician, physician assistant, intern, extern, resident, registered nurse practitioner, certified registered nurse anesthetist, chiropractor, psychiatrist, psychologist, dentist, orthodontist, endodontist, or any other dental surgeon. A **Medical Professional** shall not include any nursing professional other than those specifically listed herein.

If different Retention amounts apply to different parts of a **Claim**, different parties named in a **Claim**, or different allegations within a **Claim**, only one Retention shall apply to all **Loss** from such **Claim**. Such Retention shall be the highest single Retention applicable to such **Claim**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# STATE AMENDATORY DISCREPANCY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

In the event that there is a discrepancy between a state amendatory attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law, the **Insurer** shall apply the most favorable terms in the contract to the **Insured**, whether those terms and conditions are in either the amendatory or the policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660      **Effective:** 7/9/2018

RSG 204202 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 5
Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 111 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUBLIMIT – EMPLOYED LAWYERS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section:

The term **Insured Person** is amended to include any **Employed Lawyer** (as defined below) of the **Insured Organization**, but only for any **Claim** alleging a **Wrongful Act** in such **Employed Lawyers'** capacity as such, subject to the terms, conditions and exclusions of the policy and this endorsement.

Solely for the purposes of this endorsement, the term **Wrongful Act** means any act, error or omission of an **Employed Lawyer** in the rendering or failure to render professional legal services for the **Insured Organization**, but solely in his or her capacity as such.  Provided, however, that the term **Wrongful Act** shall not mean any act, error or omission in connection with any activities by such **Employed Lawyer**:  (1) which are not related to such **Employed Lawyer's** employment with the **Insured Organization**; (2) which are not rendered on the behalf of the **Insured Organization** at the **Insured Organization's** written request; or (3) which are performed by the **Employed Lawyer** for others for a fee.

It is further understood and agreed that solely with respect to the coverage afforded by this endorsement, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Employed Lawyer**:

(a) alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when the **Employed Lawyer** was not employed as a lawyer by the **Insured Organization**;

(b) alleging, arising out of, based upon or attributable to as of July 9, 2018, any pending or prior litigation, or administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or related wrongful act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(c) alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of July 9, 2018, an **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim**;

(d) alleging, arising out of, based upon or attributable to any activities by an **Employed Lawyer** as an officer or director of any entity, other than the **Insured Organization**.

With regard to all **Loss** arising from coverage afforded by this endorsement, the limit of the **Insurer's** liability shall be $1,000,000 (hereinafter the "sublimit of liability").  This sublimit shall be one sublimit only, regardless of the number of Coverage Sections purchased by any or all **Insureds**, and shall be part of and not in addition to the amount set forth in Item 4. of the Common Policy Declarations Page.

For the purpose of the applicability of the coverage provided by this endorsement, the **Insured Organization** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.    The **Insured Organization** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

Coverage as is afforded under this endorsement shall apply to a **Wrongful Act** only if one or more **Insured** (other than an **Employed Lawyer**) are, and remain co-defendants in the action along with an **Employed Lawyer**.

It is further understood and agreed that the coverage provided by this endorsement is specifically excess over any other valid or collectible Lawyers Professional Insurance, Legal Malpractice or Errors and Omissions Insurance, and shall only drop down and be primary insurance only in the event of exhaustion of such other insurance due to losses paid thereunder.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

The term **Employed Lawyer** means any **Employee** of the **Insured Organization**, in their capacity as such, who is admitted to practice law and who is or was employed as a lawyer full-time and salaried by the **Insured Organization**.

All other terms and conditions of this policy remain unchanged.

# DIRECTORS AND OFFICERS LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Directors and Officers Liability**

**A.** With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

**B.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

**C.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

## SECTION II. – COVERAGE EXTENSIONS

### A. Outside Board Extension

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

### B. Additional Side-A Limit of Liability

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section. This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons**.

**C. Investigation Costs Sublimit of Liability**

The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under this policy for all **Investigative Costs** shall be the Investigative Costs Sublimit of Liability as indicated in Item 2.C. of the Directors and Officers Liability Declarations Page. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

This policy shall cover **Loss** arising from all **Investigative Costs** which the **Insured Organization** shall become legally obligated to pay as a result of a **Shareholder Derivative Demand** first made during the **Policy Period** or Discovery Period, if applicable, against the **Insured Organization** for a **Wrongful Act** of an **Insured Person**.

**SECTION III. - DEFINITIONS**

**A.** **Claim**, either in the singular or the plural, means:

**1.** A written demand for monetary or non-monetary relief;

**2.** A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

**a.** Receipt or service of a complaint or similar pleading;

**b.** Return of an indictment or filing of information; or

**c.** Receipt of a notice of charges;

**3.** A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

**4.** A civil, criminal, administrative or regulatory investigation of an **Insured Person** by the Securities Exchange Commission ("SEC") or similar state or foreign government authority, after the **Insured Person** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Insured Person**;

**B.** **Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.** **Insured** means any **Insured Organization** and/or any **Insured Person**.

**D.** **Insured Person** means:

**1.** Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E.** **Investigative Costs** means reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by the **Insured Organization**, its board of directors or any committee thereof in connection with the investigation or evaluation of any **Shareholder Derivative Demand**; provided, however, that **Investigative Costs** shall not include salaries, wages, benefits, expenses or fees of any director, officer or **Employee** of the **Insured Organization**.

**F.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

   The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

G. **Shareholder Derivative Demand** means any written demand by one or more shareholders of the **Insured Organization** made upon the board of directors of the **Insured Organization** to bring a proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Based upon, arising out of or attributable to any remuneration received by an **Insured**, or the granting of any remuneration to any **Insured**, without the previous approval of the stockholders or the Board of Directors, which remuneration is found to have been illegal; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** received remuneration to which such **Insured** was not legally entitled;

2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

4. Alleging, arising out of, based upon or attributable to, in whole or part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7. Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9. Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.  Provided, however, this EXCLUSION shall not apply to:

   a. Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

   d. Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds**, except those expressly as noted in section 9.c., above; or

   e. Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

   Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**;

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering;

12. With respect to INSURING AGREEMENT C. of this policy, only:

   a. For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;

**b.** For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships; or

**c.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

**13.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act**.

**14.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**SECTION V. - CONDITIONS**

**A. Bankruptcy and Priority of Payments**

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder. The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons**.

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

**1.** First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

**2.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

**3.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy. If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                President

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 118 of 381

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE CONTRACTUAL EXCLUSION

This endorsement modifies insurance provided under the following:

### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

A.  Section IV. EXCLUSIONS, 12. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

12.  With respect to INSURING AGREEMENT C. of this policy, only:

a.  For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights; or

b.  For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships.

B.  The following is added to Section IV. EXCLUSIONS of the Directors and Officers Liability Coverage Section:

Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 244018 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 5
Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 119 of 381
LANDMARK AMERICAN INSURANCE COMPANY
RECEIVED NYSCEF: 02/01/2022

*This Endorsement Changes The Policy. Please Read It Carefully.*

## AMENDED EXCLUSION (IPO ROAD SHOW)

This endorsement modifies insurance provided under the following:

### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION IV. - EXCLUSIONS, 11. of the Directors and Officers Liability Coverage Section is amended to read as follows:

11. Alleging, arising out of, based upon or attributable to, any initial public offering of securities by the **Insured Organization**; provided, this EXCLUSION is not triggered and shall not apply to **Claims** derived from the **Insured's** preparations to commence an initial public offering, including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however that the coverage otherwise afforded herein shall be deemed to be void *ab initio* effective the IPO effective time.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 244026 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM INDEX NO. 650484/2022

NYSCEF DOC. NO. 5    Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 120 of 381   LANDMARK AMERICAN INSURANCE COMPANY 02/01/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED EXCLUSION – POLLUTION LIABILITY

This endorsement modifies insurance provided under the following:

### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION IV. – EXCLUSIONS, 10. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**; provided, however, this exclusion shall not apply to any **Claim** brought by a securities holder of the **Insured Organization**.

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660      **Effective:** 7/9/2018

RSG 244027 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - MALPRACTICE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to any medical or professional malpractice, including but not limited to the rendering or failure to render any medical or professional service.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 206107 0118

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 5

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 122 of 381

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PROFESSIONAL ERRORS AND OMISSIONS (WITH MANAGEMENT CARVE BACK)

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 7. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

7. Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

Provided, however, this EXCLUSION shall not be applicable to any derivative or shareholder class action claims against any **Insured**, which allege a failure to supervise those who performed or failed to perform such professional services in question.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660          **Effective:** 7/9/2018

RSG 246013 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# JOBS ACT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. - EXCLUSIONS, 11. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering; provided, this exclusion shall not apply to **Loss** from any **Claim** alleging, arising out of, based upon or attributable to:

   (1) any general solicitation or general advertising by or on behalf of any Organization permitted pursuant to Title II, Access to Capital for Job Creators, of the JOBS Act (as defined below);

   (2) any offering, sale or purchase of securities that qualifies for a Securities Act Registration exemption created pursuant to Title III, Crowdfunding, of the JOBS Act; or

   (3) any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title IV, Small Company Capital Formation, of the JOBS Act ("Title IV Small Company Capital Formation Claim").

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, the amount of $250,000 shall be the maximum aggregate Limit of Liability of the **Insurer** for **Loss** under this policy based upon or arising out of all Title IV Small Company Capital Formation Claims made against any **Insureds**.  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

For purposes of this Endorsement, JOBS Act means the Jumpstart Our Business Startups Act, any amendments thereto and any rules or regulations promulgated thereunder.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 244022 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# MODIFIED INSURED VS. INSURED EXCLUSION
# (CARVE BACK FORMER D&O'S)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 9.c. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

**c.** Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least <u>three</u> (3) years prior to the date such **Claim** is first made, and if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 206119 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUBLIMIT - ANTI-TRUST CLAIM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Directors and Officers Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, the amount of $ 1,000,000 shall be the maximum aggregate Limit of Liability of the **Insurer** for **Loss** under this policy in connection with any **Anti-Trust Claim** made against any **Insured**.  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

**Anti-Trust Claim** shall mean any **Claim** arising out of, based upon, or attributable to:

a.  Any actual or alleged price fixing, restraint of trade, monopolization, or unfair trade or unfair competition, including but not limited to claims, demands, causes of action, legal or quasi-legal  proceedings, decrees or judgments or  subsequent derivative or representative type actions; or

b.  Any actual or alleged violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any other federal statutory provision regarding anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade, any rules or regulations promulgated under or in connection with the above statutes, or any similar provision of any federal, state or local statutory law or common law.

A Retention in the amount of $ 150,000 shall apply to any **Loss** arising from an **Anti-Trust Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from an **Anti-Trust Claim** which is in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 204124 0118

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**A.  Employment Practices Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

**B.  Third Party Liability Coverage**

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

**Workplace Violence Expenses Sublimit**

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

**A.  Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

**1.**  A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

    **a.**  Receipt or service of a complaint or similar pleading;

    **b.**  Return of an indictment or filing of information; or

    **c.**  Receipt of a notice of charges;

**2.**  A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

**3.**  An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

**B.  Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**.  An individual who is leased or

contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.** **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

**D.** **Employment Practices Wrongful Act** means any actual or alleged:

**1.** Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

**2.** Employment related harassment (including but not limited to sexual harassment);

**3.** Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

**4.** Employment-related retaliation;

**5.** Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

**6.** Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

**7.** Wrongful failure to employ or promote;

**8.** Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

**9.** Employment related wrongful discipline;

**10.** Failure to grant tenure or practice privileges;

**11.** Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

**12.** Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

  **a.** Family and Medical Leave Act of 1993;

  **b.** Americans with Disabilities Act of 1992 (ADA);

  **c.** Civil Rights Act of 1991;

  **d.** Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

  **e.** Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

**13.** Violation of an **Insured Person's** civil rights relating to any of the above; or

**14.** Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

**E.** **Insured** means any **Insured Organization** and/or any **Insured Person**.

**F.** **Insured Person** means:

**1.** Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**G.** **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

  **1.** Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

  **2.** Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

  **3.** Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

  **4.** The cost of creating or reinstating employment;

  **5.** Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

  **6.** Civil or criminal fines or penalties;

  **7.** Taxes, whether owed to or by any **Insured**;

  **8.** Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

  **9.** Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**H.** **Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

**I.** **Third Party** means any person(s) with whom an **Insured** interacts.

**J.** **Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**K.** **Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

**L.** **Workplace Violence** means any intentional and unlawful act:

  **1.** of deadly force involving the use of lethal weapon; or

  **2.** the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**M.** **Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

  **1.** an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

  **2.** an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

  **3.** a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

  **4.** independent security guard services for up to fifteen (15) days; and

  **5.** an independent forensic analyst.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

2. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

   The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

   a. which occurs at any location other than the **Insured Organization's Premises**;

   b. arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

   c. that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

   d. resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5. Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

6. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

7. Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act;

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUBLIMIT-DEFENSE EXPENSES – WAGE AND HOUR CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, this Policy shall allow up to $50,000 solely for **Defense Expenses** in connection with **Claims** made against any **Insured** for violation of the Fair Labor Standards Act or any similar state or local law or regulation specifically governing the payment of wages or hours worked ("**Wage and Hour Claim**").  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Employment Practices Liability Declarations Page, and shall not act to create coverage for any form of relief sought or available in any **Wage and Hour Claim**.

A Retention in the amount of $100,000 shall apply to any **Wage and Hour Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Defense Expenses** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A," or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHP677660    **Effective:** 7/9/2018

RSG 204153 0118

# FIDUCIARY LIABILITY COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Fiduciary Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Fiduciary Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this Coverage Section shall be non-rescindable by the **Insurer**.

## SECTION II. – ADDITIONAL COVERAGES

The **Insurer** shall pay **Loss** arising from **Additional Claims** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy which result in **Loss** as described in the Additional Coverages as shown below.

Any Sublimits and Retentions set forth in the Fiduciary Liability Declarations Page for the Additional Coverage(s) shall apply separately and specifically to any **Loss** arising from the specified Additional Coverage(s). Such Retentions shall be borne by the **Insured Organization**, and the **Insurer** shall only be liable for the amount of **Loss** arising from the specified Additional Coverage(s) that is in excess of the specifically stated Retention amount applicable to such Additional Coverage, and subject to the applicable Sublimit.

### A. HIPAA Violations

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act ("HIPAA").

### B. Voluntary Compliance Fees/Sanctions

The definition of **Loss** is amended to include:

**1.** Any sanctions imposed upon an **Insured** as a fiduciary; or

**2.** Any compliance fees incurred by an **Insured**, under the Employee Plans Compliance Resolution System described in any applicable Internal Revenue Service Revenue Procedure ("EPCRS Sanctions/Fees").

### C. PPACA Civil Money Penalties

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act, as amended ("PPACA"), and any rules or regulations promulgated thereunder.

### D. Plan Value Fiduciary Liability

**Loss** is amended to include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits".

### E. Settlor Breaches of Duty

**Loss** is amended to include amounts incurred arising from Settlor Breaches of Duty meaning any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA**, COBRA, or HIPAA, in the discharge of any **Insured's** duties in a settlor capacity with respect to **Employee Benefits**.

**F. Other Penalties**

**Loss** is amended to include **Defense Expenses** resulting from any **Claim** arising out of:

**1.** the civil penalties under Section 502(c) of **ERISA**;

**2.** the civil penalties under the Pension Protection Act of 2006; and

**3.** the 15% or less tax penalty imposed upon an Insured under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments.

## SECTION III. – DEFINITIONS

**A. Additional Claims** means written demands or written allegations demanding relief as described in Section II., Additional Coverages, of this **Coverage Section**.

**B. Administration** means:

**1.** handling records in connection with **Employee Benefits**;

**2.** effecting enrollment, termination or cancellation of **Employees** under an **Employee Benefits** program;

**3.** giving counsel to **Employees** with respect to **Employee Benefits**; or

**4.** interpreting **Employee Benefits**.

**C. Claim** means a **Fiduciary Claim**.

**D. Employee** means any natural persons whose labor or service is engaged by and directed by the **Insured Organization**, including part-time, seasonal, leased and temporary employees.  **Employee** shall not include any independent contractor.

**E. Employee Benefits** means any **Plan** or **Healthcare Exchange**, and any workers' compensation insurance, unemployment insurance, Social Security or disability benefits for **Employees** of the **Insured Organization**.

**F. ERISA** means:

**1.** the Employee Retirement Income Security Act of 1974, as amended and any rules or regulations promulgated thereunder (including, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Heath Insurance Portability and Accountability Act of 1996 ("HIPAA"));

**2.** the English Pension Scheme Act of 1993, and the English Pensions Act of 1995, as such Acts are amended and any rules or regulations promulgated under such Acts, and

any similar statutory or common law anywhere in the world, and any rules or regulations promulgated thereunder, and

**3.** the privacy provisions under HIPAA.

**G. Fiduciary Claim** means a:

**1.** written demand for money or other civil relief commenced by the receipt of such demand;

**2.** civil proceeding, including any arbitration or other alternative dispute resolution proceeding commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

**3.** criminal proceeding commenced by the return of an indictment;

**4.** written notice of the commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation; or

**5.** formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar documents;

against an **Insured** for a **Fiduciary Wrongful Act**.

**H. Fiduciary Wrongful Act** means any actual or alleged:

**1.** breach of the duties, responsibilities or obligations imposed upon fiduciaries of any **Plan** by **ERISA** or the common law or statutory law of any jurisdiction governing such **Plan**; or

**2.** any negligent act, error or omission by an **Insured** in the **Administration** of **Employee Benefits** or any other matter claimed against an **Insured** solely by reason of their service as a fiduciary of any **Plan**.

3. Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries of any **Plan** by the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); or

4. Other violation of HIPAA claimed against an **Insured** due solely to such **Insured's** service as a fiduciary of any **Plan**; or

5. Negligent violation of HIPAA by an **Insured** in the **Administration** of any **Plan**.

**I.** **Healthcare Exchange** shall be any facility or vehicle set up to facilitate the purchase of health insurance in each state in accordance with the Patient Protection and Affordable Care Act.

**J.** **Insured** means the **Insured Persons**, the **Plan** and the **Sponsor Organization**.

**K.** **Insured Person** means any director, officer, trustee, partner or **Employee** of the **Plan** or of the **Sponsor Organization** while acting in his or her capacity as a fiduciary or settlor of the **Plan**.

**L.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Fines, penalties or taxes imposed by law, except that **Loss** may include claimant's attorney's fees awarded by a court pursuant to Section 502(g) of the Employee Retirement Income Security Act of 1974, as amended, against an **Insured**; civil penalties of up to five percent (5%) imposed pursuant to Section 502(i) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") for inadvertent violation of Section 406 of **ERISA**, and civil penalties of up to twenty percent (20%) of any settlement or judgment imposed pursuant to Section 502(l) of **ERISA** for breach of fiduciary duty;

2. Benefits due or to become due under the terms of any **Plan**, unless and then only to the extent that recovery for such benefits is based on a **Fiduciary Wrongful Act** and is payable as the personal obligation of an **Insured** who is a natural person; provided that **Loss** shall include **Defense Expenses** with respect to any **Claim** seeking benefits due or to become due under the terms of any **Plan**; and **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits";

3. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

4. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

6. The cost of creating or reinstating employment;

7. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

8. Civil or criminal fines or penalties not expressly provided for in this **Coverage Section**;

9. Taxes, whether owed to or by any **Insured**;

10. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**M.** **Pension Benefit Plan** means any employee pension benefit plan, as such term is defined in **ERISA**, which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

**N.** **Plan** means any:

1. **Pension Benefit Plan** and any trust established to hold the assets of any such **Pension Benefit Plan**;

2. **Welfare Benefit Plan** which was, is now, or becomes sponsored solely by any **Sponsor Organization**;

3. **Pension Benefit Plan**, or any trust established to hold the assets of any such **Pension Benefit Plan**, created during the **Policy Period** by any **Sponsor Organization** or by any interest owned or controlled by such **Sponsor Organization** for the **Employees** thereof, but only if the Insured provides the Insurer with written notice of the creation of such **Pension Benefit Plan** within ninety (90) days of the effective date of such **Pension Benefit Plan**; and

4. otherwise covered **Plan** of any **Subsidiary** as that term is defined in the Common Policy Terms and Conditions SECTION III. - DEFINITIONS, M., or as allowed in the Common Policy Terms and Conditions SECTION V. – CONDITIONS, G., but only if the:

   (a) **Insured** provides the **Insurer** such additional information with respect thereto as the **Insurer** may reasonably require;

   (b) **Insured** provides the **Insurer** written notice of such acquisition as soon as practicable after the effective date thereof; and

   (c) **Insurer** specifically agrees by written endorsement to provide coverage with respect to such **Plan** and the **Insured** has accepted any additional terms, conditions and limitations of coverage, and agrees to pay any additional premium that the **Insurer** in its sole discretion, shall deem appropriate.

   **Plan** shall not include any multiemployer plan.

O. **Sponsor Organization** means the **Insured Organization** while acting in its capacity as a sponsor of a **Plan** solely for the benefit of its **Employees**.

P. **Welfare Benefit Plan** means any employee welfare benefit plan, as such term is defined in **ERISA** which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

## SECTION IV. - EXCLUSIONS

Specifically with respect to **Fiduciary Claims** or **Additional Claims**, exclusions in this endorsement shall govern in the event of any specific conflict between them and other exclusions in the policy.

The **Insurer** shall not be liable to make any payment for **Loss**, and shall have no duty to defend or pay **Defense Expenses**, in connection with any **Fiduciary Claim** made against any **Insured**:

1. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Fiduciary Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which was brought on or before the date referenced in Item 4. of the Fiduciary Liability Declarations Page;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure by any **Insured** to comply with any law, rule or regulation concerning workers' compensation insurance, unemployment insurance, Social Security or disability benefits, whether or not such failure to comply is willful;

3. For the failure to collect contributions owed to any **Plan** from any employer unless such failure is due to the negligence of an **Insured,** or for the return to any employer of any contributions if such amounts are or could be chargeable to a **Plan**; provided, this EXCLUSION 3. shall not apply to the **Insurer's** obligations, subject to the applicable Limit of Liability, to defend such **Fiduciary Claim** and to pay **Defense Expenses** resulting therefrom;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

**6.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

**7.** Made by or on behalf of a fidelity insurer against a natural person whose conduct has resulted in a **Loss** which has been paid under a fidelity bond; or

**8.** Based upon, arising out of, directly or indirectly resulting from any discrimination, retaliation or wrongful termination of employment; provided, this EXCLUSION 8. will not apply to **Fiduciary Claims** asserted under Section 510 of **ERISA**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

### SECTION V. - CONDITIONS

**A. Coverage for New Plans**

If during the **Policy Period** the **Insured**:

**1.** forms or acquires an employee welfare benefit plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured**; this **Coverage Section** shall automatically apply; or

**2.** forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are less than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date; this **Coverage Section** shall automatically apply; or

**3.** forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured** or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are equal to or greater than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date, then coverage is provided under this **Coverage Section**, but only upon the condition that within ninety (90) days of it becoming an **Employee Benefits** plan, the **Insured** provides the **Insurer** with full particulars of the new **Employee Benefits** plan and agrees to any additional premium and/or amendment of the provisions of this **Coverage Section** required by the **Insurer** related to such new **Employee Benefits** plan. Further, coverage as shall be afforded to the new **Employee Benefits** plan is conditioned upon the **Insured** paying when due any additional premium required by the **Insurer** relating to such new **Employee Benefits** plan.

In all events, coverage as afforded with respect to this Section V.A. shall not apply to an Employee Stock Ownership Plan, a Multi Employer Plan, a Multiple Employer Plan, or a Defined Benefit Plan.

**B. Creation or Acquisition of an ESOP**

Notwithstanding anything in this **Coverage Section** to the contrary, if during the **Policy Period** any **Sponsor Organization** creates or directly or indirectly acquires an employee stock ownership plan ("ESOP"), the **Sponsor Organization** shall promptly give to the **Insurer** written notice thereof together with such other information requested by the **Insurer**. The **Insurer** shall, at the request of the **Sponsor Organization**, provide to the **Sponsor Organization** a quotation for coverage for **Claims** based upon, arising from or in consequence of such ESOP, subject to such terms, conditions, limitations of coverage and such additional premium as the **Insurer**, in its sole discretion, may require.

**C. Recourse**

It is agreed that, in the event an **Insured** breaches a fiduciary obligation under **ERISA**, the **Insurer** has the right of recourse against any such **Insured** for any amount paid by the **Insurer** as a result of such breach of fiduciary duty, but the **Insurer** shall have no such right of recourse if the policy has been purchased by the fiduciary or by an employer or an employee organization.

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 137 of 381

**D.   Termination of Plan**

If the **Sponsor Organization** terminates a **Plan**, coverage shall be afforded under this coverage extension with respect to such terminated **Plan** and its **Insureds**.  Such continuation of coverage shall apply with respect to **Fiduciary Claims** for **Fiduciary Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to or after the date the **Plan** was terminated.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SOUTH CAROLINA CHANGES – CANCELLATION & NONRENEWAL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. - CONDITIONS F. Cancellation; Renewal Provision in the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**F.  Cancellation; Renewal Provision**

1.  The **Insurer** may cancel this policy by mailing or delivering to the **Insured Organization** and the agent, if any, written notice of cancellation at least:

    a.  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b.  30 days before the effective date of cancellation if we cancel for any other reason.

2.  The **Insurer** will mail or deliver our notice to the **Insured Organization's** and agent's last known addresses.

    If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

    The **Insurer** shall not be required to renew this policy upon its expiration.  The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

**Nonrenewal**

1.  The **Insurer** will not refuse to renew a policy issued for a term of more than one (1) year, until expiration of its full term, if anniversary renewal has been guaranteed by additional premium consideration.

2.  If the **Insurer** decides not to renew this policy, the **Insurer** will:

    a.  Mail or deliver written notice of nonrenewal to the **Insured Organization** and agent, if any, before:

        (1)  The expiration date of this policy, if the policy is written for a term of one (1) year or less; or

        (2)  An anniversary date of this policy, if the policy is written for a term of more than one (1) year or for an indefinite term; and

    b.  Provide at least:

        (1)  60 days' notice of nonrenewal, when nonrenewal is to become effective between November 1 and May 31; or

        (2)  90 days' notice of nonrenewal, when nonrenewal is to become effective between June 1 and October 31.

3.  Any notice of nonrenewal will be mailed or delivered to the **Insured Organization's** and agent's last known mailing address.  If notice is mailed, proof of mailing will be sufficient proof of notice.

4.  Any notice of nonrenewal will state the precise reason for nonrenewal.

IMPORTANT NOTICE: Within thirty days of receiving this notice, you or your attorney may request in writing that the director review this action to determine whether the insurer has complied with South Carolina laws in canceling or non-renewing your policy.  If this insurer has failed to comply with the cancellation or non-renewal laws, the director may require that your policy be reinstated.  However, the director is prohibited from making underwriting judgments.  If this insurer has complied with the cancellation or non-renewal laws, the director does not have the authority to overturn this action.

**Policy No.:** LHP677660     **Effective:** 7/9/2018

RSG 203045 0118

**Instructions for Using Editable Applications and Important Legal Information:**

1. Save the document to your local computer.
2. Complete the application by providing your responses in the areas provided; utilize the tab key to move ahead to the next field.
3. If there is not enough space for any particular question, please include the full response in an additional attachment to your application, as you would if you were completing a paper-based application.
4. When you have completed the application, please verify the application for accuracy and completeness before signing the application and forwarding the application to your agent or broker. Do not forward applications directly to Chubb unless you are an agent or broker.
5. If you choose to sign the application with a wet signature, please print the final application, sign the application in ink and forward the application to your agent or broker with any necessary supporting materials.
6. If you apply your signature to this form electronically, you hereby consent and agree that your use of a key pad, mouse or other device to click the "I Agree" button constitutes your signature, acceptance and agreement as if actually signed by you in writing and has the same force and effect as a signature affixed by hand. Further, you agree that the lack of a certification authority or other third party verification will not in any way affect the validity or enforceability of your signature or any resulting contract. You can apply your signature electronically by clicking on the signature field. Once all signatures have been applied, forward the application to your agent or broker via email. Any necessary supporting materials should be sent via email or postal service to your agent or broker.

If you experience technical difficulties utilizing the document, please contact the Chubb Help Desk at 1-877-747-5266, "Option 2".
For all other inquiries please contact your agent or broker. If you are an agent or broker, please contact your local Chubb representative. The document is provided for licensed insurance agents and brokers and their clients only.

IF YOU ARE ACCESSING THE DOCUMENT FROM A VENUE OTHER THAN WWW.CHUBB.COM, BY YOUR USE OF THE DOCUMENT, YOU ARE AGREEING TO THE FOLLOWING. IF YOU DO NOT AGREE, DO NOT USE THE ELECTRONIC DOCUMENT:
* Chubb does not warrant that the document will be free from viruses. You assume the entire cost of any necessary service, repair or correction.
* The privacy of communication over the Internet cannot be guaranteed, because the Internet is not a secure medium. Chubb does not assume any responsibility for any harm, loss, or damage you may experience or incur by the sending of personal or confidential information over the Internet.
* Chubb is not responsible for any versions of the document that have been manipulated, altered or revised from the version of the document that appears on www.Chubb.com. Do not post the document on the Internet.

"Chubb" refers to the member insurers of the Chubb Group of Insurance Companies. Copyright notice: All rights reserved.

| I Agree |

most recent annual financial statements, audited if outside audits are performed. For any **Applicant** with an ESOP, please complete the Supplemental ESOP Application.

3.  All **Applicants** must complete this Renewal Application in accordance with the specific coverages being renewed or requested. Attach additional pages if necessary.

## I.  NAME, ADDRESS AND CONTACT INFORMATION:

1.  Name of **Applicant**: Oaktree Medical Centre, PC dba Pain Management Associates

2.  Address of **Applicant**: 115 Brushy Creek Road

City: Easley    State: SC    Zip Code: 29642

3.  (a)  Primary insurance contact: David Webb    Title: CFO

E-Mail: dwebb@oaktreemed.com

(b)  EPL Loss Prevention Services contact: David Webb    Title: CFO

E-Mail: dwebb@oaktreemed.com

## II.  INSURANCE INFORMATION:

1.  (a)  Indicate the coverages for which the **Applicant** seeks renewal:

| Coverage Requested | Check the box (☐) if requesting larger limits than expiring and indicate requested limit | |
|---|---|---|
| ☑ Directors & Officers and Entity Liability | ☑ | 1,000,000 |
| ☑ Employment Practices Liability | ☑ | 1,000,000 |
| ☑ Fiduciary Liability | ☑ | 1,000,000 |
| ☑ Crime | ☑ | 1,000,000 |
| ☐ Kidnap Ransom and Extortion | ☐ | 1,000,000 |
| ☑ Employed Lawyers Liability | ☑ | 1,000,000 |
| ☐ CyberSecurity | ☐ | 1,000,000 |
| ☐ Workplace Violence Expense | ☐ | 1,000,000 |

**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

CHUBB

*FOREFRONT PORTFOLIO*$^{SM}$ *3.0*
**For Health Care Organizations**
*RENEWAL APPLICATION*

(b) If requesting larger liability limits than expiring as indicated in the above table, please complete the following statement: Note: CyberSecurity includes a Liability Coverage Part. *(Do not complete this statement if no change in liability limits is requested.)*

Solely with respect to any larger liability limit requested or that may ultimately be issued for the proposed renewal:

No person or entity proposed for coverage is aware of any fact, circumstance, or situation that he or she has reason to suppose might give rise to any claim that would fall within the scope of the proposed liability coverage part: None☐ or, except: _____

Solely with respect to any portion of the limit of liability for any liability coverage(s) under the proposed policy that exceed the limit(s) for such liability coverage(s) in the expiring policy, the **Applicant** understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed in response to Question 1(b) above, any claim or action arising from such fact, circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Company.

## III.   GENERAL RISK INFORMATION:

1.   Please complete the following information:

(a)   Total number of worldwide employees: __560__

Number of in-house counsel: ___1___

| | **Current Year** | **Prior Year** |
|---|---|---|
| (b) Full-time employees (excluding employed Medical Practitioners*): | 488 | 392 |
| (i) Full-time employed Medical Practitioners*: | 45 | 48 |
| (c) Part-time employees (including leased and seasonal, excluding employed Medical Practitioners*): | 27 | 34 |
| (i) Part-time employed Medical Practitioners*: | 2 | 3 |
| (d) Volunteers: | | |
| (e) Independent Contractors (excluding Medical Practitioners*): | 6 | 10 |
| (i) Independent Contractor Medical Practitioners*: | 8 | |
| (f) Employees located in California (included in (a) and (b) above): | | |
| (g) Employees located outside of the U.S.: | | |

*Only respond regarding Medical Practitioners employed by the **Applicant**. **"Medical Practitioner"** means a clinical professional, including a physician, physician assistant, surgeon, intern, extern, resident, registered nurse practitioner, certified registered nurse anesthetist, osteopathic physician or surgeon, podiatrist, dentist, orthodontist, endodontist, or any other dental surgeon.

2.   If requesting Crime coverage, has there been any change to the number of worldwide locations?   ☐Yes ☑No
If "Yes", please explain (including identification of any countries entered or exited):

_____

3.   (a)   Please indicate total REVENUES at most recent fiscal year end: _____

(b)   Additional Financial Information: Please provide the following information for the

**Applicant** for the most recent fiscal year end (indicate month/year): _____ Month _____ Year

**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

**CHUBB**

***FOREFRONT PORTFOLIO*** *SM* **3.0**
*For Health Care Organizations*
*RENEWAL APPLICATION*

| Current Assets | $ |
|---|---|
| Total Assets | $ |
| Current Liabilities | $ |
| Current Portion of Long Term Debt | $ |
| Interest Expense | $ |
| Amortization & Depreciation | $ |
| Long Term Debt | $ |
| Total Liabilities | $ |
| Retained Earnings | $ |
| Shareholder's Equity | $ |
| Net Income | $ |
| Cash Flow From Operating Activities | $ |

4. (a) Has the **Applicant** in the last 12 months completed:

   (i)   Any merger, acquisition, or divestment?    ☐Yes ☑No

   (ii)   The creation of any subsidiary(ies)?    ☐Yes ☑No

   (iii)   Entry into any related or unrelated ventures which are a material change in operations?    ☐Yes ☑No

   (iv)   Any change in outside auditors?    ☐Yes ☑No

   (v)   Any reorganization or arrangement with creditors under federal or state law?    ☐Yes ☑No

   (vi)   Any branch, location, facility, office, or subsidiary closings, consolidations or layoffs or reductions in workforce?    ☐Yes ☑No

   (vii)   Any changes to any existing partnership agreement (for any **Applicant** that is formed as or has a partnership in its organizational structure)?    ☐Yes ☑No

   (viii)   Any transaction that has resulted in the formation of any type of partnership entity or are any of the Applicant's subsidiary(ies) acting as a General Partner for an outside organization? If "Yes" then the Applicant must complete Section II of the ForeFront 3.0 for Health Care Organizations Supplemental New Line Application·    ☐Yes ☑No

(b) Is the **Applicant** currently anticipating any of the above?    ☑Yes ☐No

If the **Applicant** answered "Yes" to any part of Question 4, please attach an explanation. For Question 4(vii), also attach a copy of the updated partnership agreement(s).

## IV. COVERAGE SPECIFIC RISK INFORMATION

## A. DIRECTORS AND OFFICERS AND ENTITY LIABILITY INFORMATION

1. Ownership

   (a)   Please complete the following information for the **Applicant**:



**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

CHUBB

*FOREFRONT PORTFOLIO*$^{SM}$ *3.0*
*For Health Care Organizations*
*RENEWAL APPLICATION*

| Names of director or officer shareholders | Voting shares owned |
|---|---|
| Dr. Daniel McCollum | 100.00 % |
| | 100.00 % |
| | % |
| List any shareholders (include any individual and corporate names) that are not directors or officers | Voting shares owned |
| ☐ | % |
| ☐ | % |
| ☐ | |

Please indicate, by checking the box ☐ in the table above, if related by family to another shareholder or to a director or officer of **Applicant**.

(b)  For Partnerships, please attach an organization chart, including ownership percentage of all partner owners.

2.  Recent, Pending or Contemplated Changes

(a)  Has the **Applicant** in the past twelve (12) months had any:

(i)  Public or private offering of securities?  ☐ Yes ☑ No
(ii)  Unplanned change in directors or senior executive officers other than due to illness?  ☐ Yes ☑ No
(iii)  Issuance of debt?  ☐ Yes ☑ No

(b)  Is the **Applicant** currently anticipating any of the above?  ☐ Yes ☑ No

If "Yes" to either of the above in Question 2(a) or 2(b), please attach a full description with details, including any private placement memoranda or any documents filed with the Securities and Exchange Commission in the past year.

(c)  Has there been any change in the **Applicant's** ownership within the last twelve (12) months, or is any change anticipated in the upcoming year?  ☐ Yes ☑ No

If the **Applicant** answered "Yes" to Question 2(c), attach a full description of ownership.

(d)  Is the **Applicant** currently (or, in the past year, has the **Applicant** been) in breach or violation of any debt covenant?  ☑ Yes ☐ No

If the **Applicant** answered "No" to Question 2(d), please attach a full explanation.

## A (I).  HEALTH CARE FRAUD & ABUSE INFORMATION

If the **Applicant** is renewing Health Care Fraud & Abuse coverage, please complete the Information requested below in A (I). For renewing **Applicants**, there is no need to complete A (III) WARRANTY:HEALTH CARE FRAUD & ABUSE. If the **Applicant** is applying for Health Care Fraud & Abuse coverage for the first time, complete sections A (II) and A (III).

1.  (a)  Name of individual responsible for Compliance and title: Allison Rhodes, VP Revnue
(b)  Does this individual have direct access to the CEO or board?  ☑ Yes ☐ No

2.  Does the **Applicant** outsource the billing and/or coding of medical bills to an outside firm?  ☐ Yes ☑ No

3.  Does the Applicant provide compliance training and education to all new employees?  ☑ Yes ☐ No

4.  Does the **Applicant** provide annual training and education to employees who do billing and coding?  ☑ Yes ☐ No

If "No", please explain: _____

5.  Have any changes been made to the current Compliance Program in effect?  ☐ Yes ☑ No



**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

*FOREFRONT PORTFOLIO$^{SM}$ 3.0*
*For Health Care Organizations*
*RENEWAL APPLICATION*

If "Yes", please submit copy of updated Compliance Program and explain changes in a separate Attachment

6. Is the **Applicant** in Compliance with all aspects of HIPAA regulation? ☑Yes ☐No

## A (II). HEALTH CARE FRAUD & ABUSE INFORMATION

If the **Applicant** is applying for Health Care Fraud & Abuse coverage for the first time, please complete the information requested below.

1. (a) Name of individual responsible for Compliance and title: _____

   (b) Does this individual have direct access to the CEO or board? ☐Yes ☐No

2. Does the **Applicant** outsource the billing and/or coding of medical bills to an outside firm? ☐Yes ☐No

3. Does the **Applicant** provide compliance training and education to all new employees? ☐Yes ☐No

4. Does the **Applicant** provide annual training and education to employees who do billing and coding? ☐Yes ☐No

   If "No", please explain: _____

5. Is there a Compliance Program in effect? ☐Yes ☐No

   If "Yes", date implemented? _____

   If "Yes", please submit copy of Compliance Program.

6. In the past five (5) years, has any **Applicant** proposed for this insurance:

   (a) received any notice or contact letter from any government entity or agency including the Department of Justice (DOJ) or the Office of Inspector General (OIG) or an audit contractor (including a Recovery Audit Contractor (RAC), Zone Program Integrity Contractor (ZPIC) or Medicaid Integrity Contractor (MIC)? ☐Yes ☐No

   (b) been subjected to any type of audit investigating whether it allegedly:

   (i) received overpayments for services provided ☐Yes ☐No

   (ii) received payments for services not provided ☐Yes ☐No

   (iii) violated any health care fraud and abuse law? ☐Yes ☐No

   (c) entered into a criminal or civil settlement with the United States or with some party acting on behalf of the United States by which claims against such **Applicant** were resolved? ☐Yes ☐No

   If "Yes" to Question 6 (a), (b) or (c), please explain:

   _____

7. Is the **Applicant** in Compliance with all aspects of HIPAA regulation? ☐Yes ☐No

## A (III). WARRANTY: HEALTH CARE FRAUD & ABUSE

1. To be considered for qualification for Health Care Fraud and Abuse coverage under the Directors and Officers Liability Coverage Part, the **Applicant** must complete items four (4) and five (5) of the warranty statement below.

2. The statement applies to those coverage types for which no coverage is currently maintained, and/or for which any larger limits of liability may be requested.

3. For Alaska, Florida, Georgia, Kansas, Kentucky, Maine, Nebraska, New Hampshire, North Carolina, Oklahoma, Oregon, South Dakota, Virginia, Washington and West Virginia Residents ONLY: the title of this section and any other reference to "Warranty" is deleted and replaced with "**Applicant** Representation".

4. During the past five (5) years, neither the **Applicant** nor any individual or entity proposed for coverage has submitted any claims or given notice of any fact, circumstance, situation, transaction, event, act, error, or omission which they had reason to believe might or could reasonably be foreseen to give rise to a claim that might fall within the scope of insurance with any insurer or self-insurance instrument of which the requested coverages would be a direct or indirect replacement, except as follows:



**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

*FOREFRONT PORTFOLIO*<sup>SM</sup> *3.0*
**For Health Care Organizations**
*RENEWAL APPLICATION*

If the answer is none, so state:

None

**NOTE: WITHOUT PREJUDICE TO ANY OTHER RIGHTS OR REMEDIES OF THE COMPANY, IT IS AGREED THAT ANY CLAIM REQUIRED TO BE DISCLOSED IN RESPONSE TO QUESTION 4 IS EXCLUDED FROM THE PROPOSED INSURANCE, AND THAT ANY CLAIM ARISING FROM ANY FACT, CIRCUMSTANCE, SITUATION, TRANSACTION, EVENT, ACT, ERROR, OR OMISSION REQUIRED TO BE DISCLOSED IN RESPONSE TO QUESTION 4 IS EXCLUDED FROM THE PROPOSED INSURANCE.**

5. Neither the **Applicant** nor any individual or entity proposed for coverage is aware of any fact, circumstance, situation, transaction, event, act, error or omission which they have reason to believe may or could reasonably be foreseen to give rise to a claim that may fall within the scope of the proposed insurance, except as follows:

If the answer is none, so state:

None

**NOTE: WITHOUT PREJUDICE TO ANY OTHER RIGHTS OR REMEDIES OF THE COMPANY, IT IS AGREED THAT ANY CLAIM ARISING FROM ANY FACT, CIRCUMSTANCE, SITUATION, TRANSACTION, EVENT, ACT, ERROR OR OMISSION REQUIRED TO BE DISCLOSED IN RESPONSE TO QUESTION 5 IS EXCLUDED FROM THE PROPOSED INSURANCE.**

**B. EMPLOYMENT PRACTICES LIABILITY**

1. Within the last year has the **Applicant** updated its employment practices handbook, or human resources policies and procedures or department? ☐ Yes ☒ No

   If the **Applicant** answered "Yes" to Question 1, please attach a copy of updated materials and a description of changes.

2. Please complete the following information:

   U.S. Salary Ranges (Should total 100%)

   | Employee Salary Ranges | % in Range Current Year | % in Range Previous Year |
   |---|---|---|
   | Up to $60,000 | 86 | 84 |
   | $61,000 to $120,000 | 6 | 6 |
   | Over $120,000 | 8 | 10 |

3. Are employed physicians required to maintain credentials at any other institution as a contingency of their employment with the **Applicant** (e.g. are employed physicians required to maintain credentials at any affiliated organization)? ☐ Yes ☒ No

4. Layoffs or Reduction in Workforce

   (a) Has the **Applicant** during the past twelve (12) months experienced (or is the **Applicant** planning in the next twelve (12) months) layoffs or a reduction in workforce? ☐ Yes ☒ No

   If "Yes" and if layoffs or reductions in workforce are either 5% or more of the workforce or more than 50 employees, please respond to the following:

   (i) Attach a description of the **Applicant's** procedures for conducting a staff reduction and the management levels/positions involved in this procedure.

   (ii) Does the **Applicant** analyze whether protected classes will be adversely impacted as a result of a staff reduction? ☐ Yes ☐ No

   If yes, is the analysis reviewed by outside counsel? ☐ Yes ☐ No

   (iii) Does the **Applicant** utilize consistent criteria to determine which employees will be impacted? ☐ Yes ☐ No

   If "Yes", please attach a description of the criteria utilized, including whether reasons for selection are documented.

**CHUBB** Chubb Group of Insurance Companies
15 Mountain View Rd.
Warren, NJ 07059

*FOREFRONT PORTFOLIO*$^{SM}$ *3.0*
*For Health Care Organizations*
*RENEWAL APPLICATION*

(iv) Does the **Applicant** involve outside counsel to ensure that WARN (Worker Adjustment Retraining & Notification Act) and OWBPA (Older Worker Benefit Protection Act) requirements are met during staff reduction contemplation and implementation? ☐ Yes ☐ No

(v) Does the **Applicant** have a written severance and waiver agreement in place? ☑ Yes ☐ No

If "No", please attach an explanation.

## C. FIDUCIARY LIABILITY

1. Plan Information

(a) Please list the names and types of **Applicant's** employee benefits plan(s). Attach additional pages if needed. If the **Applicant** has an ESOP, please complete the Supplemental ESOP Application.

| Plan names (Do not include health & welfare plans) | Plan assets (Current Year) | Plan assets As of Date (List Below) | Type of plan* | (DB only) What is the current funded % under the Pension Protection Act? Indicate if "at risk" | Number of plan participants |
|---|---|---|---|---|---|
| IRS of Oaktree Medical | 4,614,651.81 | 5-8-2018 | 401K | N/A | 236 |
| | | | | | |
| | | | | | |

*Defined Contribution (DC), Defined Benefit (DB), Employee Stock Ownership (ESOP), Excess Benefit or Top Hat (EBP)

(List any additional Plans by attachments. If there is an attachment, check here ☐)

2. In the next twelve (12) months is the **Applicant** contemplating (or has the **Applicant** completed within the last year) merging, freezing or terminating any plan(s)? ☐ Yes ☑ No

If "Yes", please attach details including transaction date, status of asset distribution, whether similar benefits are being offered, and name of insurance carrier if terminated plan benefits are secured by insurance.

3. Are any plans NOT in compliance with plan agreements or ERISA? ☐ Yes ☑ No

If "Yes," please describe: _____

## D. CRIME COVERAGE

1. Does the Applicant:

(a) Allow the employees who reconcile the monthly bank statements to also sign checks, handle deposits? ☐ Yes ☑ No

(b) Have procedures in place to verify the existence and ownership of all new vendors prior to adding them to the authorized master vendor list? ☑ Yes ☐ No

(c) Verify invoices against a corresponding purchase order, receiving report and the authorized master vendor list prior to issuing payment? ☑ Yes ☐ No

2. If applicable to the Applicant's business, how often does the Applicant perform a physical inventory check of stock and equipment?
No physical inventory of supplies. Inventory of equipment completeded in 2018

3. Number of independent contractors (natural persons only): _____

## E. KIDNAP/RANSOM AND EXTORTION COVERAGE

1. Please complete the following information regarding the **Applicant's** risk profile:

**CHUBB**

Chubb Group of insurance Companies
15 Mountain View Rd.
Warren, NJ 07059

FOREFRONT PORTFOLIO$^{SM}$ 3.0
For Health Care Organizations
RENEWAL APPLICATION

| Country | Number of employees | Number of Independent Contractors | Type of operation or, if no in-country operations, average stay | If no in-country operations, number of annual trips | Number of Locations |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

For Question 1 above, please attach a separate schedule of locations/travel if needed.

2. Describe the **Applicant's** security precautions taken for foreign travel:

_____

_____

### F.  EMPLOYED LAWYERS LIABILITY COVERAGE

1. Provide the total number of attorneys as follows:

(a) Employed Lawyers: _____ 1

(b) Temporary Attorneys: _____ 1

(c) Contract Attorneys: _____ 1 (Not including outside legal counsel)

(d) Employed Lawyers with more than ten (10) years of legal experience: _____ 1

(e) Employed Lawyers that are members of the Association of Corporate Counsel: _____ 1

2. Have there been any changes to the legal services performed by the **Applicant's** attorneys, whether performed for the **Applicant** or third parties, including moonlighting?   ☐Yes ☑No

If "Yes", please attach an explanation.

### G.  CYBERSECURITY COVERAGE

1. Please indicate the **Applicant's** annual GROSS revenue from on-line sales or services: _____ 0.00

2. Is the **Applicant** compliant with all applicable federal or state law or regulation concerning privacy or the safeguarding of personally identifiable, protected health or other confidential information (other than state "breach notification")?   ☑Yes ☐No

If "No", please attach an explanation.

3. Have there been any changes in the **Applicant's** policies and procedures surrounding the following:

(a) Information Security                                    ☐Yes ☑No

(b) Web Server Security                                    ☐Yes ☑No

(c) Virus, Intrusion Detection and Penetration Testing     ☐Yes ☑No

(d) Mobile Device Security                                 ☐Yes ☑No

(e) Business Continuity Planning                           ☐Yes ☑No

(f) Backup and Archiving Processes                         ☐Yes ☑No

(g) Service Providers                                      ☐Yes ☑No

(h) Compliance, if applicable                              ☐Yes ☑No

(i) Incident Response Planning                             ☐Yes ☑No

If "Yes" to any of the above in Question 3, please attach an explanation



Chubb Group of Insurance Companies
15 Mountain View Rd.
Warren, NJ 07059

**FOREFRONT PORTFOLIO**$^{SM}$ **3.0**
*For Health Care Organizations*
*RENEWAL APPLICATION*

**Notice to District of Columbia Applicants:** WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

**Notice to Florida Applicants:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Notice to Kentucky Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Notice to Louisiana and Rhode Island Applicants:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Maine, Tennessee, Virginia and Washington Applicants:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Notice to New Jersey Applicants:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Notice to Oklahoma Applicants:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Notice to Oregon and Texas Applicants:** Any person who makes an intentional misstatement that is material to the risk may be found guilty of insurance fraud by a court of law.

**Notice to Pennsylvania Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Notice to Puerto Rico Applicants:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand (5,000) dollars and not more than ten thousand (10,000) dollars, or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Notice to New York Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to: a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**SIGNATURE OF APPLICANT'S AUTHORIZED REPRESENTATIVE**

| Date | Signature* | Title |
|------|-----------|-------|
| 5-10-2018 | *[signature]* | CFO |

*This Renewal Application must be signed by the chief executive officer, president, or chief financial officer of the Parent Organization acting as the authorized representative(s) of the person(s) and entity(ies) proposed for this insurance.

*Resigned an 9/12/2018 Daniel Culp CFO*



**Chubb Group of Insurance Companies**
15 Mountain View Rd.
Warren, NJ 07059

**FOREFRONT PORTFOLIO**$^{SM}$ **3.0**
*For Health Care Organizations*
*RENEWAL APPLICATION*

4.  Has an external system security assessment, other than vulnerability scans or penetration tests, been conducted within the past 12 months?   ☐ Yes ☑ No

    If "No", please attach an explanation.

5.  (a)  Has the **Applicant** had any computer or network security incidents during the past year? Incident includes any unauthorized access or exceeding authorized access to any computer, system, data base or data; intrusion or attack; the denial of use of any computer or system; intentional disruption, corruption or destruction of electronic data, programs or applications; or any other incidents similar to the foregoing?   ☐ Yes ☑ No

    If "Yes", please attach a complete description of the incident(s).

    (b)  If the **Applicant** has been the target of any computer or network attacks (including virus attacks) in the past year, did the number of attacks increase?   ☐ Yes ☑ No

    If applicable, check ☐ No attacks.

## H.    WORKPLACE VIOLENCE EXPENSE COVERAGE

1.  Have there been any changes to the **Applicant's** Employee Assistance Program (EAP), progressive discipline, employee complaint/grievance resolution or background checks procedures or security precautions limiting access to its premises?   ☐ Yes ☐ No

    If "Yes", please explain:

---

## V.    MATERIAL CHANGE:

If there is any material change in the answers to the questions in this Renewal Application before the policy inception date, the **Applicant** must immediately notify the Company in writing, and any outstanding quotation may be modified or withdrawn.

## VI.    DECLARATIONS, FRAUD WARNINGS AND SIGNATURES:

The **Applicant's** submission of this Renewal Application does not obligate the Company to issue, or the **Applicant** to purchase, a policy. The **Applicant** will be advised if the Renewal Application for coverage is accepted. The **Applicant** hereby authorizes the Company to make any inquiry in connection with this Renewal Application.

The undersigned authorized agents of the person(s) and entity(ies) proposed for this insurance declare that to the best of their knowledge and belief, after reasonable inquiry, the statements made in this Renewal Application and in any attachments or other documents submitted with this Renewal Application are true and complete. The undersigned agree that this Renewal Application and such attachments and other documents shall be the basis of the insurance policy should a policy providing the requested coverage be issued; that all such materials shall be deemed to be attached to and shall form a part of any such policy; and that the Company will have relied on all such materials in issuing any such policy.

The information requested in this Renewal Application is for underwriting purposes only and does not constitute notice to the Company under any policy of a Claim or potential Claim.

**Notice to Alabama and Maryland Applicants:** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Arkansas, New Mexico and Ohio Applicants:** Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false, fraudulent or deceptive statement is, or may be found to be, guilty of insurance fraud, which is a crime, and may be subject to civil fines and criminal penalties.

**Notice to Colorado Applicants:** It is unlawful to knowingly provide false, incomplete or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory agencies.

**CHUBB**

Chubb Group of Insurance Companies
15 Mountain View Rd.
Warren, NJ 07059

*FOREFRONT PORTFOLIO*[SM] *3.0*
*For Health Care Organizations*
*RENEWAL APPLICATION*

Produced By:

Agent: _____

Agency: _____

Agency Taxpayer ID or SS No.: _____  Agent License No.: _____

Address: _____

City: _____  State: _____  Zip: _____

Submitted By:

Agency: _____

Agency Taxpayer ID or SS No.: _____  Agent License No.: _____

Address: _____

City: _____  State: _____  Zip: _____

*This Endorsement Changes The Policy.  Please Read It Carefully*

# POLICY CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**
**DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY**
**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**
**EXCESS LIABILITY POLICY**

In consideration of the additional premium of ▮▮▮▮▮, it is hereby understood and agreed that this policy is extended to expire January 09, 2020 at 12:01 AM.

All other terms, conditions and warranties remaining unchanged.

This endorsement effective  07/09/2019
forms part of Policy Number  LHP677660
issued to   Oaktree Medical Centre, LLC  dba  Pain
Management Associates

Endorsement No.: 1
Date Processed   : 07/09/2019

RSG 204127 0118

| | |
|---|---|
| **From:** | Thomas K. Hanekamp <thanekamp@agdglaw.com> |
| **Sent:** | Wednesday, June 9, 2021 10:14 AM |
| **To:** | Tracey Pall |
| **Subject:** | [EXTERNAL] FW: Oaktree Medical Centre, LLC dba Pain Management Associates / Oaktree Bankruptcy Actions - RSUI Claim No. 139921 |
| **Attachments:** | SKM_C30821040118400.pdf |

> **ALERT:** This message originated outside of **AmTrust** network. **BE CAUTIOUS** before clicking any link or attachment.

Here is the first of two emails received April 2, 2021.

**Thomas K. Hanekamp**
thanekamp@agdglaw.com



---

**From:** Lee, Angela <Angela.Lee@willistowerswatson.com>
**Sent:** Friday, April 2, 2021 3:21 PM
**To:** 'pkrajec@rsui.com' <pkrajec@rsui.com>; Thomas K. Hanekamp <thanekamp@agdglaw.com>
**Cc:** tracey.pall@anv.us.com; brian.wolosky@CFINS.com; jproyapen@cfcunderwriting.com; Tina McDonald <Tina.McDonald@enstargroup.com>; Steadman, Tim <Tim.Steadman@WillisTowersWatson.com>; Morrow, Pam <Pam.Morrow@WillisTowersWatson.com>; Herche, Lindsey <Lindsey.Herche@WillisTowersWatson.com>; FXUS <FXUS@WillisTowersWatson.com>; Tim Daileader <tdaileader@drivetrainllc.com>; David Dunn <david.dunn@hoganlovells.com>
**Subject:** Oaktree Medical Centre, LLC dba Pain Management Associates / Oaktree Bankruptcy Actions - RSUI Claim No. 139921

**VIA ELECTRONIC MAIL – pkrajec@rsui.com; thenekamp@agdglaw.com**
**DELIVERY RECEIPT REQUESTED**

| | |
|---|---|
| **Insured:** | Oaktree Medical Centre, LLC dba Pain Management Associates |
| **Policy No.:** | LHP677660 |
| **Policy Pd.:** | July 09, 2018 to January 09, 2020 |
| **Matter:** | Oaktree Bankruptcy Actions |

Dear Claim Representatives:

Attached please find the attached correspondence from the Smith Hudson Law Firm issued to **Tim Daileader**.  The Smith Hudson Law Firm represents John K. Fort, Chapter 7 Trustee for the Bankruptcy Estates of the Debtors in connection with Oaktree Medical Centre, LLC; Oaktree Medical Center, PC; and Labsource, LLC bankruptcy actions.

1

Please direct your acknowledgment and coverage letters to my attention with copies to FXUS@willistowerswatson.com, Tim Daileader (tdaileader@drivetrainllc.com) and David Dunn (david.dunn@hoganlovells.com).  Here is Mr. Daileader's complete contact information:

Tim Daileader, CFA

c/o **Drivetrain, LLC**
410 Park Avenue, Ste. 900
New York, NY 10022

(646) 650-5993 (office)
(917) 923-3464 (mobile)

Thank you for your anticipated cooperation.  Please do not hesitate to contact me if you should have any questions or need any additional information.

**Angela J. Lee**
Associate Director – Claims Advocate
FINEX Claims & Legal Group

**Willis Towers Watson**
Willis Americas Administration, Inc.
5 Concourse Parkway | 18th Floor | Atlanta, GA 30328
D: (770) 206-2601
M: (678) 296-3878
**angela.lee@willistowerswatson.com**
**www.willistowerswatson.com**

**cc:**      **(Via Email)**

**Excess Carriers:**

ANV Global Services
Policy No.: ANV122398A
Policy Pd.: August 22, 2018 to January 09, 2020

Crum & Forster Specialty Insurance Company
Policy No.: EPP-100004
Policy Pd.: August 22, 2018 to January 09, 2020

CFC Underwriting Limited
Policy No.: DOH00746111
Policy Pd.: August 22, 2018 to January 09, 2020

Starstone Specialty Insurance Company (Enstar)
Policy No.: H70164180ASP
Policy Pd.: December 11, 2018 to January 09, 2020

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit https://www.willistowerswatson.com/en-GB/Notices/legal-disclaimers

Willis Towers Watson is a leading global advisory, broking and solutions company that helps clients around the world turn risk into a path for growth. Willis Towers Watson has offices in 140 countries and markets. For a complete list of office locations, please click here

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy notice by emailing unsubscribe@willistowerswatson.com [ELD-DEF].



April 1, 2021

**SUBMITTED IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS AND NOT TO BE USED FOR
ANY OTHER PURPOSE SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

### VIA EMAIL ONLY

Timothy Daileader
c/o David Dunn
Hogan Lovells US, LLP
david.dunn@hoganlovells.com

Huron Consulting Services, LLC
c/o Jonathan Miller
Williams Montgomery & John
jm@willmont.com

| | Re: | **Oaktree Medical Centre, LLC** | **Case Number 19-05154-hb** |
|---|---|---|---|
| | | **Oaktree Medical Centre, PC** | **Case Number 19-05155-hb** |
| | | **Labsource, LLC** | **Case Number 19-05161-hb** |

Dear David and Jon:

Through the authority and consent of your clients, on September 19, 2019, Oaktree Medical
Centre, LLC; Oaktree Medical Centre, P.C.; and Labsource, LLC (collectively the "Debtors") filed
petitions for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code with the
United States Bankruptcy Court for the District of South Carolina. As you know, we represent
John K. Fort, Chapter 7 Trustee (the "Trustee") for the Bankruptcy Estates of the Debtors (the
"Estates").

Based on the Trustee's investigation thus far, we have determined that Huron Consulting Services,
LLC and Timothy Daileader are jointly and severally liable to the Estates for their failure to comply
with South Carolina law by breaching their fiduciary duties while engaged as officers and directors
of the Debtors.

We ask that Huron Consulting Services, LLC and Timothy Daileader place all insurers on notice
of this matter immediately, including all general liability, excess carriers and/or umbrella policy
holders. It is foreseeable that our claims will exceed all existing policy limits, making it imperative
that all insurers are put on notice, regardless of type or coverage limits. This letter is also a demand
that Huron Consulting Services, LLC and Timothy Daileader and all persons acting on their behalf

864-908-3912 | smithhudsonlaw.com
jhudson@smithhudsonlaw.com | jsmith@smithhudsonlaw.com

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 155 of 381

preserve all documents, tangible things, photographs, videos, and electronically stored information of any nature potentially relevant to the above-referenced cases not already produced.

## Facts

### A. The Formation of Oaktree Medical Centre

Oaktree Medical Centre ("OMC") was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations. The iteration of OMC for our purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network. Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

### B. The Fidus Loan

On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina. In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions. Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

**C.    OMC Operation and Control: Tim Daileader's Placement**

Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018 the Lenders exercised one of their remedies and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource. The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent. The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1] This was Mr. Daileader's first independent directorship in a healthcare company.

Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"). In it, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years. This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility. Soon after becoming an independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

**D.    Huron's Engagement**

Around late July 2018, Mr. Daileader required Dr. McCollum and OMC to retain Huron Consulting Group ("Huron"), which included Huron Transaction Advisory ("HTA")[3] and the McGuire Woods law firm, purportedly to assist with the corporate restructuring necessary to

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

[3] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

refinance the Loan. Mr. Daileader was already in communication with a McGuire Woods attorney named Mark Freedlander. Mr. Freedlander worked his way into the matter through John DiDonato, a top Huron executive and acquaintance of Mr. Freedlander. Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuire Woods' representation for the sale of the company and their "corporate lawyering gets [McCollum] a better deal, higher price, etc." On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exclusive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75 million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend. McGuire Woods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine. However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left HTA, Huron, and McGuire Woods on the sidelines.

According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain." HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers.

Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The LOI is a distraction to Brohm and Webb[4] — they're trying to force a deal that isn't there — and they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift the strategy definitively, or else we're going to lose the last window we have."

It was during this correspondence that Mr. Daileader posed the following to Mr. Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy filing before the estate deteriorates further."

---

[4] Michael Brohm was OMC's CEO and David Webb was its CFO.

4

## E.     The Raids

Mr. Daileader did not have to think about the LOI for long because his wish for the potential purchase to fail came true just six days later. According to the DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US Department of Health and Human Services conducted raids on the Easley, Spartanburg, and Greenville OMC facilities. At that time, the refinancing effort was terminated[5], the National Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of McGuireWoods was correspondingly expanded to provide for restructuring, corporate and healthcare legal services to the entire enterprise."[6]

All three practices that were raided were fully operational with no employee loss and no patient cancellations the day after. The outside IT provider worked all night to get the practices up and running. Consequently, there was no operational crisis that Huron needed to manage. Mr. Daileader felt, however, that the sale of the business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in default with the Lenders. Mr. Daileader also felt that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon.

At this point, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies."

Despite this change of course, Mr. Daileader curiously kept Mr. Freedlander, who was not in McGuire Woods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuire Woods healthcare team until the following spring. From the beginning, Mr. Freedlander knew that the situation was a mess, but would create considerable revenue for himself and his firm, so he was eager to get on board and stay on board.

## F.     Aaron Kibbey

On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC. According to a July marketing pitch to OMC, Huron touts itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200

---

[5] By Mr. Daileader.

[6] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron, HTA pocketed the fee and Huron began billing OMC hourly.

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 159 of 381

dedicated, industry focused professionals with broad expertise; [n]umerous restructuring, business assessment, performance improvement, strategic, interim management and transaction assignments; [and that additionally] [w]e know the business, payers, market dynamics and the customers (e.g., patients and physicians)." While CROs typically have an expertise in the field of business in which the company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron and his first and only engagement as a CRO for a healthcare company.[7]

This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony:

> A. I think I've said this before. I'm not a healthcare corporate structure expert. I spent a lot of time looking at the way that all of the entities were set up. I did not understand – I understood it better as time went on and as McGuire Woods explained to me how it should be set up versus how it was set up, but I don't know if I would say I ever completely understood the structure.

Mr. Kibbey further testified:

> Q. Was it possible to reorganize Oaktree without a clear understanding of the corporate structure?
> A. With the guidance and counsel of McGuire Woods healthcare team, yes.

## G.    The MSO

A management services organization ("MSO") generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare environment because they enable the practice to have better control over overall medical spending and cost effectiveness.

The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

---

[7] As detailed below, Huron would not engage their healthcare practice team until June 2019.

Under the terms of the November 9, 2018 Engagement Letter, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales transaction and ongoing assistance and support with negotiations with the prospective purchaser under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations.

As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. In an email dated October 12, 2018 to Mr. Daileader, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level."

Despite what appeared to be a clear consensus for an MSO placement, when Mr. Kibbey was questioned about this at his 2004 Exam, he testified as follows:

> Q. Was Huron hired as an MSO-level CRO?
> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

7

Mr. Kibbey's testimony at the 341 Hearing is also illustrative:

> Q. Okay, and [OMC] PC's goal was to do what, then?
> A. So, I think they were – it was supposed to be structured, and I don't claim to be a medical corporate entity structure expert, we deferred – we had an entire team from McGuireWoods that was looking into that, and I think the way it was supposed to be structured so that you separate the clinical assets, if you will, from the non-clinical assets. Unfortunately, that was never done.
> Q. Never done before you became involved or?
> A. Correct and since. There was a plan to do it. There was a lot of time that went into what would be required in terms of the paperwork to change the entire corporate structure. I think part of that just due to a number of issues including liabilities associated with those entities, was going to be done through a Chapter 11 restructuring as well. So, there was a plan in place to do all that, but it never happened.

## H.    Problems with Huron

Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject would not be surprising but for the fact that at the time of the 341 Hearing he had just recently completed his duties as the CRO of OMC, a healthcare company, after nearly a year. As early as November 5, 2018, Mr. Daileader and Mr. Freedlander were already having issues with Huron's "stagnation," and soon after came issues with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours and lack of any detailed invoicing as to what services Huron actually performed. Mr. Freedlander remarked in one email in November 2018: "None of us look very good at the moment here and we need to rectify this very quickly before the bottom falls out."

That frustration continued throughout Huron's engagement, and their incompetence was often evident. Mr. Daileader received negative feedback from the Lenders in January regarding Huron's performance, particularly with regard to Mr. Kibbey. In February, Mr. Freedlander voiced his concern regarding a lack of CRO leadership to his McGuire Woods colleagues, as well as separately to Mr. Daileader. He wrote, "Huron has been less than efficient and effective." By April, the Lenders continued to be critical of Huron due to their inability to drive the restructuring process forward. OMC management discussed their concerns with Mr. Daileader, who confirmed even to them that he was not impressed with Huron's involvement. When pressed about substantially decreasing or even discontinuing Huron's involvement, Mr. Daileader admitted that he was looking into replacements. Nevertheless, Huron remained and the ineptitude continued. In early May, to the astonishment of a member of McGuire Woods' healthcare team, Huron nearly missed the OMC medical malpractice insurance renewals. As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational.

There may not be a better example of Huron's ineffectiveness than how they handled the Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). During the wind down and liquidation process in August 2019, after having complete control of OMC for nine months,

Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. That information is a necessary component of legally proper WARN Notices. They essentially invented a corporate structure in order to have available providers execute the Notices to clinic employees. Beyond that, for the Notices they were able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline they set for themselves, which was based on how much money was left for them to be paid for their services. Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet all they were concerned about was making sure their fees were paid in full.

## I.    Additional Fidus Loans

By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals. Because of these expenditures, incurred by Mr. Daileader and Huron, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments. OMC had not previously missed making interest payments to the Lenders. Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[8]

In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuire Woods billed OMC during its engagement as lead counsel. The billing was clearly excessive, yet Mr. Daileader never questioned it. In one email, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuire Woods'] professional service will more than adequately protect the price of the deal."

On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included covenants establishing milestone dates by which the consolidated group of entities were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit. Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million is projected to be required to support going concern operations of the enterprise through mid-October 2019."

---

[8] The OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements. Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant. Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him. In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing.

## J.    Still No MSO or Restructuring Plan

Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance. Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his 2004 Exam:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put that structure into place, and, again, it would require the consent of all of the entities that were involved, including some entities that it – it was a very complicated restructuring that involved closing down certain entities; separating from certain

> entities; and transfers of different assets, including the identification of where assets were owned and then making those transfers. One of the issues that we encountered in looking at the books and records was that the management – the existing management did not designate where certain assets were owned within the broader group. And, in fact, when we went and compared the transaction documents where they had acquired those, we saw that there was no designation made to, you know, the certain books and records of different entities. So we went back to Elliott Davis and actually asked for their help in identifying who owned these assets, and to the extent they were at the correct entity, that was fine; and to the extent they were at the incorrect entity, we would need to effect those transfers. Elliott Davis was not able to answer that, so there was an ongoing investigation to try to resolve those issues.
>
> Q. And what ultimately happened? Why did that investigation stop?
>
> A. Well, eventually the company – eventually we put in front of the lenders a full reorganizational plan, and 30-plus days after we put the lenders – the organizational plan in front of the lenders, the lenders declared to us that they were not going to fund the organizational plan, and the company then changed strategy to pursue either the sale of the company, as I described before, or a liquidation – a wind-down and a liquidation.
>
> Q. When did you present that plan to the lender?
>
> A. Around the third week of June 2019.

With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter that "the Oaktree Medical family of entities is in the process of finalizing details relating to a comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring Officer and myself, an operational restructuring of the businesses comprising the Oaktree Medical family of entities is also in process."

He continued: "The implementation of the aforementioned steps takes time, and any positive financial impact of these steps likewise is expected to take a substantial period of time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult. As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuire Woods *and* expand their team. Actual *implementation* of the plan was presumably a long way off. At many points along the way, Mr. Daileader, McGuire Woods, and Huron threatened to go "pencils down"

if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

What Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[9] In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

### K.  Final Demand of the Lenders

In early July 2019, Mr. Daileader was demanding $1 million from the Lenders. Ironically, he used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law." Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee."

By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months. However, Mr. Daileader and Huron did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding. In their outline for the Lenders, they noted that a Chapter 11: "Provides the independent director and professionals to the Oaktree companies with the releases and exculpation that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections." Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[10] Mr. Daileader wrote: "An additional result of this process is the further avoidance of professional fees, including the $300-400k monthly currently accruing, replacing these professionals with permanent management." One final time the team went pencils down while they waited, and the unsecured debt continued to balloon. Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

---

[9] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

[10] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuire Woods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuire Woods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

## L.     Liquidation and Crossing the Rubicon

The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees. Mr. Daileader and Mr. Freedlander were so unconcerned about the situation that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.
> A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

As part of the liquidation, Mr. Kibbey and his team ignored the 40% of third-party tests Labsource was conducting and gave it away to a competitor. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[11] Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[12]

On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[13] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[11] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[12] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[13] This number fell to zero less than seven weeks later, at the time of the Chapter 7 filing.



Total Assets vs Total Liabilities

On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an email to Mr. Kibbey and Mr. Freedlander which he titled "*Crossing the Rubicon?*" He wanted to know if the Chapter 7 Petitions had been filed. Mr. Freedlander informed him that they were just waiting on the wires that would compensate Huron and McGuire Woods for their final invoices. Later that day the wires were sent ($148,734 to Huron and $61,620 to McGuire Woods). Despite this, Mr. Daileader disputed that the two entities were paid in full in his 2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuire Woods
> were paid in full the day before the Chapter 7 was filed?
> A. I don't believe – I'd be surprised, because I don't actually believe
> it's true.

Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap.

On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

## Analysis

Mr. Daileader and Huron's first inquiry should have been whether there was any reasonable and actionable probability of success with one of four strategy options: 1) Stock or asset sale, 2) Refinancing, 3) Restructuring, or 4) Chapter 11 Bankruptcy.[14]

They stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues. It remains unclear, other than the desire to get paid, why Mr. Daileader and Huron could not comprehend these clear and present internal and external threats, especially after the DOJ raids. If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival should be operated to maximize returns for all creditors.

If there was a path to restructure, and clearly the team thought and communicated that there was, their first step should have been to develop a restructuring strategy, and their second should have been to implement that strategy. In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented. A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core. Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure. Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. From Mr. Daileader's 2004 Exam:

> Q. How did you value a settlement with the DOJ wither regard to the value of Oaktree as to prospective buyers.
> A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

From Mr. Kibbey's 2004 Exam:

> Q. Did you ever value a settlement with the Department of Justice?
> A. I don't understand the question.
> Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency.
> A. Again, we didn't do any solvency analysis.

---

[14] There was, of course, always the fifth option that they could have declined to accept the assignment due to the potential significant liability involved.

15

Despite that, it may have been less Mr. Daileader and Huron's failure to adapt after the DOJ raids and more a lack of internal discipline that caused OMC's downfall. Good CROs generally agree that a relatively simple fix involves regular rotation of management. The key to a successful CRO is less about his financial advisory skills and more about his capacity to drive operational change and be all encompassing. He is there to bring credibility, objectivity, and stability to the restructuring process and build consensus amongst stakeholders regarding the direction of the restructuring. The minute Mr. Daileader and Huron opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies. While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. There were clear issues with key management, yet the team kept them around for months. In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, closed the ones that weren't, and then tried to do a workout or file Chapter 11 Bankruptcy. A Chapter 11 likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts contributed to fixed costs[15] of the entities throughout Huron's engagement. Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

Instead, Mr. Daileader and Huron flip-flopped with all four options during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

Bankruptcy, especially a Chapter 7, is a last resort when a business fails. But instead, Mr. Daileader and Huron used it as a crutch, as a threat to the Lenders, thinking that if they actually went that direction, they could wipe off their hands and walk away. Under South Carolina law, however, officers and:

> directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.*, 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Woolf*, 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp*, 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors

---

[15] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), <u>dismissed sub nom.</u> *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir. Mar. 19, 2018). See also *In re Joseph Walker & Co., Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015). Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at \*13 (Bankr. D.S.C. Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at \*14.

There is no doubt that Mr. Daileader and Huron had a fundamental misconception of their fiduciary duties. From Mr. Daileader's 2004 Exam:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director or manager of.

From Mr. Kibbey's 2004 Exam:

> Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?
> A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.
> Q No. I'm asking in terms of your fiduciary duty.
> A. My fiduciary duty was to the company.
>
> Q. Tell me the difference between a critical and non-critical vendor.
> A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. ...
> Q. I'm assuming critical vendors were paid before non-critical vendors?
> A. In most instances, I would – yeah, that's a fair statement.

So, then the issue becomes OMC's insolvency. At the 341 Hearing for these matters, Mr. Kibbey testified as follows:

> Q. When did Oaktree PC become insolvent, to your knowledge?
> A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

> Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?
> A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

> Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?
> A. Correct. You can make an argument that company had been insolvent for years.

In Mr. Daileader's 2004 Exam, he testified:

> Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?
> A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.
> Q. Was it?
> A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

The following are excerpts from Mr. Kibbey's 2004 Exam:

> Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent.
> A. I don't know.
> Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?
> A. I never came to a conclusion regarding solvency.
>
> Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?
> A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.
>
> A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.
> Q. Do you dispute that testimony?
> A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.
> Q. Under what definition had Oaktree been insolvent for years when you stepped in?
> A. Under what definition?
> Q. You said it depends on the definition. I'm wondering what definition it depends on?
> A. The inability to pay your debt.

Mr. Kibbey has advanced qualifications in this area, including being a Certified Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether the company he was an officer of for nearly a year was solvent, but also of providing even a rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's fees or you were able to do enough cost-cutting initiatives to pay for it?
> A. We were not able to implement enough cost-cutting initiatives to even allow the company to consistently make payroll across all the – of the entities, and that fundamentally was the reason for the restructuring plan. When you add professional fees onto that, the only way you could fund that part of the restructuring was with

19

> additional cash infusion from an outside source. So that additional
> cash infusion went not only for professional fees but also for payroll
> so that you could keep employees working on restructuring and the
> day-to-day operations.

If a company does not have the cash to pay its bills as they become due without additional funding, it is insolvent.

Yet, despite his alleged ignorance of what insolvency is and whether he could accurately testify as to OMC's solvency, Mr. Kibbey did testify to the following:

> Q. So give me a broad scope. I realize that there's a list of items on
> the engagement letter. But big picture, what are you doing other than
> under – I mean – or was all you were doing was understanding what
> happened?
> Q. What else were you doing? What was your main goal?
> A. One of our primary objectives was to understand the company's
> liquidity position.

Huron's primary objective was to understand the company's liquidity position, but to hear Mr. Kibbey tell it, because Mr. Kibbey was not capable of understanding whether or not OMC was solvent, Mr. Kibbey was clearly unable to understand their primary objective, OMC's liquidity.

Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management. Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved. The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader allowed it to happen. Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. From his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.

20

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 174 of 381

Later in the 2004 Exam:

> Q. My understanding is that there's a Huron Transaction Advisory,
> LLC and a Huron Business Advisory, LLC. Are you familiar with
> those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing). October or November of 2018 was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank, Lenders willing to lend in order to get out of the hole they were in, and OMC had never missed an interest payment to the Lenders. Once the professional fees began, however, the $2 million was depleted and the interest payments stopped.

Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors.

A competent CRO should have drawn the conclusion early in his involvement that there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the essence in a distressed situation and the CRO is required to act decisively and quickly. Stagnation and indecision only accelerate the crisis. But yet, Mr. Kibbey testified in his 2004 Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in
> November 2018?
> A. I don't – I did not know enough to make a recommendation, at
> least, like I think I said earlier, you can always make
> recommendations – make a thoughtful recommendation as to what
> the course should be, whether it should be a Chapter 11 or Chapter
> 7 or an out-of-work. We did not know enough to make an intelligent
> professional recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

By that rational, time was not of the essence as long as you have money; if the source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004 Exam testimony:

> Q. Was Huron able to establish a fully compliant and effective
> MSO?
> A. I would answer that question a little differently. Huron doesn't
> have the ability to do that by itself.

> Q. With whatever partners you need, was it able to do so?
> A. Can you repeat the question?
> Q. Yes. Was Huron and the other professionals able to establish a
> fully compliant and effective MSO?
> A. There was a plan in place. The plan was never fully executed.
> Q. Why not?
> A. Well, because part of that plan involved filing for a Chapter 11
> as part of the corporate restructuring, and we were not able to get
> the financing filed for a Chapter 11, and the lenders requested that
> not only we do not file for Chapter 11, but that we wind down the
> operations. So at that point there was – it didn't make any sense to
> put any more time or effort into trying to create an MSO client
> organization, just to wind it down.
> Q. That was in the summer of 2019?
> A. What is your question about?
> Q. What you're talking about where the lenders asked you to wind
> it down and wouldn't fund the Chapter 11 and the client MSO, that
> was in the summer of 2019, right?
> A. Correct.

Mr. Daileader noted in his 2004 Exam testimony that "we produced a product, and we produced the opportunity for it to be restructured, and ultimately the lenders denied the funding."

Mr. Kibbey again:

> Q. Did you ever come up with a strategy?
> A. A strategy for what?
> Q. For whatever it was you were supposed to do at Oaktree.
> A. I don't know if I can answer that. I can't answer that question.
> What I can say is over the course of the engagement we developed
> a restructuring plan and with a budget and with a timeline and were
> in the process of executing that plan.

So, what did Mr. Daileader and Huron do? Not much. It was all correspondence, talk, and spreadsheets. By mid-January, they were still discussing simply *getting together* to develop a comprehensive game plan for an overall restructuring.[16] Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement (hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k. As of the writing of this letter, that money is still with the Court and the Trustee is in the process of recouping it. Huron spent an embarrassing amount of time reviewing historical OMC management emails, which was a "top priority" according to Mr. Freedlander.

---

[16] A restructuring *proposal* was not presented until May 20, 2019.

When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's testified:

> Q. So in your professional opinion, reviewing employee emails was
> important in this matter?
> A. In this matter it proved to be critical. You wanted to understand
> the real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what
> was really happening behind the scenes.

This was never achievable according to Mr. Kibbey:

> Q. So it sounds to me like you're talking about initially in November
> you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what
> point in time?
> A. I'm not sure we ever stopped trying to understand the situation.

So, what does Mr. Kibbey think they did accomplish? From his 2004 Exam again:

> Q. What measurable restructuring initiatives did you achieve during
> your engagement?
> A. I'm not sure what you're getting at. What I will – so maybe I'm
> not answering the question right. If I'm not, let me know. So the
> liability based on the proposed settlement with the Department of
> Justice that we later learned of that was on the table when we were
> engaged was 30 to $40 million. So as part of our discussions with
> the Department of Justice, that proposed settlement went down to 1
> to 5 million. So the savings there are anywhere from 35 to – or I
> guess if you start at 30 million, right, it could be 25 to 39 million of
> savings just through that liability alone.

The first and only measurable restructuring initiative they achieved, according to the CRO, was a
potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had
already testified that McGuire Woods was leading those negotiations.

Mr. Kibbey did ultimately admit that expedience was important. From his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional
> fees that Oaktree was paying could not be sustained?
> A. No. I think – I think in terms of a restructuring, I mean, that's
> often the case. A business isn't designed to pay professional fees for
> an indefinite length of time. And we never came to the conclusion
> that Oaktree could pay these fees for an indefinite length of time. It
> was how do you as quickly as you can effectuate a restructuring and

23

transition the business and presumably the ownership.

Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent without an influx of lender cash. They should have known that the only way to save the company was an expedient Chapter 11. Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7.

Perhaps Mr. Daileader should have learned from another, earlier matter he was involved with in which the Bankruptcy Court Judge, in denying Mr. Daileader's Motions for an Expedited Hearing and to Reopen the Evidentiary Record on the Confirmation Hearing, stated that "every dollar spent on professionals … detracts from the creditors' distribution." *In re: Abengoa Bioenergy Biomass of Kansas, LLC.*

There is not much that sums up the attitude that these professionals had with regard to their duties and responsibilities more than a colorful July 26, 2019 email from Mr. Freedlander to Mr. Daileader, with regard to the Lenders: "Fuck these guys. Let's kill this and move on. We all have other and better things to do. This is just a game to these fools and not worth the effort."

### Damages

The damages that Mr. Daileader and Huron caused are massive, no matter how they are quantified. The total liabilities on the OMC books as of August 31, 2019 were $39,876,123. While that is a nearly $12,000,000 increase from one year prior, the Trustee believes that had OMC been restructured properly, the entirety of the initial $32 million worth of debt could have been eliminated. The Bankruptcy Schedules that Mr. Daileader and Huron filed show potential claims totaling just under $38 million. However, the claims registers in the bankruptcies reflect potential claims of over $925 million. While that number includes some obvious arbitrary overreaches, it does not include a $140 million default judgment that the USDOJ has requested but has not yet been granted by the federal court in a False Claims Act matter which was shockingly ignored by Mr. Daileader, Huron, and their attorneys once Chapter 7 was filed. When and if the default judgment is granted, the USDOJ will be able to file that claim against the Estates, and it will certainly be added to the totals.

In order to avoid the cost and expense entailed in the commencement of litigation to recover the unsecured debt, the Trustee would like the opportunity to discuss a potential settlement of this matter without the need for litigation with your clients. Please contact me to discuss, but before doing so please make sure to have all information regarding available insurance coverage, and the contact information for the appropriate party at each carrier. The ability to negotiate this matter pre-suit expires on **April 21, 2021**, and absent contact from you, we will proceed with the commencement of litigation to formally resolve this matter.

Please note that any Adversary Complaint filed against your clients will likely include causes of action for Breach of Fiduciary Duty, Negligence, Negligent Misrepresentation, Gross Negligence, Unfair Trade Practices, Fraud, Breach of Contract, Breach of Contract Accompanied by Fraudulent

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 178 of 381

Act, Unjust Enrichment, Conversion, Civil Conspiracy, as well as 11 USC § 547 (Insider) and § 548 claims. These claims, as you know, carry with them the Trustee's ability to add punitive and/or treble damages to his already substantial claims.

This confidential letter is provided for settlement purposes only and, as such, any statements contained herein are inadmissible pursuant to Federal Rule of Evidence 408. Nothing contained herein should be construed as an admission of fact or law.

      With kind regards, I am,

              Very truly yours,

              SMITH HUDSON LAW, LLC

              Joshua J. Hudson

25

## Nashban, Stephanie A.

| | |
|---|---|
| **From:** | Wright, Greg <Greg.Wright@willistowerswatson.com> |
| **Sent:** | Wednesday, June 16, 2021 3:52 PM |
| **To:** | thanekamp@agdglaw.com; pkrajec@rsui.com; tracey.pall@anv.us.com; Jean-Pierre Royapen; 'Vazcones, Jessenia'; Tina McDonald; Meer, Jonathan; sschechter@kbrlaw.com; Joshua DiLena; Nashban, Stephanie A.; Gassman, Gary L. |
| **Cc:** | FXUS; Tim Daileader; Dunn, David |
| **Subject:** | RE: Oak Tree Medical Center LLC dba Pain Management Associates/Oaktree Bankruptcy Actions |
| **Attachments:** | DRAFT Adversary Complaint (Huron, Kibbey, & Daileader).pdf |

**\*\*EXTERNAL SENDER\*\***

CONFIDENTIAL

As an update, attached please find a confidential draft complaint recently provided by Josh Hudson of the Smith Hudson Law Firm.

Best regards,

**Gregory S. Wright**
Associate Director – Claims Advocate
FINEX Claims & Legal Group

**Willis Towers Watson**
Willis Americas Administration, Inc.
800 N. Glebe Road, Arlington, VA 22203

M: (240) 281-5594
greg.wright@willistowerswatson.com
www.willistowerswatson.com

---

**From:** Meer, Jonathan <Jonathan.Meer@wilsonelser.com>
**Sent:** Tuesday, June 15, 2021 3:42 PM
**To:** Wright, Greg <Greg.Wright@willistowerswatson.com>
**Cc:** sschechter@kbrlaw.com; Joshua DiLena <jdilena@kbrlaw.com>; 'Vazcones, Jessenia' <Jessenia.Vazcones@cfins.com>; Jean-Pierre Royapen <JPRoyapen@cfcunderwriting.com>; Tina McDonald <Tina.McDonald@enstargroup.com>; FXUS <FXUS@WillisTowersWatson.com>; Tim Daileader <tdaileader@drivetrainllc.com>; pkrajec@rsui.com; thanekamp@agdglaw.com; tracey.pall@anv.us.com; Gassman, Gary L. <ggassman@cozen.com>; Dunn, David <david.dunn@hoganlovells.com>; Nashban, Stephanie A. <SNashban@cozen.com>
**Subject:** RE: Oak Tree Medical Center LLC dba Pain Management Associates/Oaktree Bankruptcy Actions

Dear Greg,

Wilson Elser has been retailed to assist CFC in connection with this matter. If you could include me on your email distribution list, that would be appreciated.

Thank you. All rights reserved.

Regards,

Jonathan

Jonathan Meer
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5639 (Direct)
212.490.3000 (Main)
212.490.3038 (Fax)
jonathan.meer@wilsonelser.com

**From:** Dunn, David [mailto:david.dunn@hoganlovells.com]
**Sent:** Tuesday, June 15, 2021 11:21 AM
**To:** Nashban, Stephanie A. <SNashban@cozen.com>; greg.wright@willistowerswatson.com
**Cc:** sschechter@kbrlaw.com; Joshua DiLena <jdilena@kbrlaw.com>; 'Vazcones, Jessenia'
<Jessenia.Vazcones@cfins.com>; Jean-Pierre Royapen <JPRoyapen@cfcunderwriting.com>; Tina McDonald
<Tina.McDonald@enstargroup.com>; FXUS <FXUS@WillisTowersWatson.com>; Tim Daileader
<tdaileader@drivetrainllc.com>; pkrajec@rsui.com; thanekamp@agdglaw.com; tracey.pall@anv.us.com; Gassman, Gary
L. <ggassman@cozen.com>
**Subject:** RE: Oak Tree Medical Center LLC dba Pain Management Associates/Oaktree Bankruptcy Actions

Thank you.  I represent Tim Daileader.  My contact information is as follows:

**David Dunn**
Partner

**Hogan Lovells US LLP**
390 Madison Avenue
New York, NY 10017
Tel:      +1 212 918 3000
Direct:  +1 212 918 3515
Fax:     +1 212 918 3100
Email:   david.dunn@hoganlovells.com
         www.hoganlovells.com

**From:** Nashban, Stephanie A. <SNashban@cozen.com>
**Sent:** Tuesday, June 15, 2021 10:49 AM
**To:** greg.wright@willistowerswatson.com
**Cc:** sschechter@kbrlaw.com; Joshua DiLena <jdilena@kbrlaw.com>; 'Vazcones, Jessenia'
<Jessenia.Vazcones@cfins.com>; 'Jean-Pierre Royapen' <JPRoyapen@cfcunderwriting.com>; Tina McDonald
<Tina.McDonald@enstargroup.com>; FXUS <FXUS@WillisTowersWatson.com>; Tim Daileader
<tdaileader@drivetrainllc.com>; Dunn, David <david.dunn@hoganlovells.com>; pkrajec@rsui.com;
thanekamp@agdglaw.com; tracey.pall@anv.us.com; Gassman, Gary L. <ggassman@cozen.com>
**Subject:** Oak Tree Medical Center LLC dba Pain Management Associates/Oaktree Bankruptcy Actions

**[EXTERNAL]**
Greg-

Please be advised that we have been retained to represent both ANV and StarStone in connection with this matter. Please add myself and Gary Gassman (copied above) on your email list going forward.

Thank you,

Stephanie



**Stephanie A. Nashban**
**Member | Cozen O'Connor**
123 North Wacker Drive, Suite 1800 | Chicago, IL 60606
P: 312-474-1638 F: 312-706-5089 C: 917-806-2980
Pronouns: she, her, hers
Email | Bio | Map | cozen.com

---

If you would like to know more about how we are managing the impact of the COVID-19 pandemic on our firm then take a look at our brief Q&A. If you would like to know more about how to handle the COVID-19 issues facing your business then take a look at our information hub.

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.
Thank you.

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit https://www.willistowerswatson.com/en-GB/Notices/legal-disclaimers

Willis Towers Watson is a leading global advisory, broking and solutions company that helps clients around the world turn risk into a path for growth. Willis Towers Watson has offices in 140 countries and markets. For a complete list of office locations, please click here

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy notice by emailing unsubscribe@willistowerswatson.com [ELD-DEF].

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| Oaktree Medical Centre, PC, | ) | Case No. 19-05155-hb |
| | ) | |
| Debtor, | ) | |
| | ) | |
| _____ | ) | |
| | | |
| John K. Fort, Trustee, | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. _____ |
| | ) | |
| Aaron Kibbey, individually and as Chief | ) | |
| Restructuring Officer of Oaktree Medical | ) | |
| Centre, PC; Timothy Daileader, individually | ) | |
| and as Independent Director of Oaktree | ) | |
| Medical Centre, PC; and Huron Consulting | ) | |
| Services, LLC aka Huron Consulting Group, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

John K. Fort, Chapter 7 Trustee of the bankruptcy estate of Oaktree Medical Centre, PC, by and through his undersigned attorneys, hereby states as follows:

**NATURE AND BASIS OF ACTION**

This Action arises out of Defendants' engagements as third-party officers and restructuring consultants for the Debtor, during which time they succeeded only in paying themselves and substantially increasing the Debtor's unsecured debt, for which they are liable. Defendants' actions constitute breaches of their fiduciary duties, gross negligence, a violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*., and make them liable for their violation of various other statutory and common law causes of action as detailed below.

1

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 184 of 381

## PARTIES AND JURISDICTION

1.      John K. Fort, Plaintiff, is the duly qualified and acting Trustee of the bankruptcy estate of Oaktree Medical Centre, PC (hereinafter "Estate") by virtue of a Court Order dated September 19, 2019 (hereinafter "Plaintiff").

2.      OMC is the Debtor in the above-referenced Chapter 7 bankruptcy case. Debtor is a South Carolina company whose principal place of business was in Easley, South Carolina before it ceased doing business.

3.      Upon information and belief, Aaron Kibbey is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

4.      Upon information and belief, Timothy Daileader is a resident of the State of New York but was engaged by and did business for the Debtor in South Carolina.

5.      Upon information and belief, Huron Consulting Services, LLC aka Huron Consulting Group (hereinafter "Huron") is a corporation organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

6.      This adversary proceeding arises under Title 11 (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") or arises in or relates to the Chapter 7 bankruptcy case of Oaktree Medical Centre, PC (hereinafter "OMC" or "Debtor"), Case No. 19-05155, now pending in this Court.

7.      This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 544, 547, 548, and 550; 28 U.S.C. § 1334; and S.C. Code Ann. § 33-8-300.

8.      This is a core proceeding under 28 U.S.C. § 157(b)(2). To the extent Article III of the United States Constitution does not permit any cause of action asserted herein to be treated as

Case 1:22-cv-02038   Document 1-1   Filed 03/11/22   Page 185 of 381

"core," Plaintiff consents to the Court entering final orders or judgment pursuant to 28 U.S.C. § 157(c)(2).

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

**FACTUAL BACKGROUND**

**A.     The Formation of Oaktree Medical Centre**

10.     OMC was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations.

11.     The iteration of OMC for these purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

12.     OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network.

13.     Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics

and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

**B.    The Fidus Loan**

14.    On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina.

15.    In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions.

16.    Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

**C.    OMC Operation and Control: Tim Daileader's Placement**

17.    Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018, the Lenders exercised one of their remedies and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource.

4

18.     The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent.

19.     The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1]

20.     This was Mr. Daileader's first independent directorship in a healthcare company.

21.     Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"), a copy of which is attached hereto, marked as **"Exhibit A"** and incorporated herein by reference, the same as if fully set forth in this Complaint.

22.     In the DOJ Letter, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years. This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility. Soon after becoming an independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

### D.   Huron's Engagement

23.    Around late July 2018, Mr. Daileader required Dr. McCollum and OMC to retain Huron Consulting Group ("Huron"), which included Huron Transaction Advisory ("HTA")[3] and the McGuire Woods law firm, purportedly to assist with the corporate restructuring necessary to refinance the Loan.

24.    Mr. Daileader was already in communication with a McGuire Woods attorney named Mark Freedlander. Mr. Freedlander worked his way into the matter through John DiDonato, a top Huron executive and acquaintance of Mr. Freedlander.

25.    Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuire Woods' representation for the sale of the company and, as he wrote in an email, a copy of which is attached hereto, marked as **"Exhibit B"** and incorporated herein by reference, their "corporate lawyering gets [McCollum] a better deal, higher price, etc."

26.    On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exsuive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75

---

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

[3] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend.

27.    McGuire Woods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine.

28.    However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left HTA, Huron, and McGuire Woods on the sidelines.

29.    According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain."

30.    HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

31.    On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, a copy of which is attached hereto, marked as **"Exhibit C"** and incorporated herein by reference, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers.

32.    Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email, a copy of which

is attached hereto, marked as **"Exhibit D"** and incorporated herein by reference, he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The LOI is a distraction to Brohm and Webb[4] — they're trying to force a deal that isn't there — and they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift the strategy definitively, or else we're going to lose the last window we have."

33.     It was during this correspondence that Mr. Daileader posed the following to Mr. Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy filing before the estate deteriorates further."

**E.     The Raids**

34.     Mr. Daileader did not have to think about the LOI for long because his wish for the potential purchase to fail came true just six days later. According to the DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US Department of Health and Human Services conducted raids on the Easley, Spartanburg, and Greenville OMC facilities. At that time, the refinancing effort was terminated[5], the National Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of McGuireWoods was correspondingly

---

[4] Michael Brohm was OMC's CEO and David Webb was its CFO.

[5] By Mr. Daileader.

expanded to provide for restructuring, corporate and healthcare legal services to the entire enterprise."[6]

35.     All three practices that were raided were fully operational with no employee loss and no patient cancellations the day after. The outside IT provider worked all night to get the practices up and running. Consequently, there was no operational crisis that Huron needed to manage. Mr. Daileader, however, expressed in an email, a copy of which is attached hereto, marked as **"Exhibit E"** and incorporated herein by reference, that the sale of the business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in default with the Lenders. Mr. Daileader also stated that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon.

36.     At this point, according to an email, a copy of which is attached hereto, marked as **"Exhibit F"** and incorporated herein by reference, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies."

37.     Despite this change of course, Mr. Daileader curiously kept Mr. Freedlander, who was not in McGuire Woods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuire Woods healthcare team until the following spring.

---

[6] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron, HTA pocketed the fee and Huron began billing OMC hourly.

From the beginning, according to an email, a copy of which is attached hereto, marked as **"Exhibit G"** and incorporated herein by reference, Mr. Freedlander knew that the situation was a mess, but would create considerable revenue for himself and his firm, so he was eager to get on board and stay on board.

## F.    Aaron Kibbey

38.    On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC.

39.    According to a July 2018 marketing pitch to OMC, a copy of which is attached hereto, marked as **"Exhibit H"** and incorporated herein by reference, Huron touted itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200 dedicated, industry focused professionals with broad expertise; [n]umerous restructuring, business assessment, performance improvement, strategic, interim management and transaction assignments; [and that additionally] [w]e know the business, payers, market dynamics and the customers (e.g., patients and physicians)."

40.    While CROs typically have an expertise in the field of business in which the company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron and his first and only engagement as a CRO for a healthcare company.[7]

41.    This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony, conducted on September 10, 2020:

A. I think I've said this before. I'm not a healthcare corporate structure

---

[7] As detailed below, Huron would not engage their healthcare practice team until June 2019.

expert. I spent a lot of time looking at the way that all of the entities were set up. I did not understand – I understood it better as time went on and as McGuire Woods explained to me how it should be set up versus how it was set up, but I don't know if I would say I ever completely understood the structure.

42.     Mr. Kibbey further testified:

Q. Was it possible to reorganize Oaktree without a clear understanding of the corporate structure?
A. With the guidance and counsel of McGuire Woods healthcare team, yes.

## G.     The MSO

43.     An MSO generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare environment because they enable the practice to have better control over overall medical spending and cost effectiveness.

44.     The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

45.     Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to

find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

46.    Under the terms of the November 9, 2018 Engagement Letter, a copy of which is attached hereto, marked as **"Exhibit I"** and incorporated herein by reference, the same as if fully set forth in this Complaint, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales transaction and ongoing assistance and support with negotiations with the prospective purchaser under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the

audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations.

47.     As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. See **"Exhibit J,"** a copy of which is attached hereto and incorporated herein by reference.

48.     In an email dated October 12, 2018 to Mr. Daileader, a copy of which is attached hereto, marked as **"Exhibit K"** and incorporated herein by reference, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level."

49.     Despite what appeared to be a clear consensus for an MSO placement, when Mr. Kibbey was questioned about this at his 2004 Exam, he testified as follows:

> Q. Was Huron hired as an MSO-level CRO?
> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

Mr. Kibbey's testimony at the November 4, 2019 341 Meeting is also illustrative:

Q. Okay, and [OMC] PC's goal was to do what, then?
A. So, I think they were – it was supposed to be structured, and I don't claim to be a medical corporate entity structure expert, we deferred – we had an entire team from McGuireWoods that was looking into that, and I think the way it was supposed to be structured so that you separate the clinical assets, if you will, from the non-clinical assets. Unfortunately, that was never done.
Q. Never done before you became involved or?
A. Correct and since. There was a plan to do it. There was a lot of time that went into what would be required in terms of the paperwork to change the entire corporate structure. I think part of that just due to a number of issues including liabilities associated with those entities, was going to be done through a Chapter 11 restructuring as well. So, there was a plan in place to do all that, but it never happened.

## H.    Problems with Huron

50.    Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject would not be surprising but for the fact that at the time of the 341 Meeting he had just recently completed his duties as the CRO of OMC, a healthcare company, after nearly a year.

51.    As early as November 5, 2018, according to an email, a copy of which is attached hereto, marked as **"Exhibit L"** and incorporated herein by reference, Mr. Daileader and Mr. Freedlander were already having issues with Huron's "stagnation," and soon after came issues with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours and lack of any detailed invoicing as to what services Huron actually performed.

52.    Mr. Freedlander remarked in one email in November 2018, a copy of which is attached hereto, marked as **"Exhibit M"** and incorporated herein by reference: "None of us look very good at the moment here and we need to rectify this very quickly before the bottom falls out."

53.    That frustration continued throughout Huron's engagement, and their incompetence was often evident.

54.     Mr. Daileader received negative feedback from the Lenders in January regarding Huron's performance, particularly with regard to Mr. Kibbey. A copy of this correspondence is attached hereto, marked as **"Exhibit N"** and incorporated herein by reference.

55.     In February, Mr. Freedlander voiced his concern regarding a lack of CRO leadership to his McGuire Woods colleagues, as well as separately to Mr. Daileader. He wrote in an email, a copy of which is attached hereto, marked as **"Exhibit O"** and incorporated herein by reference, "Huron has been less than efficient and effective."

56.     By April, according to an email, a copy of which is attached hereto, marked as **"Exhibit P"** and incorporated herein by reference, the Lenders continued to be critical of Huron due to their inability to drive the restructuring process forward.

57.     OMC management discussed their concerns with Mr. Daileader, who, according to an email, a copy of which is attached hereto, marked as **"Exhibit Q"** and incorporated herein by reference, confirmed even to them that he was not impressed with Huron's involvement.

58.     When pressed about substantially decreasing or even discontinuing Huron's involvement, Mr. Daileader admitted, according to an email, a copy of which is attached hereto, marked as **"Exhibit R"** and incorporated herein by reference, that he was looking into replacements. Nevertheless, Huron remained and the ineptitude continued.

59.     In early May, to the astonishment of a member of McGuire Woods' healthcare team, Huron nearly missed the OMC medical malpractice insurance renewals. See **"Exhibit S,"** a copy of which is attached hereto and incorporated herein by reference

60.     As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational. See **"Exhibit T,"** a copy of which is attached hereto and incorporated herein by reference.

61. During the wind down and liquidation process in August 2019, after having complete control of OMC for nine months, Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. See **"Exhibit U,"** a copy of which is attached hereto and incorporated herein by reference.

62. That information is a necessary component of legally proper Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). Instead, Huron ostensibly invented a corporate structure in order to have available providers execute the Notices to clinic employees. See **"Exhibit V,"** a copy of which is attached hereto and incorporated herein by reference.

63. For the Notices Huron was able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline that they set for themselves, which was based in whole on how much money was left for them to be paid for their services.

64. Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet all they seemed to be concerned about was making sure their fees were paid in full.

**I.     Additional Fidus Loans**

65. By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals.

66. Because of these expenditures, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments.

67.     OMC had not previously missed making interest payments to the Lenders.

68.     Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[8]

69.     In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

70.     Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuire Woods billed OMC during its engagement as lead counsel. The billing was clearly excessive, yet Mr. Daileader never questioned it. In one email, a copy of which is attached hereto, marked as **"Exhibit W"** and incorporated herein by reference, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuire Woods'] professional service will more than adequately protect the price of the deal."

71.     On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included covenants establishing milestone dates by which the consolidated group of entities were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

---

[8] The OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

72.     On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit.

73.     Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million [was] projected to be required to support going concern operations of the enterprise through mid-October 2019."

74.     Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, a copy of which is attached hereto, marked as **"Exhibit X"** and incorporated herein by reference, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements.

75.     Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant.

76.     Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him.

77.     In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. See **"Exhibit Y,"** a copy of which is attached hereto and incorporated herein by reference.

78.     In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing.

**J.     Still No MSO or Restructuring Plan**

79.     Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

80.     An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance.

81.     Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

82.     Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his Rule 2004 Exam, conducted on August 19, 2020:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put that structure into place, and, again, it would require the consent of all of the entities that were involved, including some entities that it – it was a very complicated restructuring that involved closing down

19

Case 1:22-cv-02038 Document 1-1 Filed 03/11/22 Page 202 of 381

certain entities; separating from certain entities; and transfers of different assets, including the identification of where assets were owned and then making those transfers. One of the issues that we encountered in looking at the books and records was that the management – the existing management did not designate where certain assets were owned within the broader group. And, in fact, when we went and compared the transaction documents where they had acquired those, we saw that there was no designation made to, you know, the certain books and records of different entities. So we went back to Elliott Davis and actually asked for their help in identifying who owned these assets, and to the extent they were at the correct entity, that was fine; and to the extent they were at the incorrect entity, we would need to effect those transfers. Elliott Davis was not able to answer that, so there was an ongoing investigation to try to resolve those issues.

Q. And what ultimately happened? Why did that investigation stop?

A. Well, eventually the company – eventually we put in front of the lenders a full reorganizational plan, and 30-plus days after we put the lenders – the organizational plan in front of the lenders, the lenders declared to us that they were not going to fund the organizational plan, and the company then changed strategy to pursue either the sale of the company, as I described before, or a liquidation – a wind-down and a liquidation.

Q. When did you present that plan to the lender?

A. Around the third week of June 2019.

83.    With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter that "the Oaktree Medical family of entities is in the process of finalizing details relating to a comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring Officer and myself, an operational restructuring of the businesses comprising the Oaktree Medical family of entities is also in process."

84.    He continued: "The implementation of the aforementioned steps takes time, and any positive financial impact of these steps likewise is expected to take a substantial period of time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

85.     Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult.

86.     As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuire Woods *and* expand their team. Actual *implementation* of the plan was presumably a long way off.

87.     At many points along the way, Mr. Daileader, McGuire Woods, and Huron threatened to go "pencils down" if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

88.     What Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[9]

89.     In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

**K.     Final Demand of the Lenders**

90.     In early July 2019, Mr. Daileader was demanding $1 million from the Lenders.

91.     Ironically, Mr. Daileader used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write in an email, a copy of which is attached hereto, marked as **"Exhibit Z"** and incorporated herein

---

[9] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

by reference: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law."

92.    Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee." A copy of this email is attached hereto as **"Exhibit AA"** and incorporated herein by reference.

93.    By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months.

94.    However, Mr. Daileader and Huron did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding.

95.    In their outline for the Lenders, a copy of which is attached hereto, marked as **"Exhibit BB"** and incorporated herein by reference, they noted that a Chapter 11: "Provides the independent director and professionals to the Oaktree companies with the releases and exculpation that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections."

96.    Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[10] Mr. Daileader wrote: "An additional result of this process is the further avoidance of professional fees, including the $300-400k monthly

_____

[10] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuire Woods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuire Woods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

currently accruing, replacing these professionals with permanent management." A copy of this email is attached hereto as **"Exhibit CC"** and incorporated herein by reference.

97.     One final time the team went pencils down while they waited, and the unsecured debt continued to balloon.

98.     Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

**L.     Liquidation and Crossing the Rubicon**

99.     The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees.

100.     Mr. Daileader and Mr. Freedlander were so unconcerned about the situation that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." See **"Exhibit DD,"** a copy of which is attached hereto and incorporated herein by reference.

101.     Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.
> A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs

on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

102.    As part of the liquidation, Mr. Kibbey and his Huron team made no effort to sell Labsource as a going concern, despite the forty percent (40%) of its revenue coming from third-party tests. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[11]

103.    Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. See **"Exhibit EE,"** a copy of which is attached hereto and incorporated herein by reference.

104.    However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[12]

105.    On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[13] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[11] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[12] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[13] This number fell to zero less than seven weeks later, at the time of the Chapter 7 filing.

24



106.    On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an email to Mr. Kibbey and Mr. Freedlander,  a copy of which is attached hereto, marked as **"Exhibit FF"** and incorporated herein by reference, which he titled "*Crossing the Rubicon?*"

107.    Mr. Daileader wanted to know if the Chapter 7 Petitions had been filed. Mr. Freedlander informed him that they were just waiting on the wires that would compensate Huron and McGuire Woods for their final invoices. See **"Exhibit GG,"** a copy of which is attached hereto and incorporated herein by reference.

108.    Later that day the wires were sent ($148,734 to Huron and $61,620 to McGuire Woods).

109.    Despite this, Mr. Daileader disputed that the two entities were paid in full in his 2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuireWoods were paid in full the day before the Chapter 7 was filed?
> A. I don't believe – I'd be surprised, because I don't actually believe it's true.

110. Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. See **"Exhibit HH,"** a copy of which is attached hereto and incorporated herein by reference.

111. Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap.

112. On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

### FIRST CAUSE OF ACTION
**Breach of Fiduciary Duty as to All Defendants**

113. Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

114. Defendants were to discharge their duties as corporate officers in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the corporation and its shareholders. S.C. Code Ann. § 33-8-420.

115. Under South Carolina law, officers and:

> directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.,* 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the

26

stockholders to the creditors."); *see also Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp,* 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), dismissed sub

nom. *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir.

Mar. 19, 2018). See also *In re Joseph Walker & Co., Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015).

116. Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C.

Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was

entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at

*14.

117. Mr. Daileader and Huron had a fundamental misconception of their fiduciary

duties. Mr. Daileader testified at his 2004 Exam as follows:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director or manager of.

118. Mr. Kibbey testified at his 2004 Exam as follows:

> Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?
> A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.

Q No. I'm asking in terms of your fiduciary duty.
A. My fiduciary duty was to the company.

Q. Tell me the difference between a critical and non-critical vendor.
A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. …
Q. I'm assuming critical vendors were paid before non-critical vendors?
A. In most instances, I would – yeah, that's a fair statement.

119.     OMC was insolvent prior to the Defendants' involvement. At the 341 Meeting for

these matters, Mr. Kibbey testified as follows:

Q. When did Oaktree PC become insolvent, to your knowledge?
A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the liabilities that that entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?
A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?
A. Correct. You can make an argument that company had been insolvent for years.

28

120.    In Mr. Daileader's 2004 Exam, he testified:

Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?
A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.
Q. Was it?
A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

121.    Additionally, the following are excerpts from Mr. Kibbey's 2004 Exam:

Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent.
A. I don't know.
Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?
A. I never came to a conclusion regarding solvency.

Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?
A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.

A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.
Q. Do you dispute that testimony?
A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.
Q. Under what definition had Oaktree been insolvent for years when you stepped in?
A. Under what definition?
Q. You said it depends on the definition. I'm wondering what definition it depends on?
A. The inability to pay your debt.

122.    Mr. Kibbey has advanced qualifications in this area, including being a Certified

Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether

the company he was an officer of for nearly a year was solvent, but also of providing even a rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's fees or you were able to do enough cost-cutting initiatives to pay for it?
> A. We were not able to implement enough cost-cutting initiatives to even allow the company to consistently make payroll across all the – of the entities, and that fundamentally was the reason for the restructuring plan. When you add professional fees onto that, the only way you could fund that part of the restructuring was with additional cash infusion from an outside source. So that additional cash infusion went not only for professional fees but also for payroll so that you could keep employees working on restructuring and the day-to-day operations.

123.    If a company does not have the cash to pay its bills as they become due without additional funding, it is insolvent.

124.    Consequently, from the time the Defendants took over control of the Debtor, they failed to discharge their duties as corporate officers in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the unsecured creditors.

125.    Corporate officers and directors are individually liable for the tortious conduct of the corporation when "they commit, participate in, direct, or authorize the commission of a tort." *Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 37–38 (1994), *adhered to on reh'g* (Oct. 19, 1994). See also *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643 (1980).

126.    Mr. Daileader and Mr. Kibbey willfully directed the breach of their fiduciary duties and are thus personally liable.

127.    As a result of the foregoing, Plaintiff, on behalf of the unsecured creditors under 11 U.S.C. § 544, is entitled to recover damages proximately caused by all of the Defendants'

breaches of their duty of care, including all amounts needed to pay valid unsecured creditors in full.

## SECOND CAUSE OF ACTION
### Aiding and Abetting a Breach of Fiduciary Duty as to Huron

128.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

129.    As laid out above, upon information and belief, all of the Defendants breached their fiduciary duties to the unsecured creditors.

130.    However, if it is determined that only Mr. Daileader and Mr. Kibbey, individually and in their capacities as a director and an officer of the Debtor, held the fiduciary duty, Huron knowingly and willingly participated in Mr. Daileader and Mr. Kibbey's breaches as alleged in the First Cause of Action herein.

131.    As a proximate result of Huron's aiding and abetting Mr. Daileader and Mr. Kibbey in the breach of their fiduciary duties, Plaintiff, on behalf of the unsecured creditors under 11 U.S.C. § 544, has been damaged.

## THIRD CAUSE OF ACTION
### Negligence/Gross Negligence as to All Defendants

132.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

133.    Defendants owed a duty to the unsecured creditors to, at a minimum, be cognizant of the fact that they owed the unsecured creditors a duty of care and loyalty due to the Debtor's insolvency.

134.    The Defendants stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly

implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues.

135.     Upon information and belief, Mr. Daileader and Huron were incapable of analyzing and/or refused to analyze how these clear and present internal and external threats would affect OMC, and by extension the creditors, especially after the DOJ raids, because their main desire was to get paid.

136.     If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival should be operated to maximize returns for all creditors.

137.     If there was a path to restructure, and clearly the team thought and communicated that there was, their first step should have been to develop a restructuring strategy, and their second should have been to implement that strategy.

138.     In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented.

139.     A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core.

140.     Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure.

141.     Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. Mr. Daileader testified at his 2004 Exam as follows:

Q. How did you value a settlement with the DOJ wither regard to the value of Oaktree as to prospective buyers.

A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

142.    Mr. Kibbey testified at his 2004 Exam as follows:

Q. Did you ever value a settlement with the Department of Justice?

A. I don't understand the question.

Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency.

A. Again, we didn't do any solvency analysis.

143.    Despite that, it may have been less Mr. Daileader and Huron's failure to adapt after the DOJ raids and more a lack of internal discipline that caused OMC's downfall.

144.    Good CROs generally agree that a relatively simple fix involves regular rotation of management.

145.    The key to a successful CRO is less about his financial advisory skills and more about his capacity to drive operational change and be all encompassing. He is there to bring credibility, objectivity, and stability to the restructuring process and build consensus amongst stakeholders regarding the direction of the restructuring.

146.    The minute Mr. Daileader and Huron opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies.

147.    While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. There were clear issues with key management, yet the team kept them around for months.

148.    In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did

not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

149.    What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, closed the ones that weren't, and then tried to do a workout or file Chapter 11 Bankruptcy.

150.    A Chapter 11 likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts contributed to fixed costs[14] of the entities throughout Huron's engagement.

151.    Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

152.    Instead, Mr. Daileader and Huron flip-flopped with how to handle the Debtor during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

153.    Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and

---

[14] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

154.    Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management.

155.    Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved.

156.    The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader allowed it to happen.

157.    Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. This are excerpts from his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.
>
> Later in the 2004 Exam:
>
> Q. My understanding is that there's a Huron Transaction Advisory, LLC and a Huron Business Advisory, LLC. Are you familiar with those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

158.    Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing).

159.     October or November of 2018 was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank, Lenders willing to lend in order to get out of the hole they were in, and OMC had never missed an interest payment to the Lenders. Once the professional fees began, however, the $2 million was depleted and the interest payments stopped.

160.     Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors.

161.     A competent CRO should have drawn the conclusion early in his involvement that there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the essence in a distressed situation and the CRO is required to act decisively and quickly. Stagnation and indecision only accelerate the crisis.  But yet, Mr. Kibbey testified in his 2004 Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in November 2018?
> A. I don't – I did not know enough to make a recommendation, at least, like I think I said earlier, you can always make recommendations – make a thoughtful recommendation as to what the course should be, whether it should be a Chapter 11 or Chapter 7 or an out-of-work. We did not know enough to make an intelligent professional recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

162.     By that rational, time was not of the essence as long as you have money; if the source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004 Exam testimony:

Q. Was Huron able to establish a fully compliant and effective MSO?
A. I would answer that question a little differently. Huron doesn't have the ability to do that by itself.
Q. With whatever partners you need, was it able to do so?
A. Can you repeat the question?
Q. Yes. Was Huron and the other professionals able to establish a fully compliant and effective MSO?
A. There was a plan in place. The plan was never fully executed.
Q. Why not?
A. Well, because part of that plan involved filing for a Chapter 11 as part of the corporate restructuring, and we were not able to get the financing filed for a Chapter 11, and the lenders requested that not only we do not file for Chapter 11, but that we wind down the operations. So at that point there was – it didn't make any sense to put any more time or effort into trying to create an MSO client organization, just to wind it down.
Q. That was in the summer of 2019?
A. What is your question about?
Q. What you're talking about where the lenders asked you to wind it down and wouldn't fund the Chapter 11 and the client MSO, that was in the summer of 2019, right?
A. Correct.

163.   Mr. Daileader noted in his 2004 Exam testimony that "we produced a product, and we produced the opportunity for it to be restructured, and ultimately the lenders denied the funding."

164.   From Mr. Kibbey's 2004 Exam again:

Q. Did you ever come up with a strategy?
A. A strategy for what?
Q. For whatever it was you were supposed to do at Oaktree.
A. I don't know if I can answer that. I can't answer that question. What I can say is over the course of the engagement we developed a restructuring plan and with a budget and with a timeline and were in the process of executing that plan.

165.    Upon information and belief, Mr. Daileader and Huron did not accomplish much at all. It was all correspondence, talk, and spreadsheets.

166.     By mid-January, they were still discussing simply *getting together* to develop a comprehensive game plan for an overall restructuring.[15]

167.     Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement (hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k.

168.     Huron spent an embarrassing amount of time reviewing historical OMC management emails, which was a "top priority" according to Mr. Freedlander.

169.     When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's testified:

> Q. So in your professional opinion, reviewing employee emails was important in this matter?
> A. In this matter it proved to be critical. You wanted to understand the real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what was really happening behind the scenes.

170.     However, understanding the situation was never achievable according to Mr. Kibbey:

> Q. So it sounds to me like you're talking about initially in November you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what point in time?
> A. I'm not sure we ever stopped trying to understand the situation.

171.     During his 2004 Exam, when Mr. Kibbey was asked what he thought they did accomplish, he testified as follows:

> Q. What measurable restructuring initiatives did you achieve during your engagement?

---

[15] A restructuring *proposal* was not presented until May 20, 2019.

38

> A. I'm not sure what you're getting at. What I will – so maybe I'm not answering the question right. If I'm not, let me know. So the liability based on the proposed settlement with the Department of Justice that we later learned of that was on the table when we were engaged was 30 to $40 million. So as part of our discussions with the Department of Justice, that proposed settlement went down to 1 to 5 million. So the savings there are anywhere from 35 to – or I guess if you start at 30 million, right, it could be 25 to 39 million of savings just through that liability alone.

172.    The first and only measurable restructuring initiative they achieved, according to the CRO, was a potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had already testified that McGuire Woods was leading those negotiations.

173.    Mr. Kibbey did ultimately admit that expedience was important in his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional fees that Oaktree was paying could not be sustained?
> A. No. I think – I think in terms of a restructuring, I mean, that's often the case. A business isn't designed to pay professional fees for an indefinite length of time. And we never came to the conclusion that Oaktree could pay these fees for an indefinite length of time. It was how do you as quickly as you can effectuate a restructuring and transition the business and presumably the ownership.

174.    Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent without an influx of lender cash. They should have known that the only way to save the company was an expedient Chapter 11.

175.    Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7, in an attempt to avoid liability.

176.    Plaintiff would show that Defendants negligently, recklessly, willfully, wantonly, and grossly negligently breached their duties to the unsecured creditors by failing to understand

their role, develop a strategy, and take the appropriate action in compliance with that role and strategy.

177.    As a direct and proximate result of Defendants' negligent, reckless, willful, wanton, and grossly negligent acts, omissions and/or delicts as enumerated hereinabove, Plaintiff, on behalf of the unsecured creditors under 11 U.S.C. § 544, was seriously injured. Therefore, in accordance with *Plowman*, supra, Plaintiff requests judgment against all Defendants for actual and punitive damages with interest thereon.

**FOURTH CAUSE OF ACTION**
**Violation of the South Carolina Unfair Trade Practices Act ("UTPA"),**
**S.C. Code Ann. § 39-5-10 *et seq*. as to All Defendants**

178.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

179.    Defendants committed unfair and deceptive acts or practices by, among other things, marketing themselves as professional restructuring consultants, taking over control of a business, putting their interests above the shareholders and unsecured creditors, and negligently liquidating the business, all in violation of their respective duties and applicable law.

180.    Defendants' conduct has had a direct and specific adverse impact on the public interest, namely, to negatively impact a company's ability to hire competent restructuring professionals that will look out for the company's best interests, and to negatively impact a creditor's ability to ensure that a restructuring professional at the helm of an insolvent company looks out for the creditor's best interests.

181.    As a direct and proximate result of Defendants' misconduct, Plaintiff, on behalf of the unsecured creditors, has suffered monetary loss.

182.    Directors and officers are individually liable for the corporation's unfair trade practices when "they personally commit, participate in, direct, or authorize the commission of a violation of the UTPA." *Plowman* at 286, 38.

183.    Accordingly, Plaintiff is entitled to recover from all of the Defendants the actual damages to the unsecured creditors, under 11 U.S.C. § 544, resulting from the Defendants' unfair and deceptive acts, along with punitive damages up to three times the actual damages amount, and his attorneys' fees and costs in pursuing this action.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment as to Daileader and Huron**

184.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

185.    Through their negligent acts as detailed herein, Defendants Daileader, as Independent Director, and Huron, for their own benefit, utilized the Debtor's profits to pay themselves.

186.    It would be unjust to allow Defendants to retain those ill-gotten gains.

187.    Accordingly, as a result of the foregoing, Plaintiff is entitled to recover the damages proximately resulting from Defendants' actions, including the amount of all valid unsecured claims, in addition to being entitled to recovery of punitive damages for Defendants' willful and wanton actions.

**SIXTH CAUSE OF ACTION**
**Bankruptcy Code Section 548(a)(1)(A) (Actual Fraud)**

188.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

189.     During their tenure in control of the Debtor, Defendants paid out over $4 million in professional fees to themselves and those they utilized to perpetrate their fraud (the "Transfers").

190.     The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

191.     Upon information and belief, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.

192.     Upon information and belief, such actual intent is evidenced by, among other things, a misrepresentation of their competence and experience, a fundamental misunderstanding to their duties, and putting paying their fees above the interests of any others.

193.     Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

194.     Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

## SEVENTH CAUSE OF ACTION
### Bankruptcy Code Section 548(a)(1)(B) (Constructive Fraud)

195.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

196.     The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

197.     Upon information and belief, the Defendants are the transferees of property of the Debtor.

198.    The Debtor received no or less than reasonably equivalent value in connection with the Transfers which were made to or for the benefit of Defendants, and which were transferred by the Debtor within two years before the Petition Date.

199.    At the time of the Transfers, Debtor (i) was insolvent or became insolvent as a result thereof; (ii) was engaged in a business or transaction or was about to engage in a business or a transaction, for which any property remaining with Debtor was an unreasonably small capital; and/or (iii) intended to incur or believed or reasonably should have believed that they would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

200.    Because of the foregoing, the Transfers may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Transfers may be recovered from the Defendants as the initial transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

201.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

202.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

### EIGHTH CAUSE OF ACTION
**Bankruptcy Code Section 547 (Preferences)**

203.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

204.    The professional fees paid to the Defendants in the one year prior to the Petition Date were made to the Defendants for or on account of an antecedent debt by the Debtor to the

Defendants and Plaintiff is informed and believes that the Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547 of the United States Bankruptcy Code.

205.    At the time of the Transfers, the Debtor was insolvent and Defendants were insiders.

206.    The payments referred to in the proceeding paragraphs enabled the Defendants to receive more than they would have received under Chapter 7 of the Bankruptcy Code if the Transfers had not been made.

207.    By reason of the forgoing, Defendants are liable to Plaintiff in the full amount of the professional fees paid to them.

### NINTH CAUSE OF ACTION
**Bankruptcy Code Section 550 (Recovery of Avoided Transfers)**

208.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

209.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the value of the property transferred for the benefit of the Estate to the extent the Transfers are avoided pursuant to, among other sections, Sections 544, 547, and 548 of the Bankruptcy Code.

210.    Under Section 550(a)(1) of the Bankruptcy Code, Plaintiff may recover from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

211.    The Defendants are the initial transferees or entities for whose benefit the Transfers were made.

212.    Plaintiff prays that the Court issue an order against the Defendants, ordering recovery by Plaintiff for the benefit of Debtor's Estate the value of the property transferred with respect to any transfers avoided under this Complaint pursuant to 11 U.S.C. § 550 to the extent

the Defendants are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees.

<u>**PRAYER FOR RELIEF**</u>

Plaintiff respectfully requests and prays that this Court enter judgment in his favor and against Defendant, and award the following relief:

a. An order granting actual, general, compensatory, incidental, and consequential damages in an amount to be determined at trial;

b. An order granting exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

c. An order granting treble damages for Defendants' violation of the UTPA;

d. An order granting judgment for Plaintiff and voiding the Transfers from Debtor to Defendants found to be fraudulent pursuant to 11 U.S.C. § 548 and pursuant to 11 U.S.C. § 550;

e. An order granting judgment for Plaintiff and ordering recovery of the value of the property transferred to the Defendants pursuant to 11 U.S.C. § 550 to the extent they are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees;

f. Pre-judgment interest;

g. Post-judgment interest;

h. An order awarding Plaintiff the costs of this suit; and

i. For such other and further relief as this Court deems just and equitable.

(Signature page follows)

/s/Joshua J. Hudson
Joshua J. Hudson, Fed. ID No. 11620
Joseph O. Smith, Fed. ID No. 10551
jhudson@smithhudsonlaw.com
Smith Hudson Law, LLC
200 N. Main St., Suite 301-C
Greenville, SC 29601
(864) 908-3914
*Attorneys for Trustee/Plaintiff*

Greenville, South Carolina

June _____, 2021

Case 21-80058-jw Doc 1 Filed 06/17/21 Entered 06/17/21 16:02:37 Desc Main
Document    Page 1 of 51

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:                                   )        CHAPTER 7
                                         )
Oaktree Medical Centre, LLC,             )        Case No. 19-05154-hb
                                         )
        Debtor,                          )
                                         )
_____         )
                                         )
John K. Fort, Trustee,                   )        **COMPLAINT**
                                         )
        Plaintiff,                       )
                                         )
        vs.                              )        Adversary Proceeding No. _____
                                         )
Aaron Kibbey, individually and as Chief  )
Restructuring Officer of Oaktree Medical )
Centre, PC; Timothy Daileader, individually )
and as Independent Director of Oaktree   )
Medical Centre, PC; Huron Consulting     )
Services, LLC aka Huron Consulting Group; )
Mark Freedlander; David Pivnick; and     )
McGuireWoods LLP,                        )
                                         )
        Defendants.                      )
_____         )

John K. Fort, Chapter 7 Trustee of the bankruptcy estate of Oaktree Medical Centre,

LLC, by and through his undersigned attorneys, hereby states as follows:

## NATURE AND BASIS OF ACTION

This Action arises out of Defendants' engagements as third-party officers, restructuring

consultants, and professionals for the Debtor and two sister entities that are companion cases

hereto. During their tenure, they succeeded only in paying themselves and substantially

increasing the Debtor's unsecured debt, for which they are liable. Defendants' actions constitute

breaches of their fiduciary duties, gross negligence, a violation of the South Carolina Unfair

1

Trade Practices Act (S.C. Code Ann. § 39-5-10, *et seq.*), and make them liable for violation of various other statutory and common law causes of action as detailed below.

The Defendants were hired to fix a healthcare conglomerate that was failing to pay its debt on a credit facility secured by, among other things, the lender's ability to place turnaround professionals into critical management positions. Over the course of approximately one year, and while with complete financial, operational, and fiduciary control, the Defendants made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a corporate restructuring. As the Debtors' assets were quickly depleted and the liabilities grew, the Defendants collected professional fees totaling nearly $5 million. Once there were no more funds to pay those fees, and with no concern for the unsecured creditors to whom the Defendants owed a fiduciary duty, they filed the herein Chapter 7 Petitions.

## PARTIES AND JURISDICTION

1.      On September 19, 2019, Oaktree Medical Centre, LLC; Oaktree Medical Centre, PC; and Labsource, LLC filed petitions for relief under Chapter 7 of the United States Bankruptcy Code in the Western District of North Carolina. On or about October 1, 2019, the Chapter 7 cases were transferred to the United States Bankruptcy Court for the District of South Carolina, and, on October 2, 2019, John K. Fort (hereinafter "Plaintiff") was appointed as duly qualified and acting Chapter 7 Trustee for all three Debtors (hereinafter collectively the "Estate").

2.      Oaktree Medical Centre, LLC is the Debtor in the above-referenced Chapter 7 bankruptcy case. Oaktree Medical Centre, LLC is a South Carolina company whose principal place of business was in Easley, South Carolina before it ceased doing business.

2

3. Upon information and belief, Aaron Kibbey is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

4. Upon information and belief, Timothy Daileader is a resident of the State of New York but was engaged by and did business for the Debtor in South Carolina.

5. Upon information and belief, Huron Consulting Services, LLC aka Huron Consulting Group (hereinafter "Huron") is a limited liability company organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

6. Upon information and belief, Mark Freedlander is a resident of the State of Pennsylvania but was engaged by and did business for the Debtor in South Carolina.

7. Upon information and belief, David Pivnick is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

8. Upon information and belief, McGuireWoods LLP (hereinafter "McGuireWoods" or "Lawyers") is a limited liability partnership organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

9. This adversary proceeding arises under Title 11 (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") or arises in or relates to the Chapter 7 bankruptcy cases of Oaktree Medical Centre, LLC, Case No. 19-05154; Oaktree Medical Centre, PC, Case No. 19-05155; and Labsource, LLC, Case No. 19-05161, all now pending in this Court (and all three Debtors are hereinafter collectively referred to as "OMC" or "Debtors").

10. This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 329, 544, 547, 548, and 550; 28 U.S.C. § 1334; S.C. Code Ann. § 33-8-300; and S.C. Code Ann. § 39-5-10.

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2). To the extent Article III of the United States Constitution does not permit any cause of action asserted herein to be treated as "core," Plaintiff consents to the Court entering final orders or judgment pursuant to 28 U.S.C. § 157(c)(2).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### A.     The Formation of Oaktree Medical Centre

13.     OMC was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations.

14.     The iteration of OMC for these purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

15.     OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network.

16.     Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-80058-jdc Doc 38   Filed 08/17/21   Entered 08/17/21 16:03:37   Desc Main
Document       Page 5 of 51

Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

**B.     The Fidus Loan**

17.     On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina.

18.     In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions.

19.     Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

**C.     OMC Operation and Control: Tim Daileader's Placement**

20.     Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018, the Lenders exercised one of their remedies

and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource.

21.    The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent.

22.    The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1]

23.    This was Mr. Daileader's first independent directorship in a healthcare company.

24.    Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"). This, **Exhibit A**, attached hereto, and all other exhibits herein, are incorporated by reference, the same as if fully set forth in this Complaint.

25.    In the DOJ Letter, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years. This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility. Soon after becoming an

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

### D.    Huron and McGuireWoods Engagements

26.    In mid-July 2018, Mark Freedlander, an attorney with McGuireWoods, ran into an old acquaintance, John DiDonato, head of Huron's restructuring group, at the gym. Mr. DiDonato told Mr. Freedlander that he was involved with a matter in Charlotte, North Carolina that "had the potential to get nasty in short order." This information was relayed from Mr. Freedlander to Scott Vaughn, an attorney in McGuireWoods' restructuring group in Charlotte, in an email. See **Exhibit B**.

27.    Mr. Freedlander urged Mr. DiDonato to get McGuireWoods and Mr. Vaughn involved. See **Exhibit C**.

28.    By July 18, 2018, Mr. Freedlander had connected with Mr. Daileader and a McGuireWoods team member had drafted a form letter for Mr. Daileader's signature terminating the engagement of OMC's prior counsel. See **Exhibit D**.

29.    As of late July, Mr. Daileader, Mr. Freedlander, and Mr. DiDonato were still attempting to coordinate their engagements. Mr. Freedlander wrote in an email to Mr. Daileader and Mr. DiDonato that McGuireWoods was "pressing to become overall transactional counsel [for OMC] in light of the MSO structure." See **Exhibit E**.

30.    Upon information and belief, Mr. Freedlander had no experience with a management services organization ("MSO")[3] and had already been soliciting advice from a McGuireWoods attorney who did. See **Exhibit F**.

---

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

31.     In the same email, Exhibit E, that Mr. Freedlander wrote to Mr. Daileader and Mr. DiDonato regarding the MSO, Mr. Freedlander noted to Mr. Daileader: "I appreciate your concerns about conflict but if the lenders are paid in full as a result of the transaction, then these conflicts don't matter."

32.     Ultimately, and ignoring any potential conflicts, Mr. Daileader required Dr. McCollum and OMC to retain Huron, which included Huron Transaction Advisory ("HTA")[4] and the McGuireWoods law firm, purportedly to assist with the corporate restructuring necessary to refinance the Loan.

33.     Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuireWoods' representation for the sale of the company and, as he wrote in an email, their "corporate lawyering gets [McCollum] a better deal, higher price, etc." See **Exhibit G**.

34.     On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exclusive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75 million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend.

---

[3] See (G), infra.

[4] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

35. McGuireWoods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine. This was relayed in an email from Mr. Vaughn to Grady Jordan, Dr. McCollum's personal lawyer. See **Exhibit H**.

36. However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left Mr. Daileader, HTA, Huron, and McGuireWoods on the sidelines.

37. According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain."

38. HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

39. On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers. See **Exhibit I**.

40. Upon information and belief, Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually

need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The

LOI is a distraction to Brohm and Webb[5] — they're trying to force a deal that isn't there — and

they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift

the strategy definitively, or else we're going to lose the last window we have." See **Exhibit J**.

41.     It was during this correspondence that Mr. Daileader posed the following to Mr.

Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB[6]

letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy

filing before the estate deteriorates further."

**E.     The Raids**

42.     Mr. Daileader did not have to think about the National Spine LOI for long

because his wish for the potential purchase to fail came true just six days later. According to the

DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US

Department of Health and Human Services conducted raids on the Easley, Spartanburg, and

Greenville OMC facilities. At that time, the refinancing effort was terminated[7], the National

Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to

include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of

McGuireWoods was correspondingly expanded to provide for restructuring, corporate and

healthcare legal services to the entire enterprise."[8]

43.     The day after the raids, Mr. Daileader expressed in an email that the sale of the

business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in

---

[5] Michael Brohm was OMC's CEO and David Webb was its CFO.

[6] "Investment Banker"

[7] By Mr. Daileader.

[8] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron,
HTA pocketed the fee and Huron began billing OMC hourly.

default with the Lenders. Mr. Daileader also stated that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon. See **Exhibit K**.

44.     At this point, according to an email, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies." See **Exhibit L**.

45.     Despite this change of course, Mr. Daileader kept Mr. Freedlander, who was not in McGuireWoods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuireWoods healthcare team until the following spring. From the beginning, according to an email, Mr. Freedlander knew that the situation was a mess, but would create an opportunity for considerable revenue for the Lawyers, including himself, so he was eager to get on board and stay on board. See **Exhibit M**.

**F.     Aaron Kibbey**

46.     On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC.

47.     According to a July 2018 marketing pitch to OMC, Huron touted itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and

rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200 dedicated,
industry focused professionals with broad expertise; [n]umerous restructuring, business
assessment, performance improvement, strategic, interim management and transaction
assignments; [and that additionally] [w]e know the business, payers, market dynamics and the
customers (e.g., patients and physicians)." See **Exhibit N**.

48.      While CROs typically have an expertise in the field of business in which the
company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron
and his first and only engagement as a CRO for a healthcare company.[9]

49.      This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony,
conducted on September 10, 2020:

> A. I think I've said this before. I'm not a healthcare corporate structure
> expert. I spent a lot of time looking at the way that all of the entities
> were set up. I did not understand – I understood it better as time went
> on and as McGuireWoods explained to me how it should be set up
> versus how it was set up, but I don't know if I would say I ever
> completely understood the structure.

50. Mr. Kibbey further testified:

> Q. Was it possible to reorganize Oaktree without a clear understanding
> of the corporate structure?
> A. With the guidance and counsel of McGuireWoods healthcare team,
> yes.

## G.      The MSO

51.      An MSO generally refers to a health care specific administrative and management
engine that provides a host of non-clinical administrative and practice management functions to a
medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare
environment because they enable the practice to have better control over overall medical
spending and cost effectiveness.

---

[9] As detailed below, Huron would not engage their healthcare practice team until June 2019.

12

52. The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

53. Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

54. Under the terms of the November 9, 2018 Engagement Letter, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales

Case 21-08053-RBC Doc 38   Filed 08/17/21   Entered 08/17/21 16:09:27 Desc Main
Document     Page 14 of 51

transaction and ongoing assistance and support with negotiations with the prospective purchaser under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations. See **Exhibit O**.

55.    As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. See **Exhibit P**.

56.    In an email dated October 12, 2018 to Mr. Daileader, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level." See **Exhibit Q**.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 6

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 21-bo0583acv-bo038  Elec0m0m7/21  Fimom0m17/21oc09t37of39esc Main
Document     Page 15 of 51

57.     Despite what appeared to be a clear consensus for an MSO placement, when Mr.

Kibbey was questioned about this at his 2004 Exam, he testified as follows:

> Q. Was Huron hired as an MSO-level CRO?
> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of
> OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an
> MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

Mr. Kibbey's testimony at the November 4, 2019 341 Meeting is also illustrative:

> Q. Okay, and [OMC] PC's goal was to do what, then?
> A. So, I think they were – it was supposed to be structured, and I
> don't claim to be a medical corporate entity structure expert, we
> deferred – we had an entire team from McGuireWoods that was
> looking into that, and I think the way it was supposed to be
> structured so that you separate the clinical assets, if you will, from
> the non-clinical assets. Unfortunately, that was never done.
> Q. Never done before you became involved or?
> A. Correct and since. There was a plan to do it. There was a lot of
> time that went into what would be required in terms of the
> paperwork to change the entire corporate structure. I think part of
> that just due to a number of issues including liabilities associated
> with those entities, was going to be done through a Chapter 11
> restructuring as well. So, there was a plan in place to do all that,
> but it never happened.

## H.     Problems with Huron

58.     Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject

would not be surprising but for the fact that at the time of the 341 Meeting he had just recently

completed his duties as the CRO of OMC, a healthcare company, after nearly a year.

59.     As early as November 5, 2018, according to an email, Mr. Daileader and Mr.

Freedlander were already having issues with Huron's "stagnation," and soon after came issues

with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours and lack of any detailed invoicing as to what services Huron actually performed. See **Exhibit R**.

60.     Mr. Freedlander remarked in one email in November 2018, "None of us look very good at the moment here and we need to rectify this very quickly before the bottom falls out." See **Exhibit S**.

61.     Similar frustrations continued throughout Huron's engagement, and their incompetence was often evident.

62.     Mr. Daileader received negative feedback from the Lenders in January regarding Huron's performance, particularly with regard to Mr. Kibbey. See **Exhibit T**.

63.     In February, Mr. Freedlander voiced his concern regarding a lack of CRO leadership to his McGuireWoods colleagues, as well as separately to Mr. Daileader. He wrote in an email: "Huron has been less than efficient and effective." See **Exhibit U**.

64.     By April, according to an email, the Lenders continued to be critical of Huron due to their inability to drive the restructuring process forward. See **Exhibit V**.

65.     OMC management discussed their concerns with Mr. Daileader, who, according to an email, confirmed even to them that he was not impressed with Huron's involvement. See **Exhibit W**.

66.     When pressed about substantially decreasing or even discontinuing Huron's involvement, Mr. Daileader admitted, according to an email, that he was looking into replacements. Nevertheless, Huron remained and the ineptitude continued. See **Exhibit X**.

67.     In early May, to the astonishment of a member of McGuireWoods' healthcare team, Huron nearly missed the OMC medical malpractice insurance renewals. See **Exhibit Y**.

68.     As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational. See **Exhibit Z**.

69.     After firing Dr. McCollum in early summer 2019, Huron neglected to remove him from the bank accounts and he absconded with $23,000. See **Exhibit AA**.

70.     During the wind down and liquidation process in August 2019, after having complete financial and operational control of OMC for nine months, Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. See **Exhibit BB**.

71.     A clear understanding of the corporate structure is a necessary component of legally proper Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). Instead, Huron ostensibly invented a corporate structure in order to have available providers execute the Notices to clinic employees. See **Exhibit CC**.

72.     For the Notices Huron was able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline that they set for themselves, which was based in whole on how much money was left for them to be paid for their services.

73.     Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet their actions showed no concern for anything other than making sure their fees were paid in full.

**I.      Additional Fidus Loans**

74.     By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-00058-abc-Doc38    Filed 08/17/21    Entered 08/17/21 Page 09:67:38 Desc Main
Document    Page 18 of 51

75.     Because of these expenditures, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments.

76.     Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[10]

77.     In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

78.     Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuireWoods billed OMC during its engagement as lead counsel. The billing was excessive, yet Mr. Daileader never questioned it. In one email on July 23, 2018, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuireWoods'] professional service will more than adequately protect the price of the deal." See **Exhibit DD**. The facts of this case directly dispute Mr. Daileader's "more than adequately protect the price of the deal" prediction.

79.     On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included, much like earlier amendments to the loan agreement, covenants establishing milestone dates by which the consolidated group of entities

---

[10] The unaudited OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

80. On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit.

81. Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million [was] projected to be required to support going concern operations of the enterprise through mid-October 2019."

82. Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements. See **Exhibit EE**.

83. Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant.

84. Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him.

85. In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. See **Exhibit FF**.

86. In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing and more time was wasted.

**J. Still No MSO or Restructuring Plan**

87. Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

88. An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance.

89. Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

90. Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his Rule 2004 Exam, conducted on August 19, 2020:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put that structure into place, and, again, it would require the consent of

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022
Case 21-03058-abc Doc 38 Filed 09/17/21 Entered 09/17/21 16:09:17 Desc Main
Document    Page 21 of 51

all of the entities that were involved, including some entities that it –
it was a very complicated restructuring that involved closing down
certain entities; separating from certain entities; and transfers of
different assets, including the identification of where assets were
owned and then making those transfers. One of the issues that we
encountered in looking at the books and records was that the
management – the existing management did not designate where
certain assets were owned within the broader group. And, in fact,
when we went and compared the transaction documents where they
had acquired those, we saw that there was no designation made to,
you know, the certain books and records of different entities. So we
went back to Elliott Davis and actually asked for their help in
identifying who owned these assets, and to the extent they were at
the correct entity, that was fine; and to the extent they were at the
incorrect entity, we would need to effect those transfers. Elliott
Davis was not able to answer that, so there was an ongoing
investigation to try to resolve those issues.

Q. And what ultimately happened? Why did that investigation stop?
A. Well, eventually the company – eventually we put in front of the
lenders a full reorganizational plan, and 30-plus days after we put
the lenders – the organizational plan in front of the lenders, the
lenders declared to us that they were not going to fund the
organizational plan, and the company then changed strategy to
pursue either the sale of the company, as I described before, or a
liquidation – a wind-down and a liquidation.

Q. When did you present that plan to the lender?
A. Around the third week of June 2019.

91.    With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter
that "the Oaktree Medical family of entities is in the process of finalizing details relating to a
comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring
Officer and myself, an operational restructuring of the businesses comprising the Oaktree
Medical family of entities is also in process."

92.    He continued: "The implementation of the aforementioned steps takes time, and
any positive financial impact of these steps likewise is expected to take a substantial period of
time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 6
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-30058-hcm Doc 33 Filed 09/17/21 Entered 09/17/21 16:05:07 Desc Main
Document      Page 22 of 51

steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

93.     Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult.

94.     As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuireWoods *and* expand their team. Actual *implementation* of the plan was presumably a long way off.

95.     At many points along the way McGuireWoods and Huron threatened to go "pencils down" if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

96.     Upon information and belief, what Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[11]

97.     In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

## K.     Final Demand of the Lenders

98.     In early July 2019, Mr. Daileader was demanding $1 million from the Lenders.

---

[11] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

99.     Ironically, Mr. Daileader used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write in an email: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law." See **Exhibit GG**.

100.    Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee." See **Exhibit HH**.

101.    By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months.

102.    However, Mr. Daileader, Huron, and McGuireWoods did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding.

103.    In their outline for the Lenders, they noted that a Chapter 11 provides the "independent director and professionals to the OMC companies releases and exculpations that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections." See **Exhibit II**.

104.    Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[12] Mr. Daileader wrote: "An additional result

---

[12] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuireWoods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuireWoods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

of this process is the further avoidance of professional fees, including the $300-400k monthly currently accruing, replacing these professionals with permanent management." See **Exhibit JJ**.

105.    One final time the team went pencils down while they waited, and the unsecured debt continued to balloon.

106.    Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

**L.    Liquidation and Crossing the Rubicon**

107.    The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees.

108.    Mr. Daileader and Mr. Freedlander were so unconcerned about OMC's insolvency and the harm it was causing the unsecured creditors that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." See **Exhibit KK**.

109.    Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.
> A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-80058-hcm Doc 38 Electronic Filed 08/07/21 Entered 08/27/21 16:03:17 Desc Main
Document      Page 25 of 51

on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

110.    As part of the liquidation, Mr. Kibbey and his Huron team made no effort to sell Labsource as a going concern, despite the forty percent (40%) of its revenue coming from third-party tests. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[13]

111.    Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. See **Exhibit LL**.

112.    However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[14]

113.    On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[15] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[13] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[14] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[15] This number fell to zero for unsecured creditors less than seven weeks later, at the time of the Chapter 7 filing.



Figure: Total Assets vs Total Liabilities

114. On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an email to Mr. Kibbey and Mr. Freedlander, which he titled "*Crossing the Rubicon?*" See **Exhibit MM**.

115. Mr. Daileader wanted to know if the Chapter 7 Petitions had been filed. Mr. Freedlander informed him that they were just waiting on the wires that would compensate Huron and McGuireWoods for their final invoices. See **Exhibit NN**.

116. Later that day the wires were sent ($148,734 to Huron and $61,620 to McGuireWoods).

117. Despite this, Mr. Daileader disputed that the two entities were paid in full in his 2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuireWoods were paid in full the day before the Chapter 7 was filed?
> A. I don't believe –  I'd be surprised, because I don't actually believe

26

it's true.

118.     Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. See **Exhibit OO**.

119.     Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap, *and* demanded and received a retainer for post-petition work.

120.     By September 15, 2019, Mark Freedlander and McGuireWoods were already moving on to the next liquidation where they would be "stepping into an existing situation where nobody can blame us for the mess and we can only stand to get credit for making it a [*sic*] drop better." See **Exhibit PP**.

121.     On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty as to All Defendants

122.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

123.     Defendants were to discharge their duties as corporate officers in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the corporation and its shareholders. S.C. Code Ann. § 33-8-420.

124.     Under South Carolina law, officers and:

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022

Case 21-03083-hb Doc 33 Filed 08/17/21 Entered 08/17/21 16:03:57 Desc Main
Document     Page 28 of 51

directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.,* 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp,* 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), <u>dismissed sub</u>

<u>nom.</u> *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir.

Mar. 19, 2018). See also *In re Joseph Walker & Co., Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015).

125.    Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C.

Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was

entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at

*14.

126.    Mr. Daileader and Huron had a fundamental misconception of their fiduciary

duties. Mr. Daileader testified at his 2004 Exam as follows:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director
> or manager of.

127.    Mr. Kibbey testified at his 2004 Exam as follows:

Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?

A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.

Q No. I'm asking in terms of your fiduciary duty.

A. My fiduciary duty was to the company.

Q. Tell me the difference between a critical and non-critical vendor.

A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. …

Q. I'm assuming critical vendors were paid before non-critical vendors?

A. In most instances, I would – yeah, that's a fair statement.

128.    OMC was insolvent prior to the Defendants' involvement. At the 341 Meeting for

these matters, Mr. Kibbey testified as follows:

Q. When did Oaktree PC become insolvent, to your knowledge?

A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the liabilities that that entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?

A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?

A. Correct. You can make an argument that company had been insolvent for years.

129.    In Mr. Daileader's 2004 Exam, he testified:

Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?

A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.

Q. Was it?

A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

130.    Additionally, the following are excerpts from Mr. Kibbey's 2004 Exam:

Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent.

A. I don't know.

Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?

A. I never came to a conclusion regarding solvency.

Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?

A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.

A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.

Q. Do you dispute that testimony?

A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.

Q. Under what definition had Oaktree been insolvent for years when you stepped in?

A. Under what definition?

Q. You said it depends on the definition. I'm wondering what

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 6
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022
Case 21-80058-reg Doc 33   Filed 08/17/21   Entered 08/17/21 16:09:17   Desc Main
Document     Page 31 of 51

definition it depends on?
A. The inability to pay your debt.

131.    Mr. Kibbey has advanced qualifications in this area, including being a Certified

Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether

the company he was an officer of for nearly a year was solvent, but also of providing even a

rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's
> fees or you were able to do enough cost-cutting initiatives to pay for
> it?
> A. We were not able to implement enough cost-cutting initiatives to
> even allow the company to consistently make payroll across all the –
> of the entities, and that fundamentally was the reason for the
> restructuring plan. When you add professional fees onto that, the only
> way you could fund that part of the restructuring was with additional
> cash infusion from an outside source. So that additional cash infusion
> went not only for professional fees but also for payroll so that you
> could keep employees working on restructuring and the day-to-day
> operations.

132.    If a company does not have the cash to pay its bills as they become due without

additional funding, it is cash-flow insolvent.

133.    Consequently, from the time the Defendants took over control of the Debtors,

they failed to discharge their duties as corporate officers in good faith, with the care an ordinarily

prudent person in a like position would exercise under similar circumstances, and in a manner

that they reasonably believed to be in the best interest of the unsecured creditors.

134.    Corporate officers and directors are individually liable for the tortious conduct of

the corporation when "they commit, participate in, direct, or authorize the commission of a

tort." *Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 37–38 (1994), *adhered to on*

*reh'g* (Oct. 19, 1994). See also *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643 (1980).

135.    Mr. Daileader, Mr. Kibbey, and Huron willfully directed the breach of their fiduciary duties and are thus personally liable. McGuireWoods gave bad advice and failed to properly advise Mr. Daileader, Mr. Kibbey, and Huron.

136.    As a result of the foregoing, Plaintiff, on behalf of the unsecured creditors, is entitled to recover damages proximately caused by all of the Defendants' breaches of their duty of care, including all amounts needed to pay valid unsecured creditors in full.

### SECOND CAUSE OF ACTION
### Aiding and Abetting a Breach of Fiduciary Duty as to Huron

137.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

138.    As laid out above, upon information and belief, all of the Defendants breached their fiduciary duties to the unsecured creditors.

139.    However, if it is determined that only Mr. Daileader and Mr. Kibbey, individually and in their capacities as a director and an officer of the Debtors, held the fiduciary duty, Huron, Mark Freedlander, and McGuireWoods knowingly and willingly participated in Mr. Daileader and Mr. Kibbey's breaches as alleged in the First Cause of Action herein.

140.    There is not much that sums up the attitude that these professionals had with regard to their duties and responsibilities more than a colorful July 26, 2019 email from Mr. Freedlander to Mr. Daileader, with regard to the Lenders: "F**k these guys. Let's kill this and move on. We all have other and better things to do. This is just a game to these fools and not worth the effort." See **Exhibit QQ**.

141.    As a proximate result of Huron aiding and abetting Mr. Daileader and Mr. Kibbey in the breach of their fiduciary duties, Plaintiff, on behalf of the unsecured creditors, has been damaged.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-80058-jac Doc 8   Filed 08/17/21   Entered 08/17/21 16:01:17   Desc Main
Document     Page 33 of 51

### THIRD CAUSE OF ACTION
**Negligence/Gross Negligence as to All Defendants and Lawyers' Professional Malpractice**

142.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

143.    Defendants owed a duty to the unsecured creditors to, at a minimum, be cognizant of the fact that they owed the unsecured creditors a duty of care and loyalty due to the Debtors' insolvency.

144.    The Defendants stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues.

145.    Upon information and belief, Mr. Daileader and Huron were incapable of analyzing and/or refused to analyze how these clear and present internal and external threats would affect OMC, and by extension the creditors, especially after the DOJ raids, as their actions demonstrated that payment of their own fees was their primary objective.

146.    If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival are required by law to be operated to maximize returns for all creditors.

147.    If there was a path to restructure, and clearly Mr. Daileader's team thought and communicated that there was, their first step in the careful and prudent discharge of their duties would have been to ascertain whether restructuring was possible and, if so, second, to develop a restructuring strategy, and third, to implement that strategy, all of which they failed to do, constituting negligence and gross negligence which caused damage to the estate including the unsecured creditors.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 6

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-05058-amc Doc 38 Filed 09/07/21 Entered 09/27/21 16:08:27 Desc Main
Document        Page 34 of 51

148.    In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented.

149.    A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core.

150.    Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure.

151.    Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. Mr. Daileader testified at his 2004 Exam as follows:

> Q. How did you value a settlement with the DOJ with regard to the value of Oaktree as to prospective buyers.
> A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

152.    Mr. Kibbey testified at his 2004 Exam as follows:

> Q. Did you ever value a settlement with the Department of Justice?
> A. I don't understand the question.
> Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency.
> A. Again, we didn't do any solvency analysis.

153.    Despite that, it may have been less Mr. Daileader and Huron's failure to develop a clear strategy that incorporated the issues raised by the effect of the USDOJ raids, and more a lack of internal discipline that caused OMC's downfall.

154.    The minute Mr. Daileader, Huron, and McGuireWoods opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies.

155.    While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. Even though Mr. Daileader determined early on that prior management was the root of the Debtors' problems, neither he nor Huron acted to terminate any of the prior management until March 2019, and allowed these individuals to collectively earn at least $790,000 from their continued employment with the Debtors.

156.    In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

157.    What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, close the ones that weren't, and then try to do a workout, attempt to sell the business, or file Chapter 11 Bankruptcy.

158.    A Chapter 11 sale likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts contributed to fixed costs[16] of the entities throughout Huron's engagement. *See* Exhibit RR, infra.

159.    Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these

---

[16] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

160.    Instead, Mr. Daileader and Huron flip-flopped with how to handle the Debtors during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

161.    Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

162.    Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management.

163.    Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved.

164.    The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader supported the decision.

165.   Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. This are excerpts from his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.
>
> Later in the 2004 Exam:
>
> Q. My understanding is that there's a Huron Transaction Advisory, LLC and a Huron Business Advisory, LLC. Are you familiar with those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

166.   Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing).

167.   October or November of 2018, or earlier, was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank and Lenders willing to lend in order to get out of the hole they were in. Once the professional fees began, however, the $2 million was depleted and the interest payments to the Lenders stopped.

168.   Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors had the petitions been filed in November 2018, or earlier, rather than proposed in July 2019.

169.     A competent CRO should have drawn the conclusion early in his involvement that
there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the
essence in a distressed situation and the CRO is required to act decisively and quickly.
Stagnation and indecision only accelerate the crisis.  But yet, Mr. Kibbey testified in his 2004
Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in November
> 2018?
> A. I don't – I did not know enough to make a recommendation, at
> least, like I think I said earlier, you can always make recommendations
> – make a thoughtful recommendation as to what the course should be,
> whether it should be a Chapter 11 or Chapter 7 or an out-of-work. We
> did not know enough to make an intelligent professional
> recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

170.     By that rational, time was not of the essence as long as you have money; if the
source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004
Exam testimony:

> Q. Was Huron able to establish a fully compliant and effective MSO?
> A. I would answer that question a little differently. Huron doesn't have
> the ability to do that by itself.
> Q. With whatever partners you need, was it able to do so?
> A. Can you repeat the question?
> Q. Yes. Was Huron and the other professionals able to establish a fully
> compliant and effective MSO?
> A. There was a plan in place. The plan was never fully executed.
> Q. Why not?
> A. Well, because part of that plan involved filing for a Chapter 11 as
> part of the corporate restructuring, and we were not able to get the
> financing filed for a Chapter 11, and the lenders requested that not
> only we do not file for Chapter 11, but that we wind down the
> operations. So at that point there was – it didn't make any sense to put
> any more time or effort into trying to create an MSO client
> organization, just to wind it down.
> Q. That was in the summer of 2019?

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM

INDEX NO. 650484/2022

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 02/01/2022

Case 21-30058-hdh11 Doc 33 Filed 09/07/21 Entered 09/07/21 16:09:17 Desc Main
Document    Page 39 of 51

> A. What is your question about?
> Q. What you're talking about where the lenders asked you to wind it
> down and wouldn't fund the Chapter 11 and the client MSO, that was
> in the summer of 2019, right?
> A. Correct.

171.   Mr. Daileader noted in his 2004 Exam testimony that "we produced a product, and we produced the opportunity for it to be restructured, and ultimately the lenders denied the funding."

172.   From Mr. Kibbey's 2004 Exam again:

> Q. Did you ever come up with a strategy?
> A. A strategy for what?
> Q. For whatever it was you were supposed to do at Oaktree.
> A. I don't know if I can answer that. I can't answer that question.
> What I can say is over the course of the engagement we developed a
> restructuring plan and with a budget and with a timeline and were in
> the process of executing that plan.

173.   Upon information and belief, Mr. Daileader and Huron did not accomplish much at all. It was all correspondence, talk, and spreadsheets.

174.   By mid-January, they were still discussing simply *getting together* to develop a comprehensive game plan for an overall restructuring.[17]

175.   Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement (hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k.

176.   Huron spent an embarrassing amount of time reviewing historical OMC management emails, which was a "top priority" according to Mr. Freedlander.

177.   When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's testified:

---

[17] A restructuring *proposal* was not presented until May 20, 2019.

> Q. So in your professional opinion, reviewing employee emails was important in this matter?
> A. In this matter it proved to be critical. You wanted to understand the real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what was really happening behind the scenes.

178.    However, understanding the situation was never achievable according to Mr. Kibbey:

> Q. So it sounds to me like you're talking about initially in November you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what point in time?
> A. I'm not sure we ever stopped trying to understand the situation.

179.    During his 2004 Exam, when Mr. Kibbey was asked what he thought they did accomplish, he testified as follows:

> Q. What measurable restructuring initiatives did you achieve during your engagement?
> A. I'm not sure what you're getting at. What I will – so maybe I'm not answering the question right. If I'm not, let me know. So the liability based on the proposed settlement with the Department of Justice that we later learned of that was on the table when we were engaged was 30 to $40 million. So as part of our discussions with the Department of Justice, that proposed settlement went down to 1 to 5 million. So the savings there are anywhere from 35 to – or I guess if you start at 30 million, right, it could be 25 to 39 million of savings just through that liability alone.

180.    The first and only measurable restructuring initiative they achieved, according to the CRO, was a potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had already testified that McGuireWoods was leading those negotiations.

181.    Mr. Kibbey did ultimately admit that expedience was important in his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional

fees that Oaktree was paying could not be sustained?

A. No. I think – I think in terms of a restructuring, I mean, that's often the case. A business isn't designed to pay professional fees for an indefinite length of time. And we never came to the conclusion that Oaktree could pay these fees for an indefinite length of time. It was how do you as quickly as you can effectuate a restructuring and transition the business and presumably the ownership.

182.    Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent. They should have known that the only way to save the company was an expedient Chapter 11.

183.    Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7, in an attempt to avoid liability.

184.    Plaintiff would show that Defendants negligently, recklessly, willfully, wantonly, and grossly negligently breached their duties to the unsecured creditors by, among other things, failing to:

a.  understand their role;

b.  develop a reasonable and actionable strategy;

c.  get all of the interested parties to agree to a well-reasoned strategy; and

d.  take timely and appropriate action in compliance with that role and strategy.

185.    As to McGuireWoods, Mark Freedlander, and David Pivnick, and in compliance with South Carolina Code Ann. § 15-36-100, the Affidavit of Michael M. Beal is attached hereto as **Exhibit RR**.

186.    At all relevant times, a client-lawyer relationship existed between the Debtor, on the one hand as client, and the Lawyers, on the other as professional attorneys.

187.   The scope of the Lawyers' representation of the Debtor was to provide legal services, counsel, advice, preparation, drafting, careful planning and review of ongoing facts and circumstances with a view toward providing benefit to those entities and individuals to whom the Lawyers owed a duty.

188.   The Lawyers owed professional duties initially to the Debtor but said professionals on cursory examination soon after their engagement knew or should have known of the Debtor's insolvency and at that point the Lawyers owed a duty to the creditors and to the Debtor to advise its officers and managers that in light of the Debtor's insolvency their duties had shifted to the Debtor's creditors, said duties of the Lawyers and other defendants were to adequately, timely and competently counsel, plan, advise, prepare and to be a good steward of estate funds and assets to the benefit and in the interest of the Debtor's creditors.

189.   The Lawyers breached their professional duties to the Debtor and its creditors by failing to adequately, timely and competently provide legal services, counsel, advice, planning, and preparation with a view toward maximizing the value of the Debtor's assets and minimizing to the extent possible the expansion of future debt without realistic benefit to those to whom the Lawyers owed a duty of professional care.

190.   The Lawyers failed to meet the minimum standard of care thereby breaching professional duties to the Debtor and creditors in other ways and by such other particulars as the evidence developed during discovery in this case may demonstrate.

191.   As a direct and proximate result of Defendants' negligent, reckless, willful, wanton, and grossly negligent acts, omissions and/or delicts as enumerated hereinabove, Plaintiff, on behalf of the unsecured creditors, was seriously damaged. Therefore, in accordance

with *Plowman*, supra, Plaintiff requests judgment against all Defendants for actual and punitive damages with interest thereon.

**FOURTH CAUSE OF ACTION**
**Violation of the South Carolina Unfair Trade Practices Act ("UTPA"),**
**S.C. Code Ann. § 39-5-10 *et seq.* as to All Defendants**

192.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

193.    Defendants committed unfair and deceptive acts or practices by, among other things, marketing themselves as professional restructuring consultants, taking over control of a business, putting their interests above the shareholders and unsecured creditors, and negligently liquidating the business, all in violation of their respective duties and applicable law.

194.    Defendants' conduct has had a direct and specific adverse impact on the public interest, namely, to negatively impact a company's ability to hire competent restructuring professionals that will look out for the company's best interests, and to negatively impact a creditor's ability to ensure that a restructuring professional at the helm of an insolvent company looks out for the creditor's best interests.

195.    As a direct and proximate result of Defendants' misconduct, Plaintiff, on behalf of the unsecured creditors, has suffered monetary loss.

196.    Directors and officers are individually liable for the corporation's unfair trade practices when "they personally commit, participate in, direct, or authorize the commission of a violation of the UTPA." *Plowman* at 286, 38.

197.    Accordingly, Plaintiff is entitled to recover from all of the Defendants the actual damages to the unsecured creditors resulting from the Defendants' unfair and deceptive acts,

Case 21-80055-jic Doc 68 Electronic Stamp 01/17/21 Filed 09/27/21 Page 272 of 381 Desc Main
Document     Page 44 of 51

along with punitive damages up to three times the actual damages amount, and his attorneys' fees and costs in pursuing this action.

### FIFTH CAUSE OF ACTION
**Fraud as to Mr. Daileader and Mr. Kibbey**

198.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

199.    Defendants Mr. Daileader and Mr. Kibbey, in their capacities as a director and officer of the Debtors, owed a duty to disclose to the Debtors that they did not have the requisite experience to both restructure a health care company and to do so in compliance with both federal and South Carolina law.

200.    They misled the Debtors into believing that they were capable of performing these services, while knowing that the representations were false or while recklessly disregarding the truth and falsity thereof and intending that the Debtors would rely upon these representations to utilize their services.

201.    These misrepresentations by Defendants were material to the Debtors' decision to utilize Defendants' services.

202.    As a proximate result of justifiably relying upon Mr. Daileader and Mr. Kibbey's misrepresentations, the Plaintiff, on behalf of the unsecured creditors, was injured.

203.    Based upon the foregoing, the Plaintiff is entitled to judgment against Mr. Daileader and Mr. Kibbey and to an award of compensatory and punitive damages in an amount to be determined by the jury, with interest thereon.

## SIXTH CAUSE OF ACTION
### Civil Conspiracy as to All Defendants

204.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

205.   Defendants, by and between themselves, conspired to interfere with, delay, hinder, and/or prevent the Debtors' creditors from collecting debts the creditors were properly entitled to collect in order to pay the Defendants' own fees.

206.   As a proximate result of the Defendants' conspiracy against the Plaintiff, on behalf of the unsecured creditors, the Plaintiff has incurred damages.

207.   The Plaintiff is also entitled to an appropriate award of punitive damages due to the conspiracy undertaken by the Defendants.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment as to Mr. Daileader, Huron, and McGuireWoods

208.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

209.   Through their negligent acts as detailed herein, Defendants Mr. Daileader, as Independent Director, and Huron, for their own benefit, utilized the Debtors' profits to pay themselves.

210.   It would be unjust to the creditors to allow Defendants to retain those ill-gotten gains.

211.   Accordingly, as a result of the foregoing, Plaintiff is entitled to recover the damages proximately resulting from Defendants' actions, including the amount of all valid unsecured claims, in addition to being entitled to recovery of punitive damages for Defendants' willful and wanton actions.

## EIGHTH CAUSE OF ACTION
### Bankruptcy Code Section 548(a)(1)(A) (Actual Fraud) as to All Defendants

212. Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

213. During their tenure in control of the Debtors, Defendants paid out over $4 million in professional fees to themselves and those they utilized to perpetrate their fraud (the "Transfers").

214. The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

215. Upon information and belief, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors.

216. Upon information and belief, such actual intent is evidenced by, among other things, a misrepresentation of their competence and experience, a fundamental misunderstanding to their duties, and putting paying their fees above the interests of any others.

217. Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

218. Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

## NINTH CAUSE OF ACTION
### Bankruptcy Code Section 548(a)(1)(B) (Constructive Fraud) as to All Defendants

219. Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-0058 Doc 38 Filed 08/17/21 Entered 08/17/21 Page 275 of 381 Desc Main
Document    Page 47 of 51

220.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

221.    Upon information and belief, the Defendants are the transferees of property of the Debtors.

222.    The Debtors received no or less than reasonably equivalent value in connection with the Transfers which were made to or for the benefit of Defendants, and which were transferred by the Debtors within two years before the Petition Date.

223.    At the time of the Transfers, the Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction or was about to engage in a business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur or believed or reasonably should have believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

224.    Because of the foregoing, the Transfers may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Transfers may be recovered from the Defendants as the initial transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

225.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

226.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022

Case 21-90058-rbc Doc 8 Filed 09/17/21 Entered 09/17/21 16:07:67 Desc Main
Document    Page 48 of 51

### TENTH CAUSE OF ACTION
### Bankruptcy Code Section 547 (Preferences) as to All Defendants

227.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

228.    The professional fees paid to the Defendants in the one year prior to the Petition Date were made to the Defendants for or on account of an antecedent debt by the Debtors to the Defendants and Plaintiff is informed and believes that the Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547 of the United States Bankruptcy Code.

229.    At the time of the Transfers, the Debtors were insolvent and Defendants were insiders.

230.    The payments referred to in the proceeding paragraphs enabled the Defendants to receive more than they would have received under Chapter 7 of the Bankruptcy Code if the Transfers had not been made.

231.    By reason of the forgoing, Defendants are liable to Plaintiff in the full amount of the professional fees paid to them.

### ELEVENTH CAUSE OF ACTION
### Bankruptcy Code Section 329 as to McGuireWoods (Unreasonable Compensation)

232.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

233.    McGuireWoods was paid in excess of $1.4 million from August 2018 to September 2019. McGuireWoods was engaged to assist Oaktree in a financial restructuring which would be accomplished through a sale or refinancing.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM INDEX NO. 650484/2022

NYSCEF DOC. NO. 8    Case 21-08058-mcv-Doc8    Electron0/17/21    Filed RBC/17/Zpage 03/17 of 5Bsc Main    RECEIVED NYSCEF: 02/01/2022

Document    Page 49 of 51

234.    The Debtors failed in every respect in these endeavors and ultimately filed Chapter 7 with substantially more debt and substantially less assets than when McGuireWoods was initially engaged.

235.    The fees paid to McGuireWoods far exceeded the reasonable value of any such services.

236.    By reason of the forgoing, McGuireWoods is liable to Plaintiff in the full amount of the professional fees paid to it.

<u>TWELFTH CAUSE OF ACTION</u>
**Bankruptcy Code Section 550 (Recovery of Avoided Transfers)**

237.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

238.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the value of the property transferred for the benefit of the Estates to the extent the Transfers are avoided pursuant to, among other sections, Sections 329, 544, 547, and 548 of the Bankruptcy Code.

239.    Under Section 550(a)(1) of the Bankruptcy Code, Plaintiff may recover from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

240.    The Defendants are the initial transferees or entities for whose benefit the Transfers were made.

241.    Plaintiff prays that the Court issue an order against the Defendants, ordering recovery by Plaintiff for the benefit of Debtors' Estates the value of the property transferred with respect to any transfers avoided under this Complaint pursuant to 11 U.S.C. § 550 to the extent the Defendants are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees.

## PRAYER FOR RELIEF

Plaintiff respectfully requests and prays that this Court enter judgment in his favor and against Defendant, and award the following relief:

a.  An order granting actual, general, compensatory, incidental, and consequential damages in an amount to be determined at trial;

b.  An order granting exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

c.  An order granting treble damages for Defendants' violation of the UTPA;

d.  An order granting judgment for Plaintiff and voiding the Transfers from the Debtors to Defendants found to be fraudulent pursuant to 11 U.S.C. § 548, and/or preferences pursuant to 11 U.S.C. § 547, and pursuant to 11 U.S.C. § 550;

e.  An order granting judgment for Plaintiff and voiding the fees paid from the Debtors to Defendant McGuireWoods found to be unreasonable pursuant to 11 U.S.C. § 329;

f.  An order granting judgment for Plaintiff and ordering recovery of the value of the property transferred to the Defendants pursuant to 11 U.S.C. § 550 to the extent they are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees;

g.  Pre-judgment interest;

h.  Post-judgment interest;

i.  An order awarding Plaintiff the costs of this suit; and

j.  For such other and further relief as this Court deems just and equitable.

(Signature page follows)

/s/Joshua J. Hudson
Joshua J. Hudson, Fed. ID No. 11620
Joseph O. Smith, Fed. ID No. 10551
jhudson@smithhudsonlaw.com
Smith Hudson Law, LLC
200 N. Main St., Suite 301-C
Greenville, SC 29601
(864) 908-3914

Warren C. Powell, Jr., Fed ID No. 3138
Benjamin C. Bruner, Fed ID No. 10625
Chelsea J. Clark, Fed ID No. 12730
Bruner Powell Wall & Mullins, LLC
PO Box 61110
Columbia, SC 29260
(803) 252-7693
*Attorneys for Trustee/Plaintiff*

Greenville, South Carolina
September 17, 2021

Case 21-80059-jw  Doc 38  Filed 09/17/21  Entered 09/17/21 16:38:60 of 35 Desc Main
Document     Page 1 of 51

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| Labsource, LLC, | ) | Case No. 19-05161-hb |
| | ) | |
| Debtor, | ) | |
| | ) | |
| _____ | ) | |
| | | |
| John K. Fort, Trustee, | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. _____ |
| | ) | |
| Aaron Kibbey, individually and as Chief | ) | |
| Restructuring Officer of Oaktree Medical | ) | |
| Centre, PC; Timothy Daileader, individually | ) | |
| and as Independent Director of Oaktree | ) | |
| Medical Centre, PC; Huron Consulting | ) | |
| Services, LLC aka Huron Consulting Group; | ) | |
| Mark Freedlander; David Pivnick; and | ) | |
| McGuireWoods LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

John K. Fort, Chapter 7 Trustee of the bankruptcy estate of Labsource, LLC, by and

through his undersigned attorneys, hereby states as follows:

### NATURE AND BASIS OF ACTION

This Action arises out of Defendants' engagements as third-party officers, restructuring

consultants, and professionals for the Debtor and two sister entities that are companion cases

hereto. During their tenure, they succeeded only in paying themselves and substantially

increasing the Debtor's unsecured debt, for which they are liable. Defendants' actions constitute

breaches of their fiduciary duties, gross negligence, a violation of the South Carolina Unfair

1

Trade Practices Act (S.C. Code Ann. § 39-5-10, *et seq*.), and make them liable for violation of various other statutory and common law causes of action as detailed below.

The Defendants were hired to fix a healthcare conglomerate that was failing to pay its debt on a credit facility secured by, among other things, the lender's ability to place turnaround professionals into critical management positions. Over the course of approximately one year, and while with complete financial, operational, and fiduciary control, the Defendants made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a corporate restructuring. As the Debtors' assets were quickly depleted and the liabilities grew, the Defendants collected professional fees totaling nearly $5 million. Once there were no more funds to pay those fees, and with no concern for the unsecured creditors to whom the Defendants owed a fiduciary duty, they filed the herein Chapter 7 Petitions.

## PARTIES AND JURISDICTION

1.     On September 19, 2019, Oaktree Medical Centre, LLC; Oaktree Medical Centre, PC; and Labsource, LLC filed petitions for relief under Chapter 7 of the United States Bankruptcy Code in the Western District of North Carolina. On or about October 1, 2019, the Chapter 7 cases were transferred to the United States Bankruptcy Court for the District of South Carolina, and, on October 2, 2019, John K. Fort (hereinafter "Plaintiff") was appointed as duly qualified and acting Chapter 7 Trustee for all three Debtors (hereinafter collectively the "Estate").

2.     Labsource, LLC is the Debtor in the above-referenced Chapter 7 bankruptcy case. Labsource, LLC is a South Carolina company whose principal place of business was in Greenville, South Carolina before it ceased doing business.

3.      Upon information and belief, Aaron Kibbey is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

4.      Upon information and belief, Timothy Daileader is a resident of the State of New York but was engaged by and did business for the Debtor in South Carolina.

5.      Upon information and belief, Huron Consulting Services, LLC aka Huron Consulting Group (hereinafter "Huron") is a limited liability company organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

6.      Upon information and belief, Mark Freedlander is a resident of the State of Pennsylvania but was engaged by and did business for the Debtor in South Carolina.

7.      Upon information and belief, David Pivnick is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

8.      Upon information and belief, McGuireWoods LLP (hereinafter "McGuireWoods" or "Lawyers") is a limited liability partnership organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

9.      This adversary proceeding arises under Title 11 (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") or arises in or relates to the Chapter 7 bankruptcy cases of Oaktree Medical Centre, LLC, Case No. 19-05154; Oaktree Medical Centre, PC, Case No. 19-05155; and Labsource, LLC, Case No. 19-05161, all now pending in this Court (and all three Debtors are hereinafter collectively referred to as "OMC" or "Debtors").

10.     This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 329, 544, 547, 548, and 550; 28 U.S.C. § 1334; S.C. Code Ann. § 33-8-300; and S.C. Code Ann. § 39-5-10.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022
Case 21-80059-dsc-11 Doc 38 Filed 08/17/21 Entered 08/17/21 16:38:50 Desc Main
Document     Page 4 of 51

11.    This is a core proceeding under 28 U.S.C. § 157(b)(2). To the extent Article III of the United States Constitution does not permit any cause of action asserted herein to be treated as "core," Plaintiff consents to the Court entering final orders or judgment pursuant to 28 U.S.C. § 157(c)(2).

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

FACTUAL BACKGROUND

A.    **The Formation of Oaktree Medical Centre**

13.    OMC was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations.

14.    The iteration of OMC for these purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

15.    OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network.

16.    Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity

Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

**B.     The Fidus Loan**

17.     On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina.

18.     In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions.

19.     Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

**C.     OMC Operation and Control: Tim Daileader's Placement**

20.     Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018, the Lenders exercised one of their remedies

and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource.

21.     The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent.

22.     The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1]

23.     This was Mr. Daileader's first independent directorship in a healthcare company.

24.     Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"). This, **Exhibit A**, attached hereto, and all other exhibits herein, are incorporated by reference, the same as if fully set forth in this Complaint.

25.     In the DOJ Letter, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years. This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility. Soon after becoming an

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

### D. Huron and McGuireWoods Engagements

26.     In mid-July 2018, Mark Freedlander, an attorney with McGuireWoods, ran into an old acquaintance, John DiDonato, head of Huron's restructuring group, at the gym. Mr. DiDonato told Mr. Freedlander that he was involved with a matter in Charlotte, North Carolina that "had the potential to get nasty in short order." This information was relayed from Mr. Freedlander to Scott Vaughn, an attorney in McGuireWoods' restructuring group in Charlotte, in an email. See **Exhibit B**.

27.     Mr. Freedlander urged Mr. DiDonato to get McGuireWoods and Mr. Vaughn involved. See **Exhibit C**.

28.     By July 18, 2018, Mr. Freedlander had connected with Mr. Daileader and a McGuireWoods team member had drafted a form letter for Mr. Daileader's signature terminating the engagement of OMC's prior counsel. See **Exhibit D**.

29.     As of late July, Mr. Daileader, Mr. Freedlander, and Mr. DiDonato were still attempting to coordinate their engagements. Mr. Freedlander wrote in an email to Mr. Daileader and Mr. DiDonato that McGuireWoods was "pressing to become overall transactional counsel [for OMC] in light of the MSO structure." See **Exhibit E**.

30.     Upon information and belief, Mr. Freedlander had no experience with a management services organization ("MSO")[3] and had already been soliciting advice from a McGuireWoods attorney who did. See **Exhibit F**.

---

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

31.     In the same email, Exhibit E, that Mr. Freedlander wrote to Mr. Daileader and Mr. DiDonato regarding the MSO, Mr. Freedlander noted to Mr. Daileader: "I appreciate your concerns about conflict but if the lenders are paid in full as a result of the transaction, then these conflicts don't matter."

32.     Ultimately, and ignoring any potential conflicts, Mr. Daileader required Dr. McCollum and OMC to retain Huron, which included Huron Transaction Advisory ("HTA")[4] and the McGuireWoods law firm, purportedly to assist with the corporate restructuring necessary to refinance the Loan.

33.     Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuireWoods' representation for the sale of the company and, as he wrote in an email, their "corporate lawyering gets [McCollum] a better deal, higher price, etc." See **Exhibit G**.

34.     On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exclusive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75 million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend.

---

[3] See (G), infra.

[4] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

35.     McGuireWoods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine. This was relayed in an email from Mr. Vaughn to Grady Jordan, Dr. McCollum's personal lawyer. See **Exhibit H**.

36.     However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left Mr. Daileader, HTA, Huron, and McGuireWoods on the sidelines.

37.     According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain."

38.     HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

39.     On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers. See **Exhibit I**.

40.     Upon information and belief, Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually

need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The LOI is a distraction to Brohm and Webb[5] — they're trying to force a deal that isn't there — and they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift the strategy definitively, or else we're going to lose the last window we have." See **Exhibit J**.

41.     It was during this correspondence that Mr. Daileader posed the following to Mr. Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB[6] letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy filing before the estate deteriorates further."

## E.     The Raids

42.     Mr. Daileader did not have to think about the National Spine LOI for long because his wish for the potential purchase to fail came true just six days later. According to the DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US Department of Health and Human Services conducted raids on the Easley, Spartanburg, and Greenville OMC facilities. At that time, the refinancing effort was terminated[7], the National Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of McGuireWoods was correspondingly expanded to provide for restructuring, corporate and healthcare legal services to the entire enterprise."[8]

43.     The day after the raids, Mr. Daileader expressed in an email that the sale of the business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in

---

[5] Michael Brohm was OMC's CEO and David Webb was its CFO.

[6] "Investment Banker"

[7] By Mr. Daileader.

[8] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron, HTA pocketed the fee and Huron began billing OMC hourly.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022
Case 21-01895-JJG-11 Doc 33 Filed 09/17/21 Entered 09/17/21 16:32:00 Desc Main
Document     Page 11 of 51

default with the Lenders. Mr. Daileader also stated that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon. See **Exhibit K**.

44.     At this point, according to an email, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies." See **Exhibit L**.

45.     Despite this change of course, Mr. Daileader kept Mr. Freedlander, who was not in McGuireWoods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuireWoods healthcare team until the following spring. From the beginning, according to an email, Mr. Freedlander knew that the situation was a mess, but would create an opportunity for considerable revenue for the Lawyers, including himself, so he was eager to get on board and stay on board. See **Exhibit M**.

**F.     Aaron Kibbey**

46.     On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC.

47.     According to a July 2018 marketing pitch to OMC, Huron touted itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and

rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200 dedicated, industry focused professionals with broad expertise; [n]umerous restructuring, business assessment, performance improvement, strategic, interim management and transaction assignments; [and that additionally] [w]e know the business, payers, market dynamics and the customers (e.g., patients and physicians)." See **Exhibit N**.

48.     While CROs typically have an expertise in the field of business in which the company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron and his first and only engagement as a CRO for a healthcare company.[9]

49.     This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony, conducted on September 10, 2020:

> A. I think I've said this before. I'm not a healthcare corporate structure expert. I spent a lot of time looking at the way that all of the entities were set up. I did not understand – I understood it better as time went on and as McGuireWoods explained to me how it should be set up versus how it was set up, but I don't know if I would say I ever completely understood the structure.

50. Mr. Kibbey further testified:

> Q. Was it possible to reorganize Oaktree without a clear understanding of the corporate structure?
> A. With the guidance and counsel of McGuireWoods healthcare team, yes.

**G.     The MSO**

51.     An MSO generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare environment because they enable the practice to have better control over overall medical spending and cost effectiveness.

---

[9] As detailed below, Huron would not engage their healthcare practice team until June 2019.

52.     The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

53.     Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

54.     Under the terms of the November 9, 2018 Engagement Letter, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 21-10059-JcV-D00-3B   Elec:06/17/21   FIle:06/17/21   Page:33p50 of 384esc Main
Document      Page 14 of 51

transaction and ongoing assistance and support with negotiations with the prospective purchaser under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations. See **Exhibit O**.

55.     As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. See **Exhibit P**.

56.     In an email dated October 12, 2018 to Mr. Daileader, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level." See **Exhibit Q**.

57.    Despite what appeared to be a clear consensus for an MSO placement, when Mr.

Kibbey was questioned about this at his 2004 Exam, he testified as follows:

> Q. Was Huron hired as an MSO-level CRO?
> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

Mr. Kibbey's testimony at the November 4, 2019 341 Meeting is also illustrative:

> Q. Okay, and [OMC] PC's goal was to do what, then?
> A. So, I think they were – it was supposed to be structured, and I don't claim to be a medical corporate entity structure expert, we deferred – we had an entire team from McGuireWoods that was looking into that, and I think the way it was supposed to be structured so that you separate the clinical assets, if you will, from the non-clinical assets. Unfortunately, that was never done.
> Q. Never done before you became involved or?
> A. Correct and since. There was a plan to do it. There was a lot of time that went into what would be required in terms of the paperwork to change the entire corporate structure. I think part of that just due to a number of issues including liabilities associated with those entities, was going to be done through a Chapter 11 restructuring as well. So, there was a plan in place to do all that, but it never happened.

## H.    Problems with Huron

58.    Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject

would not be surprising but for the fact that at the time of the 341 Meeting he had just recently

completed his duties as the CRO of OMC, a healthcare company, after nearly a year.

59.    As early as November 5, 2018, according to an email, Mr. Daileader and Mr.

Freedlander were already having issues with Huron's "stagnation," and soon after came issues

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-30059-hcm Doc 38 Filed 08/17/21 Entered 08/17/21 Page 295 of 381 Desc Main
Document    Page 16 of 51

with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours and lack of any detailed invoicing as to what services Huron actually performed. See **Exhibit R**.

60.    Mr. Freedlander remarked in one email in November 2018, "None of us look very good at the moment here and we need to rectify this very quickly before the bottom falls out." See **Exhibit S**.

61.    Similar frustrations continued throughout Huron's engagement, and their incompetence was often evident.

62.    Mr. Daileader received negative feedback from the Lenders in January regarding Huron's performance, particularly with regard to Mr. Kibbey. See **Exhibit T**.

63.    In February, Mr. Freedlander voiced his concern regarding a lack of CRO leadership to his McGuireWoods colleagues, as well as separately to Mr. Daileader. He wrote in an email: "Huron has been less than efficient and effective." See **Exhibit U**.

64.    By April, according to an email, the Lenders continued to be critical of Huron due to their inability to drive the restructuring process forward. See **Exhibit V**.

65.    OMC management discussed their concerns with Mr. Daileader, who, according to an email, confirmed even to them that he was not impressed with Huron's involvement. See **Exhibit W**.

66.    When pressed about substantially decreasing or even discontinuing Huron's involvement, Mr. Daileader admitted, according to an email, that he was looking into replacements. Nevertheless, Huron remained and the ineptitude continued. See **Exhibit X**.

67.    In early May, to the astonishment of a member of McGuireWoods' healthcare team, Huron nearly missed the OMC medical malpractice insurance renewals. See **Exhibit Y**.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022

Case 21-30059-hcm Doc 38 Filed 08/17/21 Entered 08/17/21 13:32:60 Desc Main
Document        Page 17 of 51

68.    As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational. See **Exhibit Z**.

69.    After firing Dr. McCollum in early summer 2019, Huron neglected to remove him from the bank accounts and he absconded with $23,000. See **Exhibit AA**.

70.    During the wind down and liquidation process in August 2019, after having complete financial and operational control of OMC for nine months, Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. See **Exhibit BB**.

71.    A clear understanding of the corporate structure is a necessary component of legally proper Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). Instead, Huron ostensibly invented a corporate structure in order to have available providers execute the Notices to clinic employees. See **Exhibit CC**.

72.    For the Notices Huron was able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline that they set for themselves, which was based in whole on how much money was left for them to be paid for their services.

73.    Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet their actions showed no concern for anything other than making sure their fees were paid in full.

**I.    Additional Fidus Loans**

74.    By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals.

75. Because of these expenditures, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments.

76. Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[10]

77. In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

78. Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuireWoods billed OMC during its engagement as lead counsel. The billing was excessive, yet Mr. Daileader never questioned it. In one email on July 23, 2018, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuireWoods'] professional service will more than adequately protect the price of the deal." See **Exhibit DD**. The facts of this case directly dispute Mr. Daileader's "more than adequately protect the price of the deal" prediction.

79. On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included, much like earlier amendments to the loan agreement, covenants establishing milestone dates by which the consolidated group of entities

[10] The unaudited OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

80.     On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit.

81.     Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million [was] projected to be required to support going concern operations of the enterprise through mid-October 2019."

82.     Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements. See **Exhibit EE**.

83.     Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant.

84.     Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him.

85.     In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. See **Exhibit FF**.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-03059-hb Doc 33 Filed 08/17/21 Entered 08/17/21 16:38:50 Desc Main
Document     Page 20 of 51

86.     In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing and more time was wasted.

**J.     Still No MSO or Restructuring Plan**

87.     Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

88.     An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance.

89.     Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

90.     Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his Rule 2004 Exam, conducted on August 19, 2020:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put that structure into place, and, again, it would require the consent of

all of the entities that were involved, including some entities that it – it was a very complicated restructuring that involved closing down certain entities; separating from certain entities; and transfers of different assets, including the identification of where assets were owned and then making those transfers. One of the issues that we encountered in looking at the books and records was that the management – the existing management did not designate where certain assets were owned within the broader group. And, in fact, when we went and compared the transaction documents where they had acquired those, we saw that there was no designation made to, you know, the certain books and records of different entities. So we went back to Elliott Davis and actually asked for their help in identifying who owned these assets, and to the extent they were at the correct entity, that was fine; and to the extent they were at the incorrect entity, we would need to effect those transfers. Elliott Davis was not able to answer that, so there was an ongoing investigation to try to resolve those issues.

Q. And what ultimately happened? Why did that investigation stop?

A. Well, eventually the company – eventually we put in front of the lenders a full reorganizational plan, and 30-plus days after we put the lenders – the organizational plan in front of the lenders, the lenders declared to us that they were not going to fund the organizational plan, and the company then changed strategy to pursue either the sale of the company, as I described before, or a liquidation – a wind-down and a liquidation.

Q. When did you present that plan to the lender?

A. Around the third week of June 2019.

91.     With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter that "the Oaktree Medical family of entities is in the process of finalizing details relating to a comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring Officer and myself, an operational restructuring of the businesses comprising the Oaktree Medical family of entities is also in process."

92.     He continued: "The implementation of the aforementioned steps takes time, and any positive financial impact of these steps likewise is expected to take a substantial period of time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-03059-jmcv-DOc8    Ellecc108/17/21    EnteredD09/27/21age 3050 of 3Desc Main
Document    Page 22 of 51

steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

93.    Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult.

94.    As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuireWoods *and* expand their team. Actual *implementation* of the plan was presumably a long way off.

95.    At many points along the way McGuireWoods and Huron threatened to go "pencils down" if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

96.    Upon information and belief, what Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[11]

97.    In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

**K.    Final Demand of the Lenders**

98.    In early July 2019, Mr. Daileader was demanding $1 million from the Lenders.

---

[11] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

99.     Ironically, Mr. Daileader used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write in an email: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law." See **Exhibit GG**.

100.     Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee." See **Exhibit HH**.

101.     By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months.

102.     However, Mr. Daileader, Huron, and McGuireWoods did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding.

103.     In their outline for the Lenders, they noted that a Chapter 11 provides the "independent director and professionals to the OMC companies releases and exculpations that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections." See **Exhibit II**.

104.     Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[12] Mr. Daileader wrote: "An additional result

---

[12] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuireWoods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuireWoods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

23

of this process is the further avoidance of professional fees, including the $300-400k monthly currently accruing, replacing these professionals with permanent management." See **Exhibit JJ**.

105.    One final time the team went pencils down while they waited, and the unsecured debt continued to balloon.

106.    Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

**L.    Liquidation and Crossing the Rubicon**

107.    The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees.

108.    Mr. Daileader and Mr. Freedlander were so unconcerned about OMC's insolvency and the harm it was causing the unsecured creditors that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." See **Exhibit KK**.

109.    Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.
> A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-80059-swd-7 Doc 38 Filed 08/17/21 Entered 08/17/21 18:38:50 Desc Main
Document    Page 25 of 51

on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

110.    As part of the liquidation, Mr. Kibbey and his Huron team made no effort to sell Labsource as a going concern, despite the forty percent (40%) of its revenue coming from third-party tests. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[13]

111.    Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. See **Exhibit LL**.

112.    However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[14]

113.    On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[15] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[13] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[14] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[15] This number fell to zero for unsecured creditors less than seven weeks later, at the time of the Chapter 7 filing.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO: 8
Case 21-ldoes21cv-Doc83  Filedos/07/21  Entered 08/27/21 16:38:50 of Desc Main
RECEIVED NYSCEF: 02/01/2022
Document      Page 26 of 51



Total Assets vs Total Liabilities

114.    On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an email to Mr. Kibbey and Mr. Freedlander, which he titled "*Crossing the Rubicon?*" See **Exhibit MM**.

115.    Mr. Daileader wanted to know if the Chapter 7 Petitions had been filed. Mr. Freedlander informed him that they were just waiting on the wires that would compensate Huron and McGuireWoods for their final invoices. See **Exhibit NN**.

116.    Later that day the wires were sent ($148,734 to Huron and $61,620 to McGuireWoods).

117.    Despite this, Mr. Daileader disputed that the two entities were paid in full in his 2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuireWoods were paid in full the day before the Chapter 7 was filed?
> A. I don't believe –  I'd be surprised, because I don't actually believe

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

Case 21-03059-5-mcr Doc 38 Filed 08/17/21 Entered 08/17/21 16:30:06 Desc Main
Document    Page 27 of 51

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

it's true.

118.    Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. See **Exhibit OO**.

119.    Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap, *and* demanded and received a retainer for post-petition work.

120.    By September 15, 2019, Mark Freedlander and McGuireWoods were already moving on to the next liquidation where they would be "stepping into an existing situation where nobody can blame us for the mess and we can only stand to get credit for making it a [*sic*] drop better." See **Exhibit PP**.

121.    On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty as to All Defendants**

122.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

123.    Defendants were to discharge their duties as corporate officers in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the corporation and its shareholders. S.C. Code Ann. § 33-8-420.

124.    Under South Carolina law, officers and:

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-03059-5-rbc Doc 33 Filed 08/17/21 Entered 08/17/21 16:38:50 Desc Main
Document     Page 28 of 51

> directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.,* 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp,* 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), <u>dismissed sub nom.</u> *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir. Mar. 19, 2018). See also *In re Joseph Walker & Co., Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015).

125. Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C. Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at *14.

126. Mr. Daileader and Huron had a fundamental misconception of their fiduciary duties. Mr. Daileader testified at his 2004 Exam as follows:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director or manager of.

127. Mr. Kibbey testified at his 2004 Exam as follows:

Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?

A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.

Q No. I'm asking in terms of your fiduciary duty.

A. My fiduciary duty was to the company.

Q. Tell me the difference between a critical and non-critical vendor.

A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. …

Q. I'm assuming critical vendors were paid before non-critical vendors?

A. In most instances, I would – yeah, that's a fair statement.

128.    OMC was insolvent prior to the Defendants' involvement. At the 341 Meeting for

these matters, Mr. Kibbey testified as follows:

Q. When did Oaktree PC become insolvent, to your knowledge?

A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the liabilities that that entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?

A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?

A. Correct. You can make an argument that company had been insolvent for years.

129.    In Mr. Daileader's 2004 Exam, he testified:

Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?

A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.

Q. Was it?

A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

130.    Additionally, the following are excerpts from Mr. Kibbey's 2004 Exam:

Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent.

A. I don't know.

Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?

A. I never came to a conclusion regarding solvency.

Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?

A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.

A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.

Q. Do you dispute that testimony?

A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.

Q. Under what definition had Oaktree been insolvent for years when you stepped in?

A. Under what definition?

Q. You said it depends on the definition. I'm wondering what

definition it depends on?
A. The inability to pay your debt.

131.     Mr. Kibbey has advanced qualifications in this area, including being a Certified
Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether
the company he was an officer of for nearly a year was solvent, but also of providing even a
rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's
> fees or you were able to do enough cost-cutting initiatives to pay for
> it?
> A. We were not able to implement enough cost-cutting initiatives to
> even allow the company to consistently make payroll across all the –
> of the entities, and that fundamentally was the reason for the
> restructuring plan. When you add professional fees onto that, the only
> way you could fund that part of the restructuring was with additional
> cash infusion from an outside source. So that additional cash infusion
> went not only for professional fees but also for payroll so that you
> could keep employees working on restructuring and the day-to-day
> operations.

132.     If a company does not have the cash to pay its bills as they become due without
additional funding, it is cash-flow insolvent.

133.     Consequently, from the time the Defendants took over control of the Debtors,
they failed to discharge their duties as corporate officers in good faith, with the care an ordinarily
prudent person in a like position would exercise under similar circumstances, and in a manner
that they reasonably believed to be in the best interest of the unsecured creditors.

134.     Corporate officers and directors are individually liable for the tortious conduct of
the corporation when "they commit, participate in, direct, or authorize the commission of a
tort." *Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 37–38 (1994), *adhered to on
reh'g* (Oct. 19, 1994). See also *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643 (1980).

135.    Mr. Daileader, Mr. Kibbey, and Huron willfully directed the breach of their fiduciary duties and are thus personally liable. McGuireWoods gave bad advice and failed to properly advise Mr. Daileader, Mr. Kibbey, and Huron.

136.    As a result of the foregoing, Plaintiff, on behalf of the unsecured creditors, is entitled to recover damages proximately caused by all of the Defendants' breaches of their duty of care, including all amounts needed to pay valid unsecured creditors in full.

### SECOND CAUSE OF ACTION
### Aiding and Abetting a Breach of Fiduciary Duty as to Huron

137.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

138.    As laid out above, upon information and belief, all of the Defendants breached their fiduciary duties to the unsecured creditors.

139.    However, if it is determined that only Mr. Daileader and Mr. Kibbey, individually and in their capacities as a director and an officer of the Debtors, held the fiduciary duty, Huron, Mark Freedlander, and McGuireWoods knowingly and willingly participated in Mr. Daileader and Mr. Kibbey's breaches as alleged in the First Cause of Action herein.

140.    There is not much that sums up the attitude that these professionals had with regard to their duties and responsibilities more than a colorful July 26, 2019 email from Mr. Freedlander to Mr. Daileader, with regard to the Lenders: "F**k these guys. Let's kill this and move on. We all have other and better things to do. This is just a game to these fools and not worth the effort." See **Exhibit QQ**.

141.    As a proximate result of Huron aiding and abetting Mr. Daileader and Mr. Kibbey in the breach of their fiduciary duties, Plaintiff, on behalf of the unsecured creditors, has been damaged.

### THIRD CAUSE OF ACTION
**Negligence/Gross Negligence as to All Defendants and Lawyers' Professional Malpractice**

142.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

143.     Defendants owed a duty to the unsecured creditors to, at a minimum, be cognizant of the fact that they owed the unsecured creditors a duty of care and loyalty due to the Debtors' insolvency.

144.     The Defendants stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues.

145.     Upon information and belief, Mr. Daileader and Huron were incapable of analyzing and/or refused to analyze how these clear and present internal and external threats would affect OMC, and by extension the creditors, especially after the DOJ raids, as their actions demonstrated that payment of their own fees was their primary objective.

146.     If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival are required by law to be operated to maximize returns for all creditors.

147.     If there was a path to restructure, and clearly Mr. Daileader's team thought and communicated that there was, their first step in the careful and prudent discharge of their duties would have been to ascertain whether restructuring was possible and, if so, second, to develop a restructuring strategy, and third, to implement that strategy, all of which they failed to do, constituting negligence and gross negligence which caused damage to the estate including the unsecured creditors.

148.    In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented.

149.    A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core.

150.    Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure.

151.    Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. Mr. Daileader testified at his 2004 Exam as follows:

> Q. How did you value a settlement with the DOJ with regard to the value of Oaktree as to prospective buyers.
> A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

152.    Mr. Kibbey testified at his 2004 Exam as follows:

> Q. Did you ever value a settlement with the Department of Justice?
> A. I don't understand the question.
> Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency.
> A. Again, we didn't do any solvency analysis.

153.    Despite that, it may have been less Mr. Daileader and Huron's failure to develop a clear strategy that incorporated the issues raised by the effect of the USDOJ raids, and more a lack of internal discipline that caused OMC's downfall.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 02/01/2022

Case 21-05059-5-mcr Doc 38 Filed 09/17/21 Entered 09/17/21 16:38:50 Desc Main
Document     Page 35 of 51

154.    The minute Mr. Daileader, Huron, and McGuireWoods opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies.

155.    While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. Even though Mr. Daileader determined early on that prior management was the root of the Debtors' problems, neither he nor Huron acted to terminate any of the prior management until March 2019, and allowed these individuals to collectively earn at least $790,000 from their continued employment with the Debtors.

156.    In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

157.    What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, close the ones that weren't, and then try to do a workout, attempt to sell the business, or file Chapter 11 Bankruptcy.

158.    A Chapter 11 sale likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts contributed to fixed costs[16] of the entities throughout Huron's engagement. *See* Exhibit RR, *infra*.

159.    Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these

---

[16] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

160.    Instead, Mr. Daileader and Huron flip-flopped with how to handle the Debtors during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

161.    Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

162.    Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management.

163.    Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved.

164.    The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader supported the decision.

165.    Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. This are excerpts from his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.
>
> Later in the 2004 Exam:
>
> Q. My understanding is that there's a Huron Transaction Advisory, LLC and a Huron Business Advisory, LLC. Are you familiar with those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

166.    Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing).

167.    October or November of 2018, or earlier, was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank and Lenders willing to lend in order to get out of the hole they were in. Once the professional fees began, however, the $2 million was depleted and the interest payments to the Lenders stopped.

168.    Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors had the petitions been filed in November 2018, or earlier, rather than proposed in July 2019.

169.     A competent CRO should have drawn the conclusion early in his involvement that there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the essence in a distressed situation and the CRO is required to act decisively and quickly. Stagnation and indecision only accelerate the crisis.  But yet, Mr. Kibbey testified in his 2004 Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in November 2018?
> A. I don't – I did not know enough to make a recommendation, at least, like I think I said earlier, you can always make recommendations – make a thoughtful recommendation as to what the course should be, whether it should be a Chapter 11 or Chapter 7 or an out-of-work. We did not know enough to make an intelligent professional recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

170.     By that rational, time was not of the essence as long as you have money; if the source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004 Exam testimony:

> Q. Was Huron able to establish a fully compliant and effective MSO?
> A. I would answer that question a little differently. Huron doesn't have the ability to do that by itself.
> Q. With whatever partners you need, was it able to do so?
> A. Can you repeat the question?
> Q. Yes. Was Huron and the other professionals able to establish a fully compliant and effective MSO?
> A. There was a plan in place. The plan was never fully executed.
> Q. Why not?
> A. Well, because part of that plan involved filing for a Chapter 11 as part of the corporate restructuring, and we were not able to get the financing filed for a Chapter 11, and the lenders requested that not only we do not file for Chapter 11, but that we wind down the operations. So at that point there was – it didn't make any sense to put any more time or effort into trying to create an MSO client organization, just to wind it down.
> Q. That was in the summer of 2019?

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 6

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 21-01005-KLP-Doc-38    Filed-08/17/21    Entered 08/17/21-16:38:80 Desc Main
Document    Page 39 of 51

A. What is your question about?
Q. What you're talking about where the lenders asked you to wind it
down and wouldn't fund the Chapter 11 and the client MSO, that was
in the summer of 2019, right?
A. Correct.

171.  Mr. Daileader noted in his 2004 Exam testimony that "we produced a product,
and we produced the opportunity for it to be restructured, and ultimately the lenders denied the
funding."

172.  From Mr. Kibbey's 2004 Exam again:

Q. Did you ever come up with a strategy?
A. A strategy for what?
Q. For whatever it was you were supposed to do at Oaktree.
A. I don't know if I can answer that. I can't answer that question.
What I can say is over the course of the engagement we developed a
restructuring plan and with a budget and with a timeline and were in
the process of executing that plan.

173.  Upon information and belief, Mr. Daileader and Huron did not accomplish much
at all. It was all correspondence, talk, and spreadsheets.

174.  By mid-January, they were still discussing simply *getting together* to develop a
comprehensive game plan for an overall restructuring.[17]

175.  Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court
resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement
(hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end
of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k.

176.  Huron spent an embarrassing amount of time reviewing historical OMC
management emails, which was a "top priority" according to Mr. Freedlander.

177.  When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's
testified:

---

[17] A restructuring *proposal* was not presented until May 20, 2019.

39

> Q. So in your professional opinion, reviewing employee emails was important in this matter?
> A. In this matter it proved to be critical. You wanted to understand the real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what was really happening behind the scenes.

178.    However, understanding the situation was never achievable according to Mr. Kibbey:

> Q. So it sounds to me like you're talking about initially in November you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what point in time?
> A. I'm not sure we ever stopped trying to understand the situation.

179.    During his 2004 Exam, when Mr. Kibbey was asked what he thought they did accomplish, he testified as follows:

> Q. What measurable restructuring initiatives did you achieve during your engagement?
> A. I'm not sure what you're getting at. What I will – so maybe I'm not answering the question right. If I'm not, let me know. So the liability based on the proposed settlement with the Department of Justice that we later learned of that was on the table when we were engaged was 30 to $40 million. So as part of our discussions with the Department of Justice, that proposed settlement went down to 1 to 5 million. So the savings there are anywhere from 35 to – or I guess if you start at 30 million, right, it could be 25 to 39 million of savings just through that liability alone.

180.    The first and only measurable restructuring initiative they achieved, according to the CRO, was a potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had already testified that McGuireWoods was leading those negotiations.

181.    Mr. Kibbey did ultimately admit that expedience was important in his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 6
Case 21-... Doc 33  Filed 08/17/21  Entered 08/17/21  Page 320 of 381  Desc Main
Document    Page 41 of 51
RECEIVED NYSCEF: 02/01/2022

fees that Oaktree was paying could not be sustained?

A. No. I think – I think in terms of a restructuring, I mean, that's often the case. A business isn't designed to pay professional fees for an indefinite length of time. And we never came to the conclusion that Oaktree could pay these fees for an indefinite length of time. It was how do you as quickly as you can effectuate a restructuring and transition the business and presumably the ownership.

182.    Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent. They should have known that the only way to save the company was an expedient Chapter 11.

183.    Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7, in an attempt to avoid liability.

184.    Plaintiff would show that Defendants negligently, recklessly, willfully, wantonly, and grossly negligently breached their duties to the unsecured creditors by, among other things, failing to:

    a.  understand their role;

    b.  develop a reasonable and actionable strategy;

    c.  get all of the interested parties to agree to a well-reasoned strategy; and

    d.  take timely and appropriate action in compliance with that role and strategy.

185.    As to McGuireWoods, Mark Freedlander, and David Pivnick, and in compliance with South Carolina Code Ann. § 15-36-100, the Affidavit of Michael M. Beal is attached hereto as **Exhibit RR**.

186.    At all relevant times, a client-lawyer relationship existed between the Debtor, on the one hand as client, and the Lawyers, on the other as professional attorneys.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-00059-JMM Doc 38 Filed 08/17/21 Entered 08/17/21 16:32:50 Desc Main
Document    Page 42 of 51

187.     The scope of the Lawyers' representation of the Debtor was to provide legal services, counsel, advice, preparation, drafting, careful planning and review of ongoing facts and circumstances with a view toward providing benefit to those entities and individuals to whom the Lawyers owed a duty.

188.     The Lawyers owed professional duties initially to the Debtor but said professionals on cursory examination soon after their engagement knew or should have known of the Debtor's insolvency and at that point the Lawyers owed a duty to the creditors and to the Debtor to advise its officers and managers that in light of the Debtor's insolvency their duties had shifted to the Debtor's creditors, said duties of the Lawyers and other defendants were to adequately, timely and competently counsel, plan, advise, prepare and to be a good steward of estate funds and assets to the benefit and in the interest of the Debtor's creditors.

189.     The Lawyers breached their professional duties to the Debtor and its creditors by failing to adequately, timely and competently provide legal services, counsel, advice, planning, and preparation with a view toward maximizing the value of the Debtor's assets and minimizing to the extent possible the expansion of future debt without realistic benefit to those to whom the Lawyers owed a duty of professional care.

190.     The Lawyers failed to meet the minimum standard of care thereby breaching professional duties to the Debtor and creditors in other ways and by such other particulars as the evidence developed during discovery in this case may demonstrate.

191.     As a direct and proximate result of Defendants' negligent, reckless, willful, wanton, and grossly negligent acts, omissions and/or delicts as enumerated hereinabove, Plaintiff, on behalf of the unsecured creditors, was seriously damaged. Therefore, in accordance

with *Plowman*, supra, Plaintiff requests judgment against all Defendants for actual and punitive damages with interest thereon.

### FOURTH CAUSE OF ACTION
**Violation of the South Carolina Unfair Trade Practices Act ("UTPA"),
S.C. Code Ann. § 39-5-10 *et seq*. as to All Defendants**

192.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

193.    Defendants committed unfair and deceptive acts or practices by, among other things, marketing themselves as professional restructuring consultants, taking over control of a business, putting their interests above the shareholders and unsecured creditors, and negligently liquidating the business, all in violation of their respective duties and applicable law.

194.    Defendants' conduct has had a direct and specific adverse impact on the public interest, namely, to negatively impact a company's ability to hire competent restructuring professionals that will look out for the company's best interests, and to negatively impact a creditor's ability to ensure that a restructuring professional at the helm of an insolvent company looks out for the creditor's best interests.

195.    As a direct and proximate result of Defendants' misconduct, Plaintiff, on behalf of the unsecured creditors, has suffered monetary loss.

196.    Directors and officers are individually liable for the corporation's unfair trade practices when "they personally commit, participate in, direct, or authorize the commission of a violation of the UTPA." *Plowman* at 286, 38.

197.    Accordingly, Plaintiff is entitled to recover from all of the Defendants the actual damages to the unsecured creditors resulting from the Defendants' unfair and deceptive acts,

along with punitive damages up to three times the actual damages amount, and his attorneys' fees and costs in pursuing this action.

**FIFTH CAUSE OF ACTION**
**Fraud as to Mr. Daileader and Mr. Kibbey**

198.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

199.    Defendants Mr. Daileader and Mr. Kibbey, in their capacities as a director and officer of the Debtors, owed a duty to disclose to the Debtors that they did not have the requisite experience to both restructure a health care company and to do so in compliance with both federal and South Carolina law.

200.    They misled the Debtors into believing that they were capable of performing these services, while knowing that the representations were false or while recklessly disregarding the truth and falsity thereof and intending that the Debtors would rely upon these representations to utilize their services.

201.    These misrepresentations by Defendants were material to the Debtors' decision to utilize Defendants' services.

202.    As a proximate result of justifiably relying upon Mr. Daileader and Mr. Kibbey's misrepresentations, the Plaintiff, on behalf of the unsecured creditors, was injured.

203.    Based upon the foregoing, the Plaintiff is entitled to judgment against Mr. Daileader and Mr. Kibbey and to an award of compensatory and punitive damages in an amount to be determined by the jury, with interest thereon.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM    INDEX NO. 650484/2022
NYSCEF DOC. NO. 6                                                          RECEIVED NYSCEF: 02/01/2022

Case 21-00059-jac Doc 38 Electionsn/7/21 Enter tan/17/21 30:38:50 nc. Main
Document    Page 45 of 51

## SIXTH CAUSE OF ACTION
### Civil Conspiracy as to All Defendants

204.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

205.   Defendants, by and between themselves, conspired to interfere with, delay, hinder, and/or prevent the Debtors' creditors from collecting debts the creditors were properly entitled to collect in order to pay the Defendants' own fees.

206.   As a proximate result of the Defendants' conspiracy against the Plaintiff, on behalf of the unsecured creditors, the Plaintiff has incurred damages.

207.   The Plaintiff is also entitled to an appropriate award of punitive damages due to the conspiracy undertaken by the Defendants.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment as to Mr. Daileader, Huron, and McGuireWoods

208.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

209.   Through their negligent acts as detailed herein, Defendants Mr. Daileader, as Independent Director, and Huron, for their own benefit, utilized the Debtors' profits to pay themselves.

210.   It would be unjust to the creditors to allow Defendants to retain those ill-gotten gains.

211.   Accordingly, as a result of the foregoing, Plaintiff is entitled to recover the damages proximately resulting from Defendants' actions, including the amount of all valid unsecured claims, in addition to being entitled to recovery of punitive damages for Defendants' willful and wanton actions.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-08059-rdd-DoJ8 Filed 08/07/21 Entered 08/27/21 16:32:50 of 381 Desc Main
Document Page 46 of 51

### EIGHTH CAUSE OF ACTION
**Bankruptcy Code Section 548(a)(1)(A) (Actual Fraud) as to All Defendants**

212. Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

213. During their tenure in control of the Debtors, Defendants paid out over $4 million in professional fees to themselves and those they utilized to perpetrate their fraud (the "Transfers").

214. The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

215. Upon information and belief, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors.

216. Upon information and belief, such actual intent is evidenced by, among other things, a misrepresentation of their competence and experience, a fundamental misunderstanding to their duties, and putting paying their fees above the interests of any others.

217. Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

218. Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

### NINTH CAUSE OF ACTION
**Bankruptcy Code Section 548(a)(1)(B) (Constructive Fraud) as to All Defendants**

219. Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 21-80059-pwb Doc 33 Elect 08/17/21 Filed 08/17/21 Page 326 of 381 Desc Main
Document    Page 47 of 51

220.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

221.    Upon information and belief, the Defendants are the transferees of property of the Debtors.

222.    The Debtors received no or less than reasonably equivalent value in connection with the Transfers which were made to or for the benefit of Defendants, and which were transferred by the Debtors within two years before the Petition Date.

223.    At the time of the Transfers, the Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction or was about to engage in a business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur or believed or reasonably should have believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

224.    Because of the foregoing, the Transfers may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Transfers may be recovered from the Defendants as the initial transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

225.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

226.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

## TENTH CAUSE OF ACTION
### Bankruptcy Code Section 547 (Preferences) as to All Defendants

227.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

228.    The professional fees paid to the Defendants in the one year prior to the Petition Date were made to the Defendants for or on account of an antecedent debt by the Debtors to the Defendants and Plaintiff is informed and believes that the Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547 of the United States Bankruptcy Code.

229.    At the time of the Transfers, the Debtors were insolvent and Defendants were insiders.

230.    The payments referred to in the proceeding paragraphs enabled the Defendants to receive more than they would have received under Chapter 7 of the Bankruptcy Code if the Transfers had not been made.

231.    By reason of the forgoing, Defendants are liable to Plaintiff in the full amount of the professional fees paid to them.

## ELEVENTH CAUSE OF ACTION
### Bankruptcy Code Section 329 as to McGuireWoods (Unreasonable Compensation)

232.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

233.    McGuireWoods was paid in excess of $1.4 million from August 2018 to September 2019. McGuireWoods was engaged to assist Oaktree in a financial restructuring which would be accomplished through a sale or refinancing.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM          INDEX NO. 650484/2022

NYSCEF DOC. NO. 8          Case 21-05059-LA5vDoc38  Filed 08/17/21  Entered 08/17/21 16:38:50  Desc Main
                                                Document       Page 49 of 51          RECEIVED NYSCEF: 02/01/2022

234.    The Debtors failed in every respect in these endeavors and ultimately filed Chapter 7 with substantially more debt and substantially less assets than when McGuireWoods was initially engaged.

235.    The fees paid to McGuireWoods far exceeded the reasonable value of any such services.

236.    By reason of the forgoing, McGuireWoods is liable to Plaintiff in the full amount of the professional fees paid to it.

## TWELFTH CAUSE OF ACTION
### Bankruptcy Code Section 550 (Recovery of Avoided Transfers)

237.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

238.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the value of the property transferred for the benefit of the Estates to the extent the Transfers are avoided pursuant to, among other sections, Sections 329, 544, 547, and 548 of the Bankruptcy Code.

239.    Under Section 550(a)(1) of the Bankruptcy Code, Plaintiff may recover from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

240.    The Defendants are the initial transferees or entities for whose benefit the Transfers were made.

241.    Plaintiff prays that the Court issue an order against the Defendants, ordering recovery by Plaintiff for the benefit of Debtors' Estates the value of the property transferred with respect to any transfers avoided under this Complaint pursuant to 11 U.S.C. § 550 to the extent the Defendants are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees.

<u>**PRAYER FOR RELIEF**</u>

Plaintiff respectfully requests and prays that this Court enter judgment in his favor and against Defendant, and award the following relief:

a.  An order granting actual, general, compensatory, incidental, and consequential damages in an amount to be determined at trial;

b.  An order granting exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

c.  An order granting treble damages for Defendants' violation of the UTPA;

d.  An order granting judgment for Plaintiff and voiding the Transfers from the Debtors to Defendants found to be fraudulent pursuant to 11 U.S.C. § 548, and/or preferences pursuant to 11 U.S.C. § 547, and pursuant to 11 U.S.C. § 550;

e.  An order granting judgment for Plaintiff and voiding the fees paid from the Debtors to Defendant McGuireWoods found to be unreasonable pursuant to 11 U.S.C. § 329;

f.  An order granting judgment for Plaintiff and ordering recovery of the value of the property transferred to the Defendants pursuant to 11 U.S.C. § 550 to the extent they are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees;

g.  Pre-judgment interest;

h.  Post-judgment interest;

i.  An order awarding Plaintiff the costs of this suit; and

j.  For such other and further relief as this Court deems just and equitable.

(Signature page follows)

50

/s/Joshua J. Hudson
Joshua J. Hudson, Fed. ID No. 11620
Joseph O. Smith, Fed. ID No. 10551
jhudson@smithhudsonlaw.com
Smith Hudson Law, LLC
200 N. Main St., Suite 301-C
Greenville, SC 29601
(864) 908-3914

Warren C. Powell, Jr., Fed ID No. 3138
Benjamin C. Bruner, Fed ID No. 10625
Chelsea J. Clark, Fed ID No. 12730
Bruner Powell Wall & Mullins, LLC
PO Box 61110
Columbia, SC 29260
(803) 252-7693
*Attorneys for Trustee/Plaintiff*

Greenville, South Carolina
September 17, 2021

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-05155-hb    Doc 34    Filed 09/17/21    Entered 09/17/21 15:28:41    Desc Main
Document    Page 1 of 51

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| Oaktree Medical Centre, PC, | ) | Case No. 19-05155-hb |
| | ) | |
| Debtor, | ) | |
| | ) | |
| _____ | ) | |
| | | |
| John K. Fort, Trustee, | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. _____ |
| | ) | |
| Aaron Kibbey, individually and as Chief | ) | |
| Restructuring Officer of Oaktree Medical | ) | |
| Centre, PC; Timothy Daileader, individually | ) | |
| and as Independent Director of Oaktree | ) | |
| Medical Centre, PC; Huron Consulting | ) | |
| Services, LLC aka Huron Consulting Group; | ) | |
| Mark Freedlander; David Pivnick; and | ) | |
| McGuireWoods LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

John K. Fort, Chapter 7 Trustee of the bankruptcy estate of Oaktree Medical Centre, PC,

by and through his undersigned attorneys, hereby states as follows:

## NATURE AND BASIS OF ACTION

This Action arises out of Defendants' engagements as third-party officers, restructuring

consultants, and professionals for the Debtor and two sister entities that are companion cases

hereto. During their tenure, they succeeded only in paying themselves and substantially

increasing the Debtor's unsecured debt, for which they are liable. Defendants' actions constitute

breaches of their fiduciary duties, gross negligence, a violation of the South Carolina Unfair

1

Case 19-04551-hb Doc 34 Filed 09/17/21 Entered 09/17/21 15:32:41 Desc Main
Document Page 2 of 51

Trade Practices Act (S.C. Code Ann. § 39-5-10, *et seq*.), and make them liable for violation of various other statutory and common law causes of action as detailed below.

The Defendants were hired to fix a healthcare conglomerate that was failing to pay its debt on a credit facility secured by, among other things, the lender's ability to place turnaround professionals into critical management positions. Over the course of approximately one year, and while with complete financial, operational, and fiduciary control, the Defendants made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a corporate restructuring. As the Debtors' assets were quickly depleted and the liabilities grew, the Defendants collected professional fees totaling nearly $5 million. Once there were no more funds to pay those fees, and with no concern for the unsecured creditors to whom the Defendants owed a fiduciary duty, they filed the herein Chapter 7 Petitions.

<u>**PARTIES AND JURISDICTION**</u>

1.      On September 19, 2019, Oaktree Medical Centre, LLC; Oaktree Medical Centre, PC; and Labsource, LLC filed petitions for relief under Chapter 7 of the United States Bankruptcy Code in the Western District of North Carolina. On or about October 1, 2019, the Chapter 7 cases were transferred to the United States Bankruptcy Court for the District of South Carolina, and, on October 2, 2019, John K. Fort (hereinafter "Plaintiff") was appointed as duly qualified and acting Chapter 7 Trustee for all three Debtors (hereinafter collectively the "Estate").

2.      Oaktree Medical Centre, PC is the Debtor in the above-referenced Chapter 7 bankruptcy case. Oaktree Medical Centre, PC is a South Carolina company whose principal place of business was in Easley, South Carolina before it ceased doing business.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 8

Case 19-05155-hb Doc 34 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document Page 3 of 51

RECEIVED NYSCEF: 02/01/2022

3.      Upon information and belief, Aaron Kibbey is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

4.      Upon information and belief, Timothy Daileader is a resident of the State of New York but was engaged by and did business for the Debtor in South Carolina.

5.      Upon information and belief, Huron Consulting Services, LLC aka Huron Consulting Group (hereinafter "Huron") is a limited liability company organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

6.      Upon information and belief, Mark Freedlander is a resident of the State of Pennsylvania but was engaged by and did business for the Debtor in South Carolina.

7.      Upon information and belief, David Pivnick is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

8.      Upon information and belief, McGuireWoods LLP (hereinafter "McGuireWoods" or "Lawyers") is a limited liability partnership organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

9.      This adversary proceeding arises under Title 11 (11 U.S.C. § 101 *et seq*.) (the "Bankruptcy Code") or arises in or relates to the Chapter 7 bankruptcy cases of Oaktree Medical Centre, LLC, Case No. 19-05154; Oaktree Medical Centre, PC, Case No. 19-05155; and Labsource, LLC, Case No. 19-05161, all now pending in this Court (and all three Debtors are hereinafter collectively referred to as "OMC" or "Debtors").

10.     This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 329, 544, 547, 548, and 550; 28 U.S.C. § 1334; S.C. Code Ann. § 33-8-300; and S.C. Code Ann. § 39-5-10.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022
Case 19-Case 19-cv-00CLV Document 1 Filed 09/17/21 Page 5324 of 38 Desc Main
Document    Page 4 of 51

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2). To the extent Article III of the United States Constitution does not permit any cause of action asserted herein to be treated as "core," Plaintiff consents to the Court entering final orders or judgment pursuant to 28 U.S.C. § 157(c)(2).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### A.     The Formation of Oaktree Medical Centre

13.     OMC was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations.

14.     The iteration of OMC for these purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

15.     OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network.

16.     Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity

Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

**B.    The Fidus Loan**

17.    On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina.

18.    In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions.

19.    Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

**C.    OMC Operation and Control: Tim Daileader's Placement**

20.    Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018, the Lenders exercised one of their remedies

and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource.

21.    The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent.

22.    The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1]

23.    This was Mr. Daileader's first independent directorship in a healthcare company.

24.    Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"). This, **Exhibit A**, attached hereto, and all other exhibits herein, are incorporated by reference, the same as if fully set forth in this Complaint.

25.    In the DOJ Letter, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years. This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility. Soon after becoming an

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

Case 19-04551-JMC-Doc 84 Filed 09/17/21 Filed 09/17/21 Page 337 of 381 Desc Main
Document     Page 7 of 51

independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

**D.    Huron and McGuireWoods Engagements**

26.    In mid-July 2018, Mark Freedlander, an attorney with McGuireWoods, ran into an old acquaintance, John DiDonato, head of Huron's restructuring group, at the gym. Mr. DiDonato told Mr. Freedlander that he was involved with a matter in Charlotte, North Carolina that "had the potential to get nasty in short order." This information was relayed from Mr. Freedlander to Scott Vaughn, an attorney in McGuireWoods' restructuring group in Charlotte, in an email. See **Exhibit B**.

27.    Mr. Freedlander urged Mr. DiDonato to get McGuireWoods and Mr. Vaughn involved. See **Exhibit C**.

28.    By July 18, 2018, Mr. Freedlander had connected with Mr. Daileader and a McGuireWoods team member had drafted a form letter for Mr. Daileader's signature terminating the engagement of OMC's prior counsel. See **Exhibit D**.

29.    As of late July, Mr. Daileader, Mr. Freedlander, and Mr. DiDonato were still attempting to coordinate their engagements. Mr. Freedlander wrote in an email to Mr. Daileader and Mr. DiDonato that McGuireWoods was "pressing to become overall transactional counsel [for OMC] in light of the MSO structure." See **Exhibit E**.

30.    Upon information and belief, Mr. Freedlander had no experience with a management services organization ("MSO")[3] and had already been soliciting advice from a McGuireWoods attorney who did. See **Exhibit F**.

---

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

Case 19-01051-LT2 Doc 34 Filed 09/17/21 Entered 09/17/21 12:28:41 Desc Main
Document    Page 8 of 51

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

31.     In the same email, Exhibit E, that Mr. Freedlander wrote to Mr. Daileader and Mr. DiDonato regarding the MSO, Mr. Freedlander noted to Mr. Daileader: "I appreciate your concerns about conflict but if the lenders are paid in full as a result of the transaction, then these conflicts don't matter."

32.     Ultimately, and ignoring any potential conflicts, Mr. Daileader required Dr. McCollum and OMC to retain Huron, which included Huron Transaction Advisory ("HTA")[4] and the McGuireWoods law firm, purportedly to assist with the corporate restructuring necessary to refinance the Loan.

33.     Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuireWoods' representation for the sale of the company and, as he wrote in an email, their "corporate lawyering gets [McCollum] a better deal, higher price, etc." See **Exhibit G**.

34.     On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exclusive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75 million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend.

---

[3] See (G), infra.

[4] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

35.    McGuireWoods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine. This was relayed in an email from Mr. Vaughn to Grady Jordan, Dr. McCollum's personal lawyer. See **Exhibit H**.

36.    However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left Mr. Daileader, HTA, Huron, and McGuireWoods on the sidelines.

37.    According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain."

38.    HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

39.    On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers. See **Exhibit I**.

40.    Upon information and belief, Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually

need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The LOI is a distraction to Brohm and Webb[5] — they're trying to force a deal that isn't there — and they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift the strategy definitively, or else we're going to lose the last window we have." See **Exhibit J**.

41.     It was during this correspondence that Mr. Daileader posed the following to Mr. Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB[6] letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy filing before the estate deteriorates further."

### E.     The Raids

42.     Mr. Daileader did not have to think about the National Spine LOI for long because his wish for the potential purchase to fail came true just six days later. According to the DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US Department of Health and Human Services conducted raids on the Easley, Spartanburg, and Greenville OMC facilities. At that time, the refinancing effort was terminated[7], the National Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of McGuireWoods was correspondingly expanded to provide for restructuring, corporate and healthcare legal services to the entire enterprise."[8]

43.     The day after the raids, Mr. Daileader expressed in an email that the sale of the business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in

---

[5] Michael Brohm was OMC's CEO and David Webb was its CFO.

[6] "Investment Banker"

[7] By Mr. Daileader.

[8] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron, HTA pocketed the fee and Huron began billing OMC hourly.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 19-01656-JMC-7 Doc 34 Filed 09/17/21 Entered 09/17/21 13:28:41 Desc Main
Document     Page 11 of 51

default with the Lenders. Mr. Daileader also stated that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon. See **Exhibit K**.

44.     At this point, according to an email, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies." See **Exhibit L**.

45.     Despite this change of course, Mr. Daileader kept Mr. Freedlander, who was not in McGuireWoods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuireWoods healthcare team until the following spring. From the beginning, according to an email, Mr. Freedlander knew that the situation was a mess, but would create an opportunity for considerable revenue for the Lawyers, including himself, so he was eager to get on board and stay on board. See **Exhibit M**.

**F.     Aaron Kibbey**

46.     On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC.

47.     According to a July 2018 marketing pitch to OMC, Huron touted itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 19-01655-mg Doc 84 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document Page 12 of 51

rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200 dedicated, industry focused professionals with broad expertise; [n]umerous restructuring, business assessment, performance improvement, strategic, interim management and transaction assignments; [and that additionally] [w]e know the business, payers, market dynamics and the customers (e.g., patients and physicians)." See **Exhibit N**.

48. While CROs typically have an expertise in the field of business in which the company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron and his first and only engagement as a CRO for a healthcare company.[9]

49. This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony, conducted on September 10, 2020:

> A. I think I've said this before. I'm not a healthcare corporate structure expert. I spent a lot of time looking at the way that all of the entities were set up. I did not understand – I understood it better as time went on and as McGuireWoods explained to me how it should be set up versus how it was set up, but I don't know if I would say I ever completely understood the structure.

50. Mr. Kibbey further testified:

> Q. Was it possible to reorganize Oaktree without a clear understanding of the corporate structure?
> A. With the guidance and counsel of McGuireWoods healthcare team, yes.

### G. The MSO

51. An MSO generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare environment because they enable the practice to have better control over overall medical spending and cost effectiveness.

---

[9] As detailed below, Huron would not engage their healthcare practice team until June 2019.

Case 19-34054-smb Doc 34 Document 09/17/21 Filed 09/17/21 Entered 09/17/21 Page 343 of 381 Desc Main
Document Page 13 of 51

52.     The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

53.     Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

54.     Under the terms of the November 9, 2018 Engagement Letter, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales

transaction and ongoing assistance and support with negotiations with the prospective purchaser under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations. See **Exhibit O**.

55.     As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. See **Exhibit P**.

56.     In an email dated October 12, 2018 to Mr. Daileader, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level." See **Exhibit Q**.

57.     Despite what appeared to be a clear consensus for an MSO placement, when Mr.

Kibbey was questioned about this at his 2004 Exam, he testified as follows:

> Q. Was Huron hired as an MSO-level CRO?
> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

Mr. Kibbey's testimony at the November 4, 2019 341 Meeting is also illustrative:

> Q. Okay, and [OMC] PC's goal was to do what, then?
> A. So, I think they were – it was supposed to be structured, and I don't claim to be a medical corporate entity structure expert, we deferred – we had an entire team from McGuireWoods that was looking into that, and I think the way it was supposed to be structured so that you separate the clinical assets, if you will, from the non-clinical assets. Unfortunately, that was never done.
> Q. Never done before you became involved or?
> A. Correct and since. There was a plan to do it. There was a lot of time that went into what would be required in terms of the paperwork to change the entire corporate structure. I think part of that just due to a number of issues including liabilities associated with those entities, was going to be done through a Chapter 11 restructuring as well. So, there was a plan in place to do all that, but it never happened.

## H.     Problems with Huron

58.     Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject

would not be surprising but for the fact that at the time of the 341 Meeting he had just recently

completed his duties as the CRO of OMC, a healthcare company, after nearly a year.

59.     As early as November 5, 2018, according to an email, Mr. Daileader and Mr.

Freedlander were already having issues with Huron's "stagnation," and soon after came issues

Case 19-03459-hb   Doc 34   Filed 09/17/21   Entered 09/17/21 15:28:41   Desc Main
                            Document     Page 16 of 51

with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours

and lack of any detailed invoicing as to what services Huron actually performed. See **Exhibit R**.

60.     Mr. Freedlander remarked in one email in November 2018, "None of us look very

good at the moment here and we need to rectify this very quickly before the bottom falls out."

See **Exhibit S**.

61.     Similar frustrations continued throughout Huron's engagement, and their

incompetence was often evident.

62.     Mr. Daileader received negative feedback from the Lenders in January regarding

Huron's performance, particularly with regard to Mr. Kibbey. See **Exhibit T**.

63.     In February, Mr. Freedlander voiced his concern regarding a lack of CRO

leadership to his McGuireWoods colleagues, as well as separately to Mr. Daileader. He wrote in

an email: "Huron has been less than efficient and effective." See **Exhibit U**.

64.     By April, according to an email, the Lenders continued to be critical of Huron due

to their inability to drive the restructuring process forward. See **Exhibit V**.

65.     OMC management discussed their concerns with Mr. Daileader, who, according

to an email, confirmed even to them that he was not impressed with Huron's involvement. See

**Exhibit W**.

66.     When pressed about substantially decreasing or even discontinuing Huron's

involvement, Mr. Daileader admitted, according to an email, that he was looking into

replacements. Nevertheless, Huron remained and the ineptitude continued. See **Exhibit X**.

67.     In early May, to the astonishment of a member of McGuireWoods' healthcare

team, Huron nearly missed the OMC medical malpractice insurance renewals. See **Exhibit Y**.

Case 19-01551-JMC-7A Doc 34 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document     Page 17 of 51

68.     As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational. See **Exhibit Z**.

69.     After firing Dr. McCollum in early summer 2019, Huron neglected to remove him from the bank accounts and he absconded with $23,000. See **Exhibit AA**.

70.     During the wind down and liquidation process in August 2019, after having complete financial and operational control of OMC for nine months, Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. See **Exhibit BB**.

71.     A clear understanding of the corporate structure is a necessary component of legally proper Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). Instead, Huron ostensibly invented a corporate structure in order to have available providers execute the Notices to clinic employees. See **Exhibit CC**.

72.     For the Notices Huron was able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline that they set for themselves, which was based in whole on how much money was left for them to be paid for their services.

73.     Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet their actions showed no concern for anything other than making sure their fees were paid in full.

**I.     Additional Fidus Loans**

74.     By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 19-23649-rdd Doc 3944 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document       Page 18 of 51

75. Because of these expenditures, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments.

76. Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[10]

77. In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

78. Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuireWoods billed OMC during its engagement as lead counsel. The billing was excessive, yet Mr. Daileader never questioned it. In one email on July 23, 2018, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuireWoods'] professional service will more than adequately protect the price of the deal." See **Exhibit DD**. The facts of this case directly dispute Mr. Daileader's "more than adequately protect the price of the deal" prediction.

79. On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included, much like earlier amendments to the loan agreement, covenants establishing milestone dates by which the consolidated group of entities

---

[10] The unaudited OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

Case 19-04551-5-cw-Docu34 Doteumu/17/21 Fitered 097/17/21ge152/34 of 35Desc Main
Document    Page 19 of 51

were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

80.     On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit.

81.     Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million [was] projected to be required to support going concern operations of the enterprise through mid-October 2019."

82.     Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements. See **Exhibit EE**.

83.     Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant.

84.     Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him.

85.     In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. See **Exhibit FF**.

86. In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing and more time was wasted.

**J.      Still No MSO or Restructuring Plan**

87. Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

88. An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance.

89. Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

90. Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his Rule 2004 Exam, conducted on August 19, 2020:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully
> compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put
> that structure into place, and, again, it would require the consent of

all of the entities that were involved, including some entities that it – it was a very complicated restructuring that involved closing down certain entities; separating from certain entities; and transfers of different assets, including the identification of where assets were owned and then making those transfers. One of the issues that we encountered in looking at the books and records was that the management – the existing management did not designate where certain assets were owned within the broader group. And, in fact, when we went and compared the transaction documents where they had acquired those, we saw that there was no designation made to, you know, the certain books and records of different entities. So we went back to Elliott Davis and actually asked for their help in identifying who owned these assets, and to the extent they were at the correct entity, that was fine; and to the extent they were at the incorrect entity, we would need to effect those transfers. Elliott Davis was not able to answer that, so there was an ongoing investigation to try to resolve those issues.

Q. And what ultimately happened? Why did that investigation stop?

A. Well, eventually the company – eventually we put in front of the lenders a full reorganizational plan, and 30-plus days after we put the lenders – the organizational plan in front of the lenders, the lenders declared to us that they were not going to fund the organizational plan, and the company then changed strategy to pursue either the sale of the company, as I described before, or a liquidation – a wind-down and a liquidation.

Q. When did you present that plan to the lender?

A. Around the third week of June 2019.

91. With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter that "the Oaktree Medical family of entities is in the process of finalizing details relating to a comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring Officer and myself, an operational restructuring of the businesses comprising the Oaktree Medical family of entities is also in process."

92. He continued: "The implementation of the aforementioned steps takes time, and any positive financial impact of these steps likewise is expected to take a substantial period of time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 19-04551-hb Doc 34 Filed 09/17/21 Entered 09/17/21 32:24:41 Desc Main
Document     Page 22 of 51

steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

93.     Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult.

94.     As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuireWoods *and* expand their team. Actual *implementation* of the plan was presumably a long way off.

95.     At many points along the way McGuireWoods and Huron threatened to go "pencils down" if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

96.     Upon information and belief, what Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[11]

97.     In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

## K.     Final Demand of the Lenders

98.     In early July 2019, Mr. Daileader was demanding $1 million from the Lenders.

---

[11] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

Case 19-01655-hb2 Doc 44 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document Page 23 of 51

99. Ironically, Mr. Daileader used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write in an email: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law." See **Exhibit GG**.

100. Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee." See **Exhibit HH**.

101. By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months.

102. However, Mr. Daileader, Huron, and McGuireWoods did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding.

103. In their outline for the Lenders, they noted that a Chapter 11 provides the "independent director and professionals to the OMC companies releases and exculpations that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections." See **Exhibit II**.

104. Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[12] Mr. Daileader wrote: "An additional result

---

[12] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuireWoods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuireWoods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

of this process is the further avoidance of professional fees, including the $300-400k monthly currently accruing, replacing these professionals with permanent management." See **Exhibit JJ**.

105.    One final time the team went pencils down while they waited, and the unsecured debt continued to balloon.

106.    Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

**L.    Liquidation and Crossing the Rubicon**

107.    The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees.

108.    Mr. Daileader and Mr. Freedlander were so unconcerned about OMC's insolvency and the harm it was causing the unsecured creditors that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." See **Exhibit KK**.

109.    Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.
> A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 19-01565-11-0001344 Document 9/17/21 Filed 09/17/21 Page 532 of 38 Desc Main
Document        Page 25 of 51

on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

110.    As part of the liquidation, Mr. Kibbey and his Huron team made no effort to sell Labsource as a going concern, despite the forty percent (40%) of its revenue coming from third-party tests. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[13]

111.    Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. See **Exhibit LL**.

112.    However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[14]

113.    On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[15] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[13] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[14] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[15] This number fell to zero for unsecured creditors less than seven weeks later, at the time of the Chapter 7 filing.



114.    On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an email to Mr. Kibbey and Mr. Freedlander, which he titled "*Crossing the Rubicon?*" See **Exhibit MM**.

115.    Mr. Daileader wanted to know if the Chapter 7 Petitions had been filed. Mr. Freedlander informed him that they were just waiting on the wires that would compensate Huron and McGuireWoods for their final invoices. See **Exhibit NN**.

116.    Later that day the wires were sent ($148,734 to Huron and $61,620 to McGuireWoods).

117.    Despite this, Mr. Daileader disputed that the two entities were paid in full in his 2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuireWoods were
> paid in full the day before the Chapter 7 was filed?
> A. I don't believe –  I'd be surprised, because I don't actually believe

it's true.

118.     Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. See **Exhibit OO**.

119.     Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap, *and* demanded and received a retainer for post-petition work.

120.     By September 15, 2019, Mark Freedlander and McGuireWoods were already moving on to the next liquidation where they would be "stepping into an existing situation where nobody can blame us for the mess and we can only stand to get credit for making it a [*sic*] drop better." See **Exhibit PP**.

121.     On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty as to All Defendants

122.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

123.     Defendants were to discharge their duties as corporate officers in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the corporation and its shareholders. S.C. Code Ann. § 33-8-420.

124.     Under South Carolina law, officers and:

Case 19-04151-EB-1 Doc 34 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document    Page 28 of 51

> directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.,* 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp,* 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), <u>dismissed sub nom.</u> *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir. Mar. 19, 2018). See also *In re Joseph Walker & Co., Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015).

125.    Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C. Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at *14.

126.    Mr. Daileader and Huron had a fundamental misconception of their fiduciary duties. Mr. Daileader testified at his 2004 Exam as follows:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director or manager of.

127.    Mr. Kibbey testified at his 2004 Exam as follows:

Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?

A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.

Q No. I'm asking in terms of your fiduciary duty.

A. My fiduciary duty was to the company.

Q. Tell me the difference between a critical and non-critical vendor.

A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. …

Q. I'm assuming critical vendors were paid before non-critical vendors?

A. In most instances, I would – yeah, that's a fair statement.

128.    OMC was insolvent prior to the Defendants' involvement. At the 341 Meeting for

these matters, Mr. Kibbey testified as follows:

Q. When did Oaktree PC become insolvent, to your knowledge?

A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the liabilities that that entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?

A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-Case 19-cv-Docu34 Document 17/21 Filed 09/17/21 Page 30 of 38 Desc Main
Document      Page 30 of 51

Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?

A. Correct. You can make an argument that company had been insolvent for years.

129.     In Mr. Daileader's 2004 Exam, he testified:

Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?

A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.

Q. Was it?

A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

130.     Additionally, the following are excerpts from Mr. Kibbey's 2004 Exam:

Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent?

A. I don't know.

Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?

A. I never came to a conclusion regarding solvency.

Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?

A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.

A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.

Q. Do you dispute that testimony?

A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.

Q. Under what definition had Oaktree been insolvent for years when you stepped in?

A. Under what definition?

Q. You said it depends on the definition. I'm wondering what

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
Case 19-01051-hb Doc 34 Filed 09/17/21 Entered 09/17/21 15:38:41 Desc Main
Document    Page 31 of 51
RECEIVED NYSCEF: 02/01/2022

definition it depends on?
A. The inability to pay your debt.

131.    Mr. Kibbey has advanced qualifications in this area, including being a Certified

Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether

the company he was an officer of for nearly a year was solvent, but also of providing even a

rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's
> fees or you were able to do enough cost-cutting initiatives to pay for
> it?
> A. We were not able to implement enough cost-cutting initiatives to
> even allow the company to consistently make payroll across all the –
> of the entities, and that fundamentally was the reason for the
> restructuring plan. When you add professional fees onto that, the only
> way you could fund that part of the restructuring was with additional
> cash infusion from an outside source. So that additional cash infusion
> went not only for professional fees but also for payroll so that you
> could keep employees working on restructuring and the day-to-day
> operations.

132.    If a company does not have the cash to pay its bills as they become due without

additional funding, it is cash-flow insolvent.

133.    Consequently, from the time the Defendants took over control of the Debtors,

they failed to discharge their duties as corporate officers in good faith, with the care an ordinarily

prudent person in a like position would exercise under similar circumstances, and in a manner

that they reasonably believed to be in the best interest of the unsecured creditors.

134.    Corporate officers and directors are individually liable for the tortious conduct of

the corporation when "they commit, participate in, direct, or authorize the commission of a

tort." *Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 37–38 (1994), *adhered to on*

*reh'g* (Oct. 19, 1994). See also *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643 (1980).

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 19-03452-hb Doc 54 Filed 09/17/21 Entered 09/17/21 13:24:35 Desc Main
Document    Page 32 of 51

135.    Mr. Daileader, Mr. Kibbey, and Huron willfully directed the breach of their fiduciary duties and are thus personally liable. McGuireWoods gave bad advice and failed to properly advise Mr. Daileader, Mr. Kibbey, and Huron.

136.    As a result of the foregoing, Plaintiff, on behalf of the unsecured creditors, is entitled to recover damages proximately caused by all of the Defendants' breaches of their duty of care, including all amounts needed to pay valid unsecured creditors in full.

### SECOND CAUSE OF ACTION
#### Aiding and Abetting a Breach of Fiduciary Duty as to Huron

137.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

138.    As laid out above, upon information and belief, all of the Defendants breached their fiduciary duties to the unsecured creditors.

139.    However, if it is determined that only Mr. Daileader and Mr. Kibbey, individually and in their capacities as a director and an officer of the Debtors, held the fiduciary duty, Huron, Mark Freedlander, and McGuireWoods knowingly and willingly participated in Mr. Daileader and Mr. Kibbey's breaches as alleged in the First Cause of Action herein.

140.    There is not much that sums up the attitude that these professionals had with regard to their duties and responsibilities more than a colorful July 26, 2019 email from Mr. Freedlander to Mr. Daileader, with regard to the Lenders: "F**k these guys. Let's kill this and move on. We all have other and better things to do. This is just a game to these fools and not worth the effort." See **Exhibit QQ**.

141.    As a proximate result of Huron aiding and abetting Mr. Daileader and Mr. Kibbey in the breach of their fiduciary duties, Plaintiff, on behalf of the unsecured creditors, has been damaged.

### THIRD CAUSE OF ACTION
**Negligence/Gross Negligence as to All Defendants and Lawyers' Professional Malpractice**

142.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

143.    Defendants owed a duty to the unsecured creditors to, at a minimum, be cognizant of the fact that they owed the unsecured creditors a duty of care and loyalty due to the Debtors' insolvency.

144.    The Defendants stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues.

145.    Upon information and belief, Mr. Daileader and Huron were incapable of analyzing and/or refused to analyze how these clear and present internal and external threats would affect OMC, and by extension the creditors, especially after the DOJ raids, as their actions demonstrated that payment of their own fees was their primary objective.

146.    If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival are required by law to be operated to maximize returns for all creditors.

147.    If there was a path to restructure, and clearly Mr. Daileader's team thought and communicated that there was, their first step in the careful and prudent discharge of their duties would have been to ascertain whether restructuring was possible and, if so, second, to develop a restructuring strategy, and third, to implement that strategy, all of which they failed to do, constituting negligence and gross negligence which caused damage to the estate including the unsecured creditors.

148.     In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented.

149.     A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core.

150.     Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure.

151.     Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. Mr. Daileader testified at his 2004 Exam as follows:

> Q. How did you value a settlement with the DOJ with regard to the value of Oaktree as to prospective buyers.
> A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

152.     Mr. Kibbey testified at his 2004 Exam as follows:

> Q. Did you ever value a settlement with the Department of Justice?
> A. I don't understand the question.
> Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency?
> A. Again, we didn't do any solvency analysis.

153.     Despite that, it may have been less Mr. Daileader and Huron's failure to develop a clear strategy that incorporated the issues raised by the effect of the USDOJ raids, and more a lack of internal discipline that caused OMC's downfall.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 8

RECEIVED NYSCEF: 02/01/2022

Case 19-03565-hb Doc 34 Filed 09/17/21 Entered 09/17/21 Page 35 of 35 Desc Main
Document    Page 35 of 51

154.    The minute Mr. Daileader, Huron, and McGuireWoods opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies.

155.    While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. Even though Mr. Daileader determined early on that prior management was the root of the Debtors' problems, neither he nor Huron acted to terminate any of the prior management until March 2019, and allowed these individuals to collectively earn at least $790,000 from their continued employment with the Debtors.

156.    In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

157.    What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, close the ones that weren't, and then try to do a workout, attempt to sell the business, or file Chapter 11 Bankruptcy.

158.    A Chapter 11 sale likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts contributed to fixed costs[16] of the entities throughout Huron's engagement. *See* Exhibit RR, infra.

159.    Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these

---

[16] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022
Case 19-01565-JMC-7A Doc 344 Filed 09/17/21 Entered 09/17/21 15:38:41 Desc Main
Document     Page 36 of 51

executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

160.    Instead, Mr. Daileader and Huron flip-flopped with how to handle the Debtors during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

161.    Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

162.    Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management.

163.    Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved.

164.    The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader supported the decision.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-01565-11-cw-0o044   Document 11721 Filed 09/17/21 Page 537 of 35 Desc Main
Document       Page 37 of 51

165.     Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. This are excerpts from his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.
>
> Later in the 2004 Exam:
>
> Q. My understanding is that there's a Huron Transaction Advisory, LLC and a Huron Business Advisory, LLC. Are you familiar with those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

166.     Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing).

167.     October or November of 2018, or earlier, was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank and Lenders willing to lend in order to get out of the hole they were in. Once the professional fees began, however, the $2 million was depleted and the interest payments to the Lenders stopped.

168.     Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors had the petitions been filed in November 2018, or earlier, rather than proposed in July 2019.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 19-23649-rmb Doc 44 Document 09/11/21 Filed 09/17 Page 38 of 38 Desc Main
Document      Page 38 of 51

169.    A competent CRO should have drawn the conclusion early in his involvement that there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the essence in a distressed situation and the CRO is required to act decisively and quickly. Stagnation and indecision only accelerate the crisis.  But yet, Mr. Kibbey testified in his 2004 Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in November 2018?
> A. I don't – I did not know enough to make a recommendation, at least, like I think I said earlier, you can always make recommendations – make a thoughtful recommendation as to what the course should be, whether it should be a Chapter 11 or Chapter 7 or an out-of-work. We did not know enough to make an intelligent professional recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

170.    By that rational, time was not of the essence as long as you have money; if the source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004 Exam testimony:

> Q. Was Huron able to establish a fully compliant and effective MSO?
> A. I would answer that question a little differently. Huron doesn't have the ability to do that by itself.
> Q. With whatever partners you need, was it able to do so?
> A. Can you repeat the question?
> Q. Yes. Was Huron and the other professionals able to establish a fully compliant and effective MSO?
> A. There was a plan in place. The plan was never fully executed.
> Q. Why not?
> A. Well, because part of that plan involved filing for a Chapter 11 as part of the corporate restructuring, and we were not able to get the financing filed for a Chapter 11, and the lenders requested that not only we do not file for Chapter 11, but that we wind down the operations. So at that point there was – it didn't make any sense to put any more time or effort into trying to create an MSO client organization, just to wind it down.
> Q. That was in the summer of 2019?

A. What is your question about?
Q. What you're talking about where the lenders asked you to wind it
down and wouldn't fund the Chapter 11 and the client MSO, that was
in the summer of 2019, right?
A. Correct.

171.    Mr. Daileader noted in his 2004 Exam testimony that "we produced a product,
and we produced the opportunity for it to be restructured, and ultimately the lenders denied the
funding."

172.    From Mr. Kibbey's 2004 Exam again:

Q. Did you ever come up with a strategy?
A. A strategy for what?
Q. For whatever it was you were supposed to do at Oaktree.
A. I don't know if I can answer that. I can't answer that question.
What I can say is over the course of the engagement we developed a
restructuring plan and with a budget and with a timeline and were in
the process of executing that plan.

173.    Upon information and belief, Mr. Daileader and Huron did not accomplish much
at all. It was all correspondence, talk, and spreadsheets.

174.    By mid-January, they were still discussing simply *getting together* to develop a
comprehensive game plan for an overall restructuring.[17]

175.    Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court
resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement
(hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end
of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k.

176.    Huron spent an embarrassing amount of time reviewing historical OMC
management emails, which was a "top priority" according to Mr. Freedlander.

177.    When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's
testified:

---

[17] A restructuring *proposal* was not presented until May 20, 2019.

39

Case 19-Case 19-cv-01044   Document 11/21 Filed 09/17/21 Page 39 of 39 Desc Main
Document      Page 40 of 51

> Q. So in your professional opinion, reviewing employee emails was important in this matter?
> A. In this matter it proved to be critical. You wanted to understand the real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what was really happening behind the scenes.

178.     However, understanding the situation was never achievable according to Mr. Kibbey:

> Q. So it sounds to me like you're talking about initially in November you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what point in time?
> A. I'm not sure we ever stopped trying to understand the situation.

179.     During his 2004 Exam, when Mr. Kibbey was asked what he thought they did accomplish, he testified as follows:

> Q. What measurable restructuring initiatives did you achieve during your engagement?
> A. I'm not sure what you're getting at. What I will – so maybe I'm not answering the question right. If I'm not, let me know. So the liability based on the proposed settlement with the Department of Justice that we later learned of that was on the table when we were engaged was 30 to $40 million. So as part of our discussions with the Department of Justice, that proposed settlement went down to 1 to 5 million. So the savings there are anywhere from 35 to – or I guess if you start at 30 million, right, it could be 25 to 39 million of savings just through that liability alone.

180.     The first and only measurable restructuring initiative they achieved, according to the CRO, was a potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had already testified that McGuireWoods was leading those negotiations.

181.     Mr. Kibbey did ultimately admit that expedience was important in his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 19-03563-hb Doc 34 Filed 09/17/21 Entered 09/17/21 13:28:41 Desc Main
Document    Page 41 of 51

fees that Oaktree was paying could not be sustained?
A. No. I think – I think in terms of a restructuring, I mean, that's often the case. A business isn't designed to pay professional fees for an indefinite length of time. And we never came to the conclusion that Oaktree could pay these fees for an indefinite length of time. It was how do you as quickly as you can effectuate a restructuring and transition the business and presumably the ownership.

182.    Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent. They should have known that the only way to save the company was an expedient Chapter 11.

183.    Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7, in an attempt to avoid liability.

184.    Plaintiff would show that Defendants negligently, recklessly, willfully, wantonly, and grossly negligently breached their duties to the unsecured creditors by, among other things, failing to:

    a.   understand their role;

    b.   develop a reasonable and actionable strategy;

    c.   get all of the interested parties to agree to a well-reasoned strategy; and

    d.   take timely and appropriate action in compliance with that role and strategy.

185.    As to McGuireWoods, Mark Freedlander, and David Pivnick, and in compliance with South Carolina Code Ann. § 15-36-100, the Affidavit of Michael M. Beal is attached hereto as **Exhibit RR**.

186.    At all relevant times, a client-lawyer relationship existed between the Debtor, on the one hand as client, and the Lawyers, on the other as professional attorneys.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 8
Case 19-01055-hb Doc 34 Entered 09/17/21 Filed 09/17/21 15:27:41 Desc Main
RECEIVED NYSCEF: 02/01/2022

Document    Page 42 of 51

187.    The scope of the Lawyers' representation of the Debtor was to provide legal services, counsel, advice, preparation, drafting, careful planning and review of ongoing facts and circumstances with a view toward providing benefit to those entities and individuals to whom the Lawyers owed a duty.

188.    The Lawyers owed professional duties initially to the Debtor but said professionals on cursory examination soon after their engagement knew or should have known of the Debtor's insolvency and at that point the Lawyers owed a duty to the creditors and to the Debtor to advise its officers and managers that in light of the Debtor's insolvency their duties had shifted to the Debtor's creditors, said duties of the Lawyers and other defendants were to adequately, timely and competently counsel, plan, advise, prepare and to be a good steward of estate funds and assets to the benefit and in the interest of the Debtor's creditors.

189.    The Lawyers breached their professional duties to the Debtor and its creditors by failing to adequately, timely and competently provide legal services, counsel, advice, planning, and preparation with a view toward maximizing the value of the Debtor's assets and minimizing to the extent possible the expansion of future debt without realistic benefit to those to whom the Lawyers owed a duty of professional care.

190.    The Lawyers failed to meet the minimum standard of care thereby breaching professional duties to the Debtor and creditors in other ways and by such other particulars as the evidence developed during discovery in this case may demonstrate.

191.    As a direct and proximate result of Defendants' negligent, reckless, willful, wanton, and grossly negligent acts, omissions and/or delicts as enumerated hereinabove, Plaintiff, on behalf of the unsecured creditors, was seriously damaged. Therefore, in accordance

with *Plowman*, supra, Plaintiff requests judgment against all Defendants for actual and punitive damages with interest thereon.

**FOURTH CAUSE OF ACTION**
**Violation of the South Carolina Unfair Trade Practices Act ("UTPA"),**
**S.C. Code Ann. § 39-5-10 *et seq*. as to All Defendants**

192.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

193.     Defendants committed unfair and deceptive acts or practices by, among other things, marketing themselves as professional restructuring consultants, taking over control of a business, putting their interests above the shareholders and unsecured creditors, and negligently liquidating the business, all in violation of their respective duties and applicable law.

194.     Defendants' conduct has had a direct and specific adverse impact on the public interest, namely, to negatively impact a company's ability to hire competent restructuring professionals that will look out for the company's best interests, and to negatively impact a creditor's ability to ensure that a restructuring professional at the helm of an insolvent company looks out for the creditor's best interests.

195.     As a direct and proximate result of Defendants' misconduct, Plaintiff, on behalf of the unsecured creditors, has suffered monetary loss.

196.     Directors and officers are individually liable for the corporation's unfair trade practices when "they personally commit, participate in, direct, or authorize the commission of a violation of the UTPA." *Plowman* at 286, 38.

197.     Accordingly, Plaintiff is entitled to recover from all of the Defendants the actual damages to the unsecured creditors resulting from the Defendants' unfair and deceptive acts,

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-03551-hb Doc 34 Entered 09/17/21 Filed 09/17/21 Page 44 of 38 Desc Main
Document    Page 44 of 51

along with punitive damages up to three times the actual damages amount, and his attorneys' fees and costs in pursuing this action.

### FIFTH CAUSE OF ACTION
**Fraud as to Mr. Daileader and Mr. Kibbey**

198.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

199.    Defendants Mr. Daileader and Mr. Kibbey, in their capacities as a director and officer of the Debtors, owed a duty to disclose to the Debtors that they did not have the requisite experience to both restructure a health care company and to do so in compliance with both federal and South Carolina law.

200.    They misled the Debtors into believing that they were capable of performing these services, while knowing that the representations were false or while recklessly disregarding the truth and falsity thereof and intending that the Debtors would rely upon these representations to utilize their services.

201.    These misrepresentations by Defendants were material to the Debtors' decision to utilize Defendants' services.

202.    As a proximate result of justifiably relying upon Mr. Daileader and Mr. Kibbey's misrepresentations, the Plaintiff, on behalf of the unsecured creditors, was injured.

203.    Based upon the foregoing, the Plaintiff is entitled to judgment against Mr. Daileader and Mr. Kibbey and to an award of compensatory and punitive damages in an amount to be determined by the jury, with interest thereon.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8

INDEX NO. 650484/2022

RECEIVED NYSCEF: 02/01/2022

Case 19-01565-LA2 Doc 134 Filed 09/17/21 Entered 09/17/21 Filed 45 of 38 Desc Main
Document      Page 45 of 51

## SIXTH CAUSE OF ACTION
### Civil Conspiracy as to All Defendants

204.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

205.    Defendants, by and between themselves, conspired to interfere with, delay, hinder, and/or prevent the Debtors' creditors from collecting debts the creditors were properly entitled to collect in order to pay the Defendants' own fees.

206.    As a proximate result of the Defendants' conspiracy against the Plaintiff, on behalf of the unsecured creditors, the Plaintiff has incurred damages.

207.    The Plaintiff is also entitled to an appropriate award of punitive damages due to the conspiracy undertaken by the Defendants.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment as to Mr. Daileader, Huron, and McGuireWoods

208.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

209.    Through their negligent acts as detailed herein, Defendants Mr. Daileader, as Independent Director, and Huron, for their own benefit, utilized the Debtors' profits to pay themselves.

210.    It would be unjust to the creditors to allow Defendants to retain those ill-gotten gains.

211.    Accordingly, as a result of the foregoing, Plaintiff is entitled to recover the damages proximately resulting from Defendants' actions, including the amount of all valid unsecured claims, in addition to being entitled to recovery of punitive damages for Defendants' willful and wanton actions.

Case 19-01565-JMC-7A Doc 34 Filed 11/17/21 Entered 11/17/21 15:27:31 Desc Main
Document    Page 46 of 51

### EIGHTH CAUSE OF ACTION
### Bankruptcy Code Section 548(a)(1)(A) (Actual Fraud) as to All Defendants

212.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

213.    During their tenure in control of the Debtors, Defendants paid out over $4 million in professional fees to themselves and those they utilized to perpetrate their fraud (the "Transfers").

214.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

215.    Upon information and belief, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors.

216.    Upon information and belief, such actual intent is evidenced by, among other things, a misrepresentation of their competence and experience, a fundamental misunderstanding to their duties, and putting paying their fees above the interests of any others.

217.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

218.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

### NINTH CAUSE OF ACTION
### Bankruptcy Code Section 548(a)(1)(B) (Constructive Fraud) as to All Defendants

219.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-01455-mg Doc 34 Filed 09/17/21 Entered 09/17/21 15:27:41 Desc Main
Document Page 47 of 51

220.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

221.    Upon information and belief, the Defendants are the transferees of property of the Debtors.

222.    The Debtors received no or less than reasonably equivalent value in connection with the Transfers which were made to or for the benefit of Defendants, and which were transferred by the Debtors within two years before the Petition Date.

223.    At the time of the Transfers, the Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction or was about to engage in a business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur or believed or reasonably should have believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

224.    Because of the foregoing, the Transfers may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Transfers may be recovered from the Defendants as the initial transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

225.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

226.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022
Case 19-01565-11-c Doc 34 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document    Page 48 of 51

### TENTH CAUSE OF ACTION
### Bankruptcy Code Section 547 (Preferences) as to All Defendants

227.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

228.    The professional fees paid to the Defendants in the one year prior to the Petition Date were made to the Defendants for or on account of an antecedent debt by the Debtors to the Defendants and Plaintiff is informed and believes that the Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547 of the United States Bankruptcy Code.

229.    At the time of the Transfers, the Debtors were insolvent and Defendants were insiders.

230.    The payments referred to in the proceeding paragraphs enabled the Defendants to receive more than they would have received under Chapter 7 of the Bankruptcy Code if the Transfers had not been made.

231.    By reason of the forgoing, Defendants are liable to Plaintiff in the full amount of the professional fees paid to them.

### ELEVENTH CAUSE OF ACTION
### Bankruptcy Code Section 329 as to McGuireWoods (Unreasonable Compensation)

232.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

233.    McGuireWoods was paid in excess of $1.4 million from August 2018 to September 2019. McGuireWoods was engaged to assist Oaktree in a financial restructuring which would be accomplished through a sale or refinancing.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022

NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022

Case 19-01565-JMC-7A Doc 54 Filed 09/17/21 Entered 09/17/21 15:28:41 Desc Main
Document Page 49 of 51

234.    The Debtors failed in every respect in these endeavors and ultimately filed Chapter 7 with substantially more debt and substantially less assets than when McGuireWoods was initially engaged.

235.    The fees paid to McGuireWoods far exceeded the reasonable value of any such services.

236.    By reason of the forgoing, McGuireWoods is liable to Plaintiff in the full amount of the professional fees paid to it.

<u>TWELFTH CAUSE OF ACTION</u><br>
<strong>Bankruptcy Code Section 550 (Recovery of Avoided Transfers)</strong>

237.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

238.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the value of the property transferred for the benefit of the Estates to the extent the Transfers are avoided pursuant to, among other sections, Sections 329, 544, 547, and 548 of the Bankruptcy Code.

239.    Under Section 550(a)(1) of the Bankruptcy Code, Plaintiff may recover from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

240.    The Defendants are the initial transferees or entities for whose benefit the Transfers were made.

241.    Plaintiff prays that the Court issue an order against the Defendants, ordering recovery by Plaintiff for the benefit of Debtors' Estates the value of the property transferred with respect to any transfers avoided under this Complaint pursuant to 11 U.S.C. § 550 to the extent the Defendants are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees.

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
NYSCEF DOC. NO. 8
INDEX NO. 650484/2022
RECEIVED NYSCEF: 02/01/2022

Case 19-01553-tmd Doc 34 Filed 09/17/21 Entered 09/17/21 Page 50 of 51 Desc Main
Document    Page 50 of 51

## <u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests and prays that this Court enter judgment in his favor and against Defendant, and award the following relief:

a.  An order granting actual, general, compensatory, incidental, and consequential damages in an amount to be determined at trial;

b.  An order granting exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

c.  An order granting treble damages for Defendants' violation of the UTPA;

d.  An order granting judgment for Plaintiff and voiding the Transfers from the Debtors to Defendants found to be fraudulent pursuant to 11 U.S.C. § 548, and/or preferences pursuant to 11 U.S.C. § 547, and pursuant to 11 U.S.C. § 550;

e.  An order granting judgment for Plaintiff and voiding the fees paid from the Debtors to Defendant McGuireWoods found to be unreasonable pursuant to 11 U.S.C. § 329;

f.  An order granting judgment for Plaintiff and ordering recovery of the value of the property transferred to the Defendants pursuant to 11 U.S.C. § 550 to the extent they are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees;

g.  Pre-judgment interest;

h.  Post-judgment interest;

i.  An order awarding Plaintiff the costs of this suit; and

j.  For such other and further relief as this Court deems just and equitable.

(Signature page follows)

FILED: NEW YORK COUNTY CLERK 02/01/2022 10:11 AM
INDEX NO. 650484/2022
NYSCEF DOC. NO. 8
RECEIVED NYSCEF: 02/01/2022
Case 19-0c0c71-b2-cv0c0c44  Doc 09/17/21 Filed 09/17/21 Page 51 of 38 Desc Main
Document      Page 51 of 51

/s/Joshua J. Hudson
Joshua J. Hudson, Fed. ID No. 11620
Joseph O. Smith, Fed. ID No. 10551
jhudson@smithhudsonlaw.com
Smith Hudson Law, LLC
200 N. Main St., Suite 301-C
Greenville, SC 29601
(864) 908-3914

Warren C. Powell, Jr., Fed ID No. 3138
Benjamin C. Bruner, Fed ID No. 10625
Chelsea J. Clark, Fed ID No. 12730
Bruner Powell Wall & Mullins, LLC
PO Box 61110
Columbia, SC 29260
(803) 252-7693
*Attorneys for Trustee/Plaintiff*

Greenville, South Carolina
September 17, 2021